UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEFANY CRUZ AND MARISOL ORDONEZ VARGAS,<br><br>          Plaintiffs,<br><br>    -against-<br><br>ORANGE COUNTY (New York); WELLPATH, LLC; NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, PC; MATTHEW J. DUNDON, Trustee of Wellpath Holdings, Inc. Liquidating Trust; WELLPATH NY LLC; YESCARE CORP; JOSEPH PATRICK HARKINS; TENESHIA WASHINGTON, RN; JILLIAN M. BARONE, RN; MANDI LEE ZACCAGNINO, NP; DOMINICK PIACENTE; AND DOE DEFENDANTS 1-4,<br><br>          Defendants. | Case No.: 25-cv-00064<br><br>SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

**Deleted:** FIRST

**Deleted:** (formerly known as CORRECT CARE SOLUTIONS MEDICAL SERVICES PC and/or …

**Deleted:** )

Plaintiffs STEFANY CRUZ and MARISOL ORDONEZ VARGAS,[1] by and through their undersigned counsel, complaining of the Defendants, allege, upon information and belief and personal knowledge:

**NATURE OF THE CASE**

1.  Plaintiffs bring this action for damages for personal injury and pain and suffering they suffered while detained at the Orange County Correctional Facility ("OCCF") in Orange County, New York.

---

[1] Ms. Ordonez Vargas is a transgender person. Her name on her birth certificate is Oswaldo Jose Ordonez Vargas. Her correct name, used here, is Marisol Ordonez Vargas.

1

2. Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 and New York State Law against Orange County and its employees, agents, and servants, including but not limited to various correction officers and medical professionals, and against other named individuals.

### JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

3. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

4. The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper under 28 U.S.C. § 1402(b) in the District Court for the Southern District of New York, because the acts and omissions giving rise to Plaintiffs' claims occurred within the Southern District of New York.

6. On January 2, 2024, Plaintiff Ordonez Vargas filed a notice of claim with Defendant Orange County.

7. Plaintiff Ordonez Vargas appeared for her 50-H hearing on May 29, 2024.

8. More than thirty days have elapsed since Plaintiff Ordonez Vargas served a Notice of Claim and Orange County has not offered adjustment or payment thereof.

9. On July 25, 2025, Plaintiff Cruz filed a notice of claim with Defendant Orange County. A petition to deem this notice of claim as timely filed is pending in the Supreme Court, County of Orange, Index no. EF007296-2025 (Honorable Judge E. Loren Williams presiding).

10. Accordingly, Plaintiff Ordonez Vargas has complied with all statutory jurisdictional requirements and conditions precedent to commencement and prosecution of this litigation.

**Deleted:** (Honorable Judge E. Loren Williams presiding)

11. Both Plaintiffs initiated this action within one year and ninety days of the accrual of their respective claims.

**PARTIES**

12. Plaintiff Stefany Cruz has been, at all times relevant to this action, a resident of Orange County in the State of New York.

13. Plaintiff Marisol Ordonez Vargas has been, at all times relevant to this action, a resident of Bronx County in the State of New York.

14. Defendant Orange County is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omission of Defendants' agents or employees, who were acting within the scope of their office or employment as correctional and/or law enforcement agents of Orange County.

15. Defendant Wellpath LLC, is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omission of Defendants' agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility. Defendant Wellpath LLC is one of the U.S.'s largest for-profit health care providers for prisoners. Defendant Wellpath LLC has many professional corporations, subsidiaries, and other related corporations, including New York Correct Care Solutions Medical Services, P.C. ("NY Correct Care") and Wellpath NY LLC.

16. Upon information and belief, Wellpath LLC and the related corporations (including "NY Correct Care" and Wellpath NY LLC operate under the same policies and procedures for medical treatment of people in prison.

| | |
|---|---|
| **Deleted:** | (formerly known as Correct Care Solutions Medical Services, P.C. and/or New York Correct Care Solutions Medical Services, P.C. ("NY Correct Care")), |

17. Defendant MATTHEW J. DUNDON is the Trustee of Wellpath Holdings, Inc.'s Liquidating Trust and is responsible for liquidating claims for which Wellpath LLC is found liable.[2]

18. Defendant Wellpath NY LLC was a limited liability company and private business doing business in the state of New York as Wellpath NY.

19. Defendant New York Correct Care Solutions Medical Services, P.C. ("NY Correct Care") is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omission of Defendants' agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility.

20. Defendant YesCare Corp. ("YesCare"), formally Corizon Health, is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omission of Defendants' agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility.

21. Defendant NY Correct Care contracted with Orange County for the purpose of providing medical care and treatment for OCCF inmates and detainees until December 31, 2024.

22. Defendant YesCare is presently contracted with Orange County for the purpose of providing medical care and treatment for OCCF inmates and detainees, as of January 1, 2025.

23. At all times hereinafter mentioned, Defendants Joseph Patrick Harkins; Teneshia Washington, RN; Jillian M Barone, RN; Mandi Lee Zaccagnino, NP; and Dominick Piacente worked at OCCF.

---

[2] On June 6, 2025, the United States Bankruptcy Court for the Southern District of Texas entered an order instructing individuals with personal injury and wrongful death claims against Wellpath to include the Liquidating Trust as a nominal party when seeking determinations of Wellpath's liability in civil court. *See In re: WELLPATH HOLDINGS, INC., et al.*, No. 24-90533 (Bankr. S.D. Tex.), Docket No. 2907 at 2.

4

24. At all times hereinafter mentioned, Doe Corrections Defendants 1-3 were people employed by Orange County as members of the Department of Corrections.

25. At all times hereinafter mentioned, Doe Medical Defendant 4 worked at OCCF.

26. Each individual Defendant is sued in her or his individual and official capacities. Medical care providers, employees and agents, employed by a governmental entity are state actors for 42 U.S.C. § 1983 purposes acting under color of law when treating inmates and/or implementing policies and practices regarding provision of medical care. *West v. Atkins*, 487 U.S. 42, 54 (1988).

27. Private managers, executives, owners, directors, board members, supervisors employed to direct the delivery of medical care to inmates are state actors acting under color of law for purposes of § 1983. *Id.*

28. A municipality cannot delegate its constitutional duties to provide adequate medical care.

**FACTUAL ALLEGATIONS**

**Facts Specific to Plaintiff Stefany Cruz's Treatment.**

29. In October 2014, Plaintiff was diagnosed with lupus and deep vein thrombosis resulting in a blood clotting disorder.

30. At that time, she began taking a blood thinner to treat the blood clotting disorder.

31. In the years thereafter, she took various types of blood thinners.

32. She has taken blood thinners every day since receiving the diagnoses, with the exception of the period of time while she was incarcerated at OCCF.

33. Because of her condition, she has a history of blood clots.

34. She remains prone to clotting.

35. On October 10, 2024, she was incarcerated at OCCF.

36. While incarcerated at OCCF, she began experiencing a lupus flare-up.

37. This was the worst flare-up she's experienced to date.

38. While undergoing intake procedures at OCCF on October 10, 2024, she informed OCCF officials that she has lupus and was taking Warfarin, a blood thinner, and was actively seeking treatment from a rheumatologist.

39. After she completed intake and informed the nurse of her condition and medication, she did not receive her medication for another five days although she learned that OCCF had an alternative blood thinner in stock.

40. In the days after intake, however, she was not given any explanation for not receiving the medication, despite asking OCCF officials every day about it.

41. Instead of providing her with the requested and necessary blood thinners, OCCF officials gave her an anti-cortisone and steroid cream.

42. It wasn't until four or five days after intake that the doctor assigned to Plaintiff, Dr. Dominick Piacente, informed her that he forgot to submit the order for her medication.

43. Subsequently, the prescription for the medication was submitted by Dr. Piacente on October 15, 2024, at 4:43 P.M.

44. On October 16, 2024, one day after the prescription was ordered, she received and began taking the blood thinner.

45. Between October and December 2024 while in OCCF custody, however, Plaintiff experienced a severe flare-up that included hives and skin rashes.

6

46. She eventually had an intake meeting with an outpatient rheumatologist on December 18, 2024, at which time the rheumatologist attempted to do lab work with her at the outpatient facility but was unable to due to her dehydration.

47. Accordingly, she had to do the lab work at OCCF later that same day and then had to redo the lab work over one month later, on January 27, 2025, because OCCF did not provide her or the outpatient doctor with the December 18, 2024, results.

48. Her outpatient doctor on December 18, 2024, also prescribed her a medication to control her lupus symptoms and flare-ups, which she didn't receive until January 29, 2025, while she was at OCCF.

49. The outpatient doctor noted at her appointment that she was not initially prescribed such medication by OCCF.

50. Plaintiff returned to the outpatient rheumatologist on March 3, 2025, at which time the rheumatologist confirmed receiving the results from the January 27, 2025 lab work.

51. That lab work showed abnormally high protein creatinine levels in Plaintiff Cruz's urine.

52. This was indicative of Plaintiff Cruz's kidneys not functioning properly.

53. Accordingly, the rheumatologist sent Plaintiff Cruz to the emergency room and recommended an intravenous steroid treatment and kidney biopsy.

54. When she returned to OCCF after the emergency room visit and informed the OCCF doctor what happened, the doctor eventually told her that OCCF would arrange for her to be seen by a nephrologist.

55. OCCF never arranged that nephrologist appointment.

56. On April 11, 2025, Plaintiff Cruz was released from OCCF.

7

57. Upon release, OCCF did not provide her with an adequate amount of blood thinners in accordance with OCCF policy per Plaintiff Cruz's recollection of such policy.

58. Upon release, Plaintiff Cruz was taking approximately 5 or 6mg per tablet of blood thinners, but OCCF only gave Plaintiff 30 tablets total at 1mg each.

59. Approximately one month later, on May 5, 2025, she was seen by another rheumatologist.

60. The urine test Plaintiff Cruz completed on this date with the new rheumatologist indicated a protein creatinine level in her urine approximately five times higher than the earlier urine test.

61. On May 28, 2025, Plaintiff Cruz underwent a kidney biopsy at which time she was diagnosed with lupus nephritis.

62. Lupus nephritis is a more severe version of the lupus with which Plaintiff Cruz was previously diagnosed.

63. Plaintiff Cruz also developed scarring on her arms due to the severe flare-up she experienced while incarcerated.

64. Because of this incident, Plaintiff Cruz's resulting injuries, and the multiple weekly appointments with a rheumatologist and a nephrologist, she has been unable to maintain employment.

65. Because of Plaintiff's ongoing appointments, medical procedures, and participation in a clinical trial to attempt to remove the lupus nephritis from Plaintiff's kidneys, she has not been able to continue receiving mental health treatment.

66. Furthermore, in addition to the immense physical pain, skin rashes, hives, permanent scarring, kidney damage, and eventual diagnosis of lupus nephritis, Plaintiff also experienced

severe emotional distress due to OCCF's inadequate care and failure to provide her with the medication necessary to treat her lupus.

**Facts Specific to Plaintiff Ordonez Vargas's Treatment.**

67. Plaintiff emigrated to the United State in September of 2022 to Houston, TX. She then moved to New York. In both Houston and New York, Ms. Ordonez Vargas had been regularly checking in and attending her ICE appointments as requested.

68. On October 4, 2023, Ms. Ordonez Vargas received an email notification from ICE requesting her to appear at Federal Plaza in New York.

69. On October 5, 2023, Ms. Ordonez Vargas reported to Federal Plaza.

70. On October 5, 2023, ICE detained Plaintiff and transferred her to OCCF in Goshen, New York.

71. Plaintiff was scheduled to have surgery on her fractured nose from a recent car accident on October 5, 2023, and she had documentation with her proving this when she was detained.

72. Plaintiff told the ICE employees who detained her and transferred her to OCCF that her nose was in pain and that she was scheduled to have surgery that day.

73. Lakeena T. Lloyd, a registered nurse, examined Plaintiff in ICE custody on October 5, 2023, and noted that Plaintiff had a fractured nose and was scheduled for surgery that day.

74. Throughout Plaintiff's time at OCCF, the staff provided wholly inadequate treatment for her fractured nose, causing severe pain and mental distress including but not limited to bleeding, difficulty breathing, and anxiety.

75. OCCF staff refused to provide Plaintiff with the medication or treatment which she needed and did not take her health concerns seriously. Additionally, they placed her in solitary confinement without proper justification.

9

76.  Plaintiff speaks Spanish and does not speak English. Throughout Plaintiff's time at OCCF, OCCF repeatedly failed to make available employees who speak Spanish or translators.

77.  Upon arrival at OCCF, Plaintiff informed approximately ten staff members that Plaintiff had a headache and nose pain due to her broken nose, and that she was supposed to have surgery that day.

78.  Medical Doe 4, a medical professional, believed to be a nurse and a Black man, told Plaintiff a specialist would examine her, but this never happened.

79.  Defendant Joseph Patrick Harkins, who could be Medical Doe 4, e-signed a Suicide Watch Initial Assessment for Mental Health, which led to Plaintiff's placement in solitary confinement.

80.  Defendant Harkins does not speak Spanish, and the tele-method of interpretation made it such that Defendant Harkins could not understand Plaintiff's answers to his questions. Defendant Harkins noted in the Suicide Watch Initial Assessment for Mental Health that he could not understand Plaintiff's answers and noted the language barrier.  Despite this, Defendant Harkins e-signed a form recommending that Plaintiff be placed in solitary confinement, because Defendant Harkins stated that Plaintiff had a prior suicide attempt.

81.  Plaintiff has not attempted to commit suicide in the past and did not state that she had attempted suicide in the past.

82.  A different Commission of Correction Suicide Prevention Screening stated that Plaintiff did not have a prior suicide attempt.

83.  Despite this, Defendants then placed Plaintiff in solitary confinement where her nose continued to bleed and where she did not receive any treatment.

84.  As a result of her broken nose, Plaintiff had trouble breathing.

10

85.  Plaintiff repeatedly informed the guards outside of her cell, Defendant Corrections Does 1-3, that her nose was bleeding and in extreme pain, but Defendants provided no medical treatment for her.

86.  Plaintiff was in solitary confinement for a week during which Defendants refused to provide adequate medical treatment.

87.  While in solitary confinement, Defendant Corrections Doe 1-3 and other OCCF staff threw trays of food on the ground in her cell. She had to sleep on the floor in isolation, with no sheets. She was not given any privacy when using the bathroom, despite asking. In the cell, there was no toilet paper. She was not permitted to shower until she was removed from solitary confinement, and she was prohibited from making calls for several days into her detainment.

88.  Defendant Corrections Doe 1-3 and other OCCF staff told Plaintiff that there was no doctor available.

89.  Defendant Corrections Doe 1-3 and other OCCF staff told Plaintiff that they did not speak Spanish and could not understand her pleas for medical treatment. Upon information and belief, they did not attempt to find a staff member who spoke Spanish or a translator.

90.  After Plaintiff was transferred to the general population, she was finally able to request a visit with a medical provider.

91.  Plaintiff saw Defendants Teneshia Washington, RN; Jillian M Barone, RN; Mandi Lee Zaccagnino, NP; and Dominick Piacente, Provider, who all confirmed that she had a fractured nose, but all either provided no medical care or only administered ibuprofen.

92.  An X-ray taken on October 12, 2023 at OCCF confirmed that Plaintiff's nose was fractured.

11

93. NYU Langone faxed records to OCCF confirming that Plaintiff was in pain and had surgery scheduled for October 5, 2023.

94. Despite Plaintiff's confirmed nasal fracture; confirmed appointment for surgery; and that she repeatedly requested medical help because she could not breathe, her nose was bleeding, and she was in immense pain that the ibuprofen was not helping, Defendants did not provide any medical treatment besides ibuprofen.

95. Defendants released Plaintiff from custody on November 9, 2023.

96. Because Defendants failed to treat Plaintiff's fractured nose while she was in OCCF, her nose healed before it could be realigned or otherwise treated, leading to ongoing (and likely permanent) difficulty breathing and pain.

97. Plaintiff's nose will likely need to be re-broken before she can receive appropriate treatment.

**Orange County's Contract with Correct Care NY.**

98. Defendants Orange County and Correct Care NY[5] have a pattern of failing to ensure that adequate intake screening and health assessments are provided.

99. Defendants Orange County and Correct Care NY have a pattern of failing to develop and implement appropriate medical screening instruments that identify observable and non-observable medical needs, including chronic diseases.

100. Defendants Orange County and Correct Care NY have a pattern of failing to ensure timely access to a physician when patients present symptoms requiring such care.

_____

[5] For this and the following allegations, the same applies to Wellpath and the related entities.

101. Defendants Orange County and Correct Care NY have a pattern of failing to ensure inmates have access to adequate health care, including by failing to ensure that the medical request process for inmates adequately meets inmates' needs. The medical request process should include adequate logging, tracking, and timely responses by medical staff.

102. Defendants Orange County and Correct Care NY did not understand the New York health services market well enough to provide quality care to OCCF inmates and detainees.

103. A report issued by the Project on Government Oversight indicated Wellpath's predecessor CCS had been sued 1,395 times in federal court as of September 12, 2019.

104. Investigative reports published by CNN[6] and The Atlantic[7] in 2019 detail the denial of adequate medical care, lack of medical care options, and other life-threatening inadequacies in the medical care provided by Wellpath and its predecessor entity in jails throughout the United States.

105. The CNN report cited "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [Wellpath][8] has provided substandard care that has led to deaths and other serious outcomes that could have been avoided."[9]

---

[6] Blake Ellis & Melanie Hicken, *CNN investigation exposes preventable deaths and dangerous care that government agencies have failed to stop*, CNN (June 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.
[7] Marsha McLeod, *THE PRIVATE OPTION*, The Atlantic (Sept. 12, 2019), https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/.
[8] The report details care provided by Wellpath's predecessor entity, Correct Care Solutions (CCS), and notes that CCS was renamed Wellpath after it was acquired by a private equity firm. In this section and for the sake of consistency, Wellpath is named instead of CCS.
[9] Ellis & Hicken, *supra* note 6.

13

106. The CNN report went on to state:[10]

i.     "Across the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. [Wellpath] employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."

ii.    "A review of lawsuits filed over the last five years found the company has been sued for more than 70 deaths. In other lawsuits over that time period, inmates have alleged prolonged suffering, ongoing complications, shortened life expectancy and debt."

iii.   Among the instances of inmates being denied adequate medical care are Henry Clay Stewart and Jeff Lillis who both died after not receiving adequate medical care from the company while incarcerated. "Doctors who examined records from around a dozen deaths and other incidents for CNN said they believed that in the majority of the cases they reviewed, serious outcomes could have been avoided and inmates including Stewart and Lillis could have lived had [Wellpath] provided proper care."

iv.    "In December [2018], the US Department of Justice took the rare step of declaring the medical program at a Virginia jail unconstitutional. It found that inmate requests at the Hampton Roads Regional Jail were ignored or otherwise not taken seriously, resulting in serious harm and death."

---

[10] *Id.*

14

107. Directly referencing and implicating the pattern, practice, policy and/or custom of Wellpath, the CNN report stated, "In a deposition in a South Carolina lawsuit, a medical director [for the company] . . . said in 2014 that the company made it clear that employees who 'run up the tab' wouldn't be around very long. He said there was pressure on him from both the county and [Wellpath] to limit emergency room transfers because of the 'severe expense' involved -- regardless of who had to foot the bill."

108. Further evidence of this pattern, practice, policy and/or custom of prioritizing profit by denying medical care was another employee interviewed by CNN, "[W]ho said she started working for [a county jail] facility more than a decade ago when the county ran the medical unit, said that after [the company] took over she repeatedly made it clear to her supervisors and a county official that she believed inmates were at risk. Medical decisions and staffing were being driven by an 'obsession with profit,' she said."

109. Upon information and belief, Defendant Orange County knew or should have known about Wellpath and Correct Care NY's long pattern and practice of failures to provide medical care.

**Orange County's Pattern and Practice of Inadequate Medical Treatment**

110. Defendant Orange County has an extensive, well-documented history of failing to provide adequate medical care to individuals in its custody while those individuals are incarcerated at OCCF.

111. In particular, Defendant Orange County maintains a practice of: (1) refusing to assess and evaluate individuals to determine if they need medical care; (2) delaying the provision of medical care; and (3) ignoring complaints and requests for treatment and care.

15

112. In 2024, the New York State Commission on Correction investigated two deaths at OCCF and identified "a lack of adequate medical care" at the jail as a contributing factor. The incidents included the deaths of Troy Conklin, who died by suicide and whose "risk for suicide was not fully recognized" by the jail and Ricky Mack, who died from a combination of health-related issues and suffered from "gross failures in the medical assessments and treatment of Mack during his incarceration that were contributory to his death." Regarding the inadequate medical treatment, Orange County Attorney Rick Golden conceded that the "failures noted by the commission were significant[.]"[11]

113. In 2023, the New York Civil Liberties Union observed that the "regular abuse, exploitation, and inadequate medical care that immigrants face while trapped in jail are particularly abhorrent at Orange County Jail[,]" including ICE and local law enforcement denying basic medical care to the people incarcerated there."[12]

114. In 2022, after a tour of OCCF, New York City Council members and advocates raised concerns about "inadequate medical care and insufficient language services at" OCCF. One Council member described the conditions at the facility—such as OCCF making individuals wait seven days to get tested for Covid—as "medical negligence [that] is egregious, [] profoundly unacceptable, [and] disrespectful."[13]

115. In 2022, a coalition of organizations—Catholic Charities Community Services – Archdiocese of New York, Envision Freedom Fund, For the Many, Freedom for Immigrants,

---

[11] Lana Bellamy, *Orange County continues to use controversial medical provider at jail as it prepares new request for proposals*, Times Union (Apr. 16, 2024), https://www.timesunion.com/hudsonvalley/news/article/orange-county-jail-wellpath-correct-care-19403303.php.
[12] New York Civil Lib. Union, *New York Jails are Conspiring with ICE to Abuse Immigrants* (May 2, 2023), https://www.nyclu.org/commentary/new-york-jails-are-conspiring-ice-abuse-immigrants.
[13] Giulia McDonnell Nieto del Rio & Fisayo Okare, *Advocates Raise Concerns About Orange County Jail After Rare Tour*, Documented (May 17, 2022), https://documentedny.com/2022/05/17/orange-county-jail-covid-ny/.

New York Lawyers for the Public Interest, and New York University Law Immigrant Rights

Clinic—submitted a civil rights complaint to the U.S. Department of Homeland Security

alleging, among other issues, medical neglect, abuse, and retaliatory withholding of care at

OCCF. The complaint alleges the following:

> Detained people are regularly "ignored." Medical staff often take days, at times weeks, to respond to requests for medical attention. People have to submit "four or five sick calls" to get the attention of staff, and "go without medication for two or three weeks" due to gaps in prescription refills. Not only do sick calls and medication requests generally go unanswered, but OCCF also fails to give detained people copies of their requests, making it harder for them to keep a record of the number of times they have asked for help.

> Evidence shows that even when provided, medical treatment at OCCF is negligent and dehumanizing. Critical medical information is not communicated in the individual's preferred language, and interpreters are reportedly not used during appointments. Painkillers regularly substitute for actual care, even when medically inappropriate or inadequate. One person's medical records revealed that despite measurements of elevated liver enzymes indicative of liver disease, OCCF failed to conduct any additional testing, leaving the individual at risk of chronic liver damage.[14]

116. In 2022, The Legal Aid Society, Brooklyn Defender Services, and The Bronx

Defenders condemned OCCF's failure to protect individuals who were detained during a

widespread Covid-19 outbreak. The organizations specified "that people at Orange County

Correctional Facility are denied adequate medical care while the coronavirus is surging within

the walls of the detention facility." Jose Luis, who was incarcerated at OCCF at the time, stated

---

[14] Complaint submitted to the U.S. Department of Homeland Security, *Racist and Retaliatory Abuse, Violence, and Medical Neglect Endured by Individuals Detained at Orange County Correctional Facility*, (Feb. 17, 2022), available at https://www.law.nyu.edu/sites/default/files/OCCF%20Multi-Organization%20DHS%20CRCL%20Complaint%20and%20Index_2%2017%202022.pdf; Chris McKenna, *A moneymaker for years, Orange County jail ICE detention faces glare after complaints*, Times Herald-Record (Mar. 22, 2022), https://www.recordonline.com/story/news/local/2022/03/22/immigrants-held-orange-county-ny-jail-ice-blast-their-conditions/9430863002/ ("[The complaints] claimed the jail food is inedible, the medical care slow and indifferent."); Chris McKenna, *ICE moved 65 detained immigrants from Orange County jail to Mississippi and Buffalo*, Times Herald-Record (Aug. 3, 2022), https://www.recordonline.com/story/news/local/2022/08/03/ice-moves-detained-immigrants-orange-county-correctional-facility-to-mississippi-buffalo/65389710007/ ("The complaints about jail conditions earlier this year included allegations of barely edible food, indifferent medical care and frequent use of solitary confinement as punishment for trivial offenses.").

that he and others at the facility were "waiting so long for medical care" leading him to "becoming weaker by the day." Members of the New York State Assembly described "alarming" conditions at OCCF including OCCF's "failure to properly implement health and safety protocols [which] puts incarcerated individuals and staff at risk."[15]

117. Between 2015 and 2016, an individual identified as Luke R. was incarcerated by ICE at OCCF, at which time the facility knew about his schizophrenia and the medications he had been taking. OCCF, however, failed to treat Luke's condition during his detention, according to a report released by Human Rights Watch and Community Initiatives for Visiting Immigrants in Confinement. The report—which includes analyses by doctors who reviewed relevant medical records—described the care Luke received at OCCF as "abysmal." It indicates that OCCF medical officials gave Luke the wrong medication and did not provide him with necessary therapy. In addition, OCCF officials placed Luke in solitary confinement where he banged his head against a glass window, breaking it and causing a "large laceration" on his forehead. When OCCF officials first responded to the incident, they did not stop the bleeding or assess Luke. Instead, they placed him in restraints and recorded the incident while Luke waited an additional six minutes to be assessed by medical professionals. The report describes this delay in care as "a red flag" that "could be life or death."[16]

---

[15] Press Release, The Legal Aid Soc'y, Brooklyn Def. Servs., The Bronx Defs., *NYIFUP Statement on Client Reports of a Widespread COVID-19 Outbreak in New York Jail Impacting Immigrants in ICE Detention* (Jan. 27, 2022), https://legalaidnyc.org/wp-content/uploads/2022/01/NYIFUP-Statement-on-COVID-19-Outbreak-at-Orange_ICE-Detention.pdf.

[16] Human Rights Watch & Community Initiatives for Visiting Immigrants in Confinement, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention* (May 2017), https://www.endisolation.org/wp-content/uploads/2017/05/CIVIC_HRW_Report.pdf, at 73-75; *Id.* at 58 ("Records from people held in Orange County Jail in New York . . . also reveal instances in which requests for care were ignored or were addressed only after unreasonable delay."); *Id.* at 75 ("Reena Aurora, an attorney with New York Lawyers for Public Interest, told Human Rights Watch one of her clients had attempted suicide at Orange County Jail (the same facility in which Luke R. was held), and he was placed in isolation and never had a psychiatrist do an evaluation or assessment."); *see also* Annamarya Scaccia, *When Suicide Happens at Immigration Detention Centers,*

118. In 2019, Luis Medina was incarcerated at OCCF when, during his first day in custody, he complained of severe pain and swelling in his fourth and fifth fingers in his right hand and was subsequently examined by medical personnel employed by Wellpath. After being examined by a doctor for the pain, Mr. Medina was only given painkillers and ointment before the doctor directed that he be sent to an outside hospital for treatment. At that hospital, Mr. Medina was diagnosed with an abscess in his right hand that needed to be drained and was then discharged with specific instructions to return in two days for additional orthopedic treatment. Once Mr. Medina returned to OCCF, however, he was never sent back to the outside hospital despite his frequent complaints of severe pain and swelling. Instead, medical personnel at OCCF only treated Mr. Medina with Motrin, naproxen, oral antibiotics, and antibiotic ointment. Mr. Medina did not receive adequate treatment until after he was transferred to another facility. Due to the inadequate treatment at OCCF, Mr. Medina suffered severe pain and infection that required surgery and lengthy treatment with antibiotics.[17]

119. In 2020, Paul Smith was incarcerated at OCCF when he notified Orange County officials of his need for medical treatment after being attacked. The Orange County defendants failed to provide adequate medical treatment to Mr. Smith and, as a result, Mr. Smith suffered severe injuries.[18]

120. In 2023, Niki Capaci was incarcerated at OCCF when, three days after her incarceration, she was found dead in her cell. At the time of her incarceration, Ms. Capaci was experiencing symptoms of severe opioid withdrawal. She was intolerant to buprenorphine, a

---

*Who Is to Blame?*, VICE (May 26, 2017), https://www.vice.com/en/article/when-suicide-happens-at-immigration-detention-centers-who-is-to-blame/.

[17] *Medina v. DuBois*, Case No. 7:22-cv-08051-NSR, ECF No. 31 (S.D.N.Y. Apr. 17, 2024).
[18] *Smith v. DuBois*, Case No. 7:23-cv-08211-CS, ECF No. 10 (S.D.N.Y. Dec. 18, 2023).

common medication given to treat opioid withdrawal. Nonetheless, Ms. Capaci was given the medication which resulted in her becoming "extremely ill with uncontrollable vomiting and diarrhea." At this time, Ms. Capaci was under special protocol requiring OCCF personnel to perform periodic checks, but she was largely left alone in her cell while she was ill, without any medical intervention by OCCF personnel including medical staff.[19]

121. Between 2021 and 2023, six individuals who were incarcerated at OCCF in ICE detention were subjected to "degrading conditions and continual mistreatment while incarcerated," including inadequate medical care at the facility. For instance, Lucas Palacios Alvarado requested to be screened for cholesterol and blood sugar levels but was denied treatment by OCCF officials. Nahum Gilberto Ortiz was incarcerated with a chronic back injury and, despite repeated requests for medication and a backstrap, it took the jail more than 10 months to provide them. And, when Jeremias Lopez was ill from food poisoning, OCCF officials refused to provide adequate medical treatment, instead providing over-the-counter medications to treat his symptoms with minimal effect, and failing to conduct follow-up testing.[20]

122. From 2010 to 2012, Gregory Harvey was incarcerated at OCCF. In January 2011, Mr. Harvey complained to OCCF medical staff about multiple gastrointestinal issues. Between January 2011 and February 2012, Mr. Harvey made six complaints to OCCF medical staff about those gastrointestinal issues and had multiple additional meetings with OCCF staff where he raised those issues repeatedly. After the multiple complaints and requests for medical care Mr. Harvey made to various OCCF staff, OCCF eventually arranged for Mr. Harvey to be seen by an outpatient medical provider. That appointment occurred a year and a half after Mr. Harvey began

---

[19] Jaclyn Diaz, *She died in a New York jail. Her family still has questions, alleges medical neglect,* NPR (June 18, 2024), https://www.npr.org/2024/05/23/nx-s1-4937273/new-york-jail-death-addiction-opioids-withdrawal-wellpath
[20] *Ortiz et al. v. Orange County, NY et al.*, No. 7:23-cv-02802-VB-VR, ECF No. 81 at 10-12 (S.D.N.Y. June 11, 2024).

alerting the facility of his medical issues. Shortly after seeing the outside provider, Mr. Harvey was admitted to the hospital and diagnosed with cancer.[21]

123. In 2020, Anthony Stevenson was incarcerated at OCCF. While at OCCF, Mr. Stevenson complained of chest pain more than 20 times and was diagnosed with a sinus condition after he was seen by a doctor at an outpatient facility. Mr. Stevenson received instructions from that doctor stating that he should return to the emergency room if his symptoms continued or worsened and that he should return for a follow-up appointment. Although OCCF nurses were aware of Mr. Stevenson's complaints of continued chest pains, OCCF officials did not return him to the emergency room or to be seen for the follow-up appointment. Mr. Stevenson continued to complain of chest pain throughout his incarceration but was never seen by a doctor or taken to a hospital. In 2021, Mr. Stevenson was found dead in his cell because of his heart condition.[22]

124. In 2016, Fortunato Febus was incarcerated at OCCF, and at the time he arrived at the jail, he told the intake nurse about various serious injuries to his ribs, neck, head, shoulders, and knee. Despite his injuries, Mr. Febus did not see a doctor until about one month later, at which time the doctor ordered he receive a second mattress and breathing device. Mr. Febus did not receive the second mattress that the doctor ordered because an OCCF official refused to provide it and the breathing device Mr. Febus had was taken away from him without explanation. Mr. Febus also experienced a hernia and requested surgery to address it, but the OCCF doctor who saw Mr. Febus refused to approve the surgery request because Mr. Febus was going to leave OCCF "any day."[23]

**Formatted:** English (US)

---

[21] *Harvey v. United States*, No. 14 Civ. 1787 (PAC), 2017 U.S. Dist. LEXIS 106128 (S.D.N.Y. July 10, 2018).
[22] Stevenson v. Cnty. of Orange, No. 23-CV-6959 (NSR), 2024 U.S. Dist. LEXIS 189581 (S.D.N.Y. Oct. 18, 2024).
[23] Febus v. CCS Correct Care Sols., No. 17 CV 3408 (VB), 2018 U.S. Dist. LEXIS 147024 (S.D.N.Y. ug. 29, 2018).

### Orange County's Contract with YesCare

125. Defendants Orange County and YesCare[24] have a pattern of failing to ensure that adequate intake screening and health assessments are provided.

126. Defendants Orange County and YesCare have a pattern of failing to develop and implement appropriate medical screening instruments that identify observable and non-observable medical needs, including chronic diseases.

127. Defendants Orange County and YesCare have a pattern of failing to ensure timely access to a physician when patients present symptoms requiring such care.

---

[24] YesCare was formerly known as Corizon Health. Starting in May 2022, Corizon Health began to restructure and divide itself into two entities, Tehum Care Partners, a company that assumed Corizon's debts and liabilities, and YesCare, the company that assumed all of Corizon's active corrections contracts. Similar to Wellpath, Tehum declared bankruptcy in February 2023 which stayed claims against the company. Now, YesCare continues to provide health care in prisons and jails across the country, including OCCF. *See* Beth Schwartzapfel, *A Prison Medical Company Faced Lawsuits From Incarcerated People. Then It Went 'Bankrupt.'*, The Marshall Project (Sept. 19, 2023), https://www.themarshallproject.org/2023/09/19/corizon-yescare-private-prison-healthcare-bankruptcy; Hannah Harris Green, *When US prison healthcare companies went bust, victims' families kept fighting*, The Guardian (Aug. 19, 2025), https://www.theguardian.com/us-news/2025/aug/19/us-private-prison-healthcare-companies; Private Equity Stakeholder Project, High stakes in Corizon/YesCare bankruptcy decision (Mar. 22, 2024), https://pestakeholder.org/news/high-stakes-in-corizon-yescare-bankruptcy-decision/.

Despite the legal maneuvers in which Corizon and YesCare engaged to evade liability, Corizon's history of providing inadequate medical care and the attendant allegations against it should be imputed to YesCare because of the lack of distinction between the two entities. For one, YesCare–a company that was created in 2022–references Corizon's history of providing medical care to inmates in describing itself "[a]s the correctional healthcare pioneer and leader for 40 years." *See* YesCare Corp., "About YesCare," https://www.yescarecorp.com/about; U.S. Senator Elizabeth Warren, et al., "Letter Re Corizon Texas Two-Step" (Oct. 24, 2023), https://www.warren.senate.gov/imo/media/doc/2023.10.24%20Letter%20re%20Corizon%20Texas%20Two-Step.pdf. Further, when announcing "the company's next chapter" during the reorganization process, YesCare stated that "**the dedicated employees of Corizon Health are now YesCare,**" thus making clear that **YesCare is "composed of the former Corizon Health team."** *See* Business Wire, Leading Healthcare Group Forms YesCare, Debuting New Vision and Leadership (May 16, 2022), https://www.businesswire.com/news/home/20220516005378/en/Leading-Healthcare-Group-Forms-YesCare-Debuting-New-Vision-and-Leadership.

As U.S. Senator Elizabeth Warren noted in her letter to the U.S. Trustee for the Southern and Western District of Texas, "the assurances of 'corporate separateness' between YesCare and Tehum are a plainly unconvincing attempt to shelter assets and avoid adequately compensating victims. Even a federal judge in the Eastern District of Michigan has found that YesCare's subsidiary 'CHS TX is a mere continuation of pre-division Corizon . . . . Evidently, CHS TX picked up right where Corizon left off. Indeed, CHS TX holds itself out to clients as Corizon's successor.'" *See* U.S. Senator Elizabeth Warren, Letter to U.S. Trustee re Corizon Bankruptcy (Jan. 31, 2024), https://www.warren.senate.gov/imo/media/doc/2024.01.31%20Letter%20to%20U.S.%20Trustee%20re%20Corizon%20Bankrupcy.pdf; *Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022), at *13.

22

128. Defendants Orange County and YesCare have a pattern of failing to ensure inmates have access to adequate health care, including by failing to ensure that the medical request process for inmates adequately meets inmates' needs. The medical request process should include adequate logging, tracking, and timely responses by medical staff.

129. Defendants Orange County and YesCare did not understand the New York health services market well enough to provide quality care to OCCF inmates and detainees.

130. On January 1, 2025, YesCare "began offering comprehensive medical services, including medication-assisted addiction treatment, at the Orange County Correctional Facility in Goshen, New York." Prior to its contract with Orange County, YesCare had an extensive history of providing inadequate medical care to incarcerated patients.

131. In 2013, the American Civil Liberties Union observed that Corizon was sued 660 times in the preceding five years for malpractice. One nurse, Diane Jackson, stated that Corizon saves "money by skipping the ambulance and taking prisoners directly to the morgue."

132. As of late 2021, Corizon was sued over 1,000 times by plaintiffs alleging substandard care. By one estimate, Corizon was named as a defendant in wrongful death and sexual abuse lawsuits more than 1,300 times.

133. A 2023 investigative report published by The Marshall Project details Corizon's (and thus YesCare's) history of providing substandard medical care to incarcerated patients throughout the United States, leading to serious injuries and even death.

134. That same investigative report, for instance, detailed a case in which multiple Corizon nurses at a jail in Kent County, Michigan, were found to be deliberately indifferent to a 40-year-old inmate's pain and suffering, thus awarding the plaintiff and his family more than $6 million.

23

135. A 2023 *amicus* brief submitted on behalf of nonprofit legal advocacy organizations to the U.S. Bankruptcy Court for the Southern Division of Texas, in support of *pro se* litigants' requests for notice and opportunity to participate in Chapter 11 proceedings, further detailed Corizon's history of providing inadequate medical care:

> For over a decade, Corizon maximized profits by systematically providing substandard care—and sometimes no care at all—subjecting incarcerated people to a substantial risk of serious harm and death. Indeed, a federal district court found that the State of Arizona's prison health care system, which Corizon was responsible for administering between 2013 and 2019, "is plainly grossly inadequate." *Jensen v. Shinn*, 609 F. Supp. 3d 789, 796 (D. Ariz. 2022). As the Court detailed in its 200-page opinion, multiple incarcerated people died or were seriously harmed as a direct result of Corizon's failure to provide timely and adequate health care. See *id.* at 815- 16, 818-22, 827-30, 903 n.70. Many more suffered prolonged and preventable pain and suffering. *Id.*

136. The court in *Jensen v. Shinn* further observed that the defendants were "aware of their failures for years and [] refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference to the substantial risk of serious harm posed by the lack of adequate medical and mental health care affecting all prisoners." 609 F. Supp. 3d at 796.

137. Upon information and belief, Defendant Orange County knew or should have known about YesCare and Corizon's long pattern and practice of failures to provide medical care.

**FIRST CLAIM FOR RELIEF:**
42 USC § 1983: Deliberate Indifference to Medical Needs

138. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if fully set forth herein.

139. Defendants failed to provide Plaintiffs with timely medical attention despite their knowledge that they were suffering from serious medical conditions.

140. Defendants' actions constituted an unnecessary and wanton infliction of pain.

24

141. By their conduct and actions in failing to provide medical treatment to Plaintiffs, who were suffering from serious medical conditions, and by failing to intercede to prevent the complained of conduct, the Defendants, acting under color of law and without justification, intentionally, and/or with deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiffs' constitutional rights as guaranteed under 42 U.S.C. Section 1983 and the United States Constitution, including the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

142. As a result of the foregoing, Plaintiffs suffered physical injuries, conscious pain and suffering, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of her constitutional rights as guaranteed under 42 U.S.C. § 1983.

143. Defendants' conduct was such that punitive damages should be imposed against the non-municipal Defendants.

**SECOND CLAIM FOR RELIEF:**
Negligence under State Law and related *Respondeat Superior*

144. Plaintiffs repeat and restate each and every statement made hereinabove as if set forth fully at length once again.

145. Defendants, including by the agents and servants thereof, at all times relevant hereto, had a duty to use ordinary care to ordinary care to provide for the health and care of people incarcerated at OCCF.

146. The Defendants, including Doe Corrections Defendants 1-3, failed to use this ordinary care.

147. The foregoing acts constitute negligence on the part of the Defendants hereto.

25

**Deleted:** failed to properly provide medical care to Plaintiffs

**Deleted:** <#>Defendant New York Correct Care failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.¶
Defendant Orange County, by the agents and servants thereof at all times relevant hereto, failed to properly provide medical care to Plaintiffs.¶
Defendant Orange County failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.¶
The individual Defendants failed to abide by or follow appropriate¶
rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing¶
rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing¶
examinations, evaluations, care, treatments, procedures, services, prescribing medication,¶
or advice of, for, and to medical, surgical, orthopedic, or nursing patients.¶
As a result of all the foregoing, the Plaintiffs were caused severe and serious personal injuries, severe and serious conscious pain and suffering, severe and serious mental anguish, and will suffer future severe and serious economic losses by reason of the negligence, carelessness, neglect and medical malpractice of the Defendants.¶
The medical evaluations, consultations, care, treatments, procedures, services, medical imaging, or advice or lack thereof ordered for, requested for, recommended for, advised for, performed upon, rendered to, requested, ordered or provided to Plaintiffs on behalf of, jointly with, or under the supervision of various Defendants named herein, were ordered, neglected, requested, recommended, advised, performed, rendered, or provided in a negligent, careless, or improper manner, or in a manner contrary to good and accepted medical, surgical,¶
radiological, orthopedic or nursing practices in the community.¶
The medical evaluations, consultations, care, treatments, procedures, services, medical imaging, or advice or lack thereof constituted negligence and was careless, and improper manner, or in a manner contrary to good and accepted medical, surgical, radiological, orthopedic or nursing practices in the community.¶
That, as a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily¶
pain and mental anguish for some time to come; have been and will be required to seek and¶
obtain medical care and treatment; have been unable to attend to usual vocation and duties and¶
sustained other damages.¶
...

148. That as a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily pain and mental anguish for some time to come; have been and will be required to seek and obtain medical care and treatment; and sustained other damages.

**THIRD CLAIM FOR RELIEF:**
Gross Negligence under State Law and related *Respondeat Superior*

149. Plaintiffs repeat and restate each and every statement made hereinabove as if set forth fully at length once again.

150. The above constitutes a gross deviation for the normal standard and caused direct injury to Plaintiffs.

151. That as a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily pain and mental anguish for some time to come; have been and will be required to seek and obtain medical care and treatment; and sustained other damages.

**FOURTH CLAIM FOR RELIEF:**
Medical Malpractice under State Law

152. Plaintiffs repeat, reiterate, and re-allege each and every statement and allegation as set forth above.

153. Defendant New York Correct Care failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing

examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

154. Defendant YesCare failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

155. Defendants Wellpath LLC and Wellpath NY LLC failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

156. Defendant Orange County, by the agents and servants thereof at all times relevant hereto, failed to properly provide medical care to Plaintiffs.

157. Defendant Orange County failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

158. The individual Medical Defendants failed to abide by or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication,

27

or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

159. As a result of all the foregoing, the Plaintiffs were caused severe and serious personal injuries, severe and serious conscious pain and suffering, severe and serious mental anguish, and will suffer future severe and serious economic losses by reason of the negligence, carelessness, neglect and medical malpractice of the Defendants.

160. The medical evaluations, consultations, care, treatments, procedures, services, medical imaging, or advice or lack thereof ordered for, requested for, recommended for, advised for, performed upon, rendered to, requested, ordered or provided to Plaintiffs on behalf of, jointly with, or under the supervision of various Defendants named herein, were ordered, neglected, requested, recommended, advised, performed, rendered, or provided in a negligent, careless, or improper manner, or in a manner contrary to good and accepted medical, surgical, radiological, orthopedic or nursing practices in the community.

161. The medical evaluations, consultations, care, treatments, procedures, services, medical imaging, or advice or lack thereof constituted negligence and was careless, and improper manner, or in a manner contrary to good and accepted medical, surgical, radiological, orthopedic or nursing practices in the community.

162. That, as a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily pain and mental anguish for some time to come; have been and will be required to seek and obtain medical care and treatment; have been unable to attend to usual vocation and duties and sustained other damages.

163. The foregoing acts constituted medical malpractice on the part of the Medical Defendants hereto including their staff, agents and servants.

28

164. The foregoing constitutes a deviation from standard and accepted medical practice and standards of conduct.

165. The above acts constitute medical malpractice.

166. The aforesaid acts constitute malpractice on the part of each and all medical Defendants.

**FIFTH CLAIM FOR RELIEF:**
42 U.S.C. § 1983 *Monell* Claims Against Orange County

167. Plaintiffs repeat, reiterate, and re-allege each and every statement and allegation as set forth above.

168. The actions and/or omissions of Defendant Correct Care NY, Wellpath, Wellpath NY and YesCare in responding to the requests and demands for medical attention of Plaintiffs were done in accordance with the policy, practice, and custom of Defendant Orange County.

169. The practice of failing to respond in an adequate manner and in providing inadequate care was so persistent and widespread that it constituted an official policy or custom.

170. Orange County's policies, including those policies of Wellpath, Correct Care NY, YeCare and Corizon that it adopted by contract, were inadequate in that there was a deliberate indifference to Plaintiffs' serious medical needs and that Defendants, including Wellpath, were totally unconcerned with the welfare of those in their care.

171. The policies, practices, and customs of Defendants as described above and in the documents incorporated by reference include the failure to respond to serious medical needs documented by inmates by way of medical request forms, the prescribing and providing of painkillers when inappropriate or inadequate to treat inmates' serious medical needs, denial of access to necessary emergency room care, denial of access to outpatient care, denial of testing, imaging and biopsies in order to properly diagnose serious and/or life-threatening medical

29

**Deleted:** and

**Deleted:** and

conditions, and the failure to diagnose and monitor life-threatening illnesses and chronic diseases.

172. Further, the aforementioned policies, practices and customs of Defendants were in furtherance of the improper motive of reducing costs and/or increasing profits while denying adequate and necessary care to inmates and detainees.

173. Defendants Orange County and the individual Defendants were on notice of these policies, practices, and customs of Defendant Correct Care NY, Wellpath, YesCare and Corizon and failed to take any action to prevent the harm caused to inmates including Plaintiffs.

**Deleted:** and

174. The policies, practices, and customs discussed above led to the failure to provide adequate medical care to Plaintiffs; the delay of proper care to Plaintiffs; the negligent training of Defendants' employees; the lack of physician access for Plaintiffs: and the misdiagnosis and/or non-diagnosis and indifference to the serious medical needs of Plaintiffs, depriving them of the rights, privileges, and immunities secured by the Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

**JURY TRIAL DEMAND**

175. Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs demand the following relief jointly and severally against all of Defendants:

   a.  Compensatory damages;

   b.  Punitive damages;

   c.  The convening and empaneling of a jury to consider the merits of the claims herein;

   d.  Costs and interest and attorney's fees;

30

e.  Such other and further relief as this court may deem appropriate and equitable.

Dated: Ridgewood (Queens), New York
October 9, 2025

**Deleted:** July 28

**COHEN&GREEN P.L.L.C.**

By: _____
Elena L. Cohen
J. Remy Green
Regina Yu
Leena M. Widdi
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
   remy@femmelaw.com
   regina@femmelaw.com
   leena@femmelaw.com

**Gideon Orion Oliver**


By: _____
Gideon Oliver, Esq.
718-783-3682 (o) 646-263-3495 (c)

277 Broadway, Suite 1501,
New York, NY  10007

1825 Foster Avenue, Suite 1K,
Brooklyn, NY 11230


**ATTORNEYS FOR PLAINTIFF**