UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

STEFANY CRUZ AND MARISOL
ORDONEZ VARGAS,

                     Plaintiffs,

  -against-

ORANGE COUNTY (New York);
WELLPATH, LLC;  NEW YORK
CORRECT CARE SOLUTIONS MEDICAL
SERVICES, PC; MATTHEW J. DUNDON,
Trustee of Wellpath Holdings, Inc.
Liquidating Trust; WELLPATH NY LLC;
YESCARE CORP; JOSEPH PATRICK
HARKINS; TENESHIA WASHINGTON,
RN; JILLIAN M. BARONE, RN; MANDI
LEE ZACCAGNINO, NP; DOMINICK
PIACENTE; AND DOE DEFENDANTS 1-4,

                  Defendants.

</td><td>

Case No.: 25-cv-00064

**SECOND AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

</td></tr>
</table>

Plaintiffs STEFANY CRUZ and MARISOL ORDONEZ VARGAS,[1] by and through their undersigned counsel, complaining of the Defendants, allege, upon information and belief and personal knowledge:

### NATURE OF THE CASE

1.  Plaintiffs bring this action for damages for personal injury, suffering, and pain they experienced while detained at the Orange County Correctional Facility ("OCCF") in Orange County, New York.

---

[1] Ms. Ordonez Vargas is a transgender person. Her name on her birth certificate is Oswaldo Jose Ordonez Vargas. Her correct name, used here, is Marisol Ordonez Vargas.

2.   Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 and New York State Law against Orange County and its employees, agents, and servants, including but not limited to various correction officers and medical professionals, and against other named individuals.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

1. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

2.   Venue is proper under 28 U.S.C. § 1402(b) in the District Court for the Southern District of New York, because the acts and omissions giving rise to Plaintiffs' claims occurred within the Southern District of New York.

3. **Jurisdiction over Federal Claims.** The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

4.   **Jurisdiction over State Claims.** On January 2, 2024, Plaintiff Ordonez Vargas filed a notice of claim with Defendant Orange County.

5.   Plaintiff Ordonez Vargas appeared for her 50-H hearing on May 29, 2024.

6.   More than thirty days have elapsed since Plaintiff Ordonez Vargas served a Notice of Claim and Orange County has not offered adjustment or payment thereof.

7.   Plaintiff Ordonez Vargas filed suit on January 3, 2025—which is within 1 year and 90 days from when Plaintiff Ordonez Vargas received inadequate medical care at OCCF. *See* N.Y.C.P.L.R. § 217-a (statute governing state tort law claims). Accordingly, Plaintiff Ordonez Vargas has complied with all statutory jurisdictional requirements and conditions precedent to commencement and prosecution of this litigation.

8. On July 25, 2025, Plaintiff Cruz filed a notice of claim with Defendant Orange County. A petition to deem this notice of claim as timely filed is pending in the Supreme Court, County of Orange, Index no. EF007296-2025 (Honorable Judge E. Loren Williams presiding).

9. Both Plaintiffs can therefore be deemed to have initiated this action within one year and ninety days of the accrual of their respective claims.

## PARTIES

10. Plaintiff Stefany Cruz has been, at all times relevant to this action, a resident of Orange County in the State of New York.

11. Plaintiff Marisol Ordonez Vargas has been, at all times relevant to this action, a resident of Bronx County in the State of New York.

12. Defendant Orange County is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omissions of Defendants' agents or employees, who were acting within the scope of their office or employment as correctional and/or law enforcement agents of Orange County and as medical treatment staff engaged or contracted by Orange County to provide medical services at Orange County Correctional Facility. Orange County has a custom or practice of continuing to engage companies involved in substandard delivery of care as a means of cutting costs at Orange County Correctional Facility. At all relevant times, Orange County Sheriff Areta acted under the color of state law. As the Sheriff, Mr. Areta is the final policymaker for Orange County on matters related to the care and custody of inmates at the County jail, including the care and custody of pretrial detainees. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

13. Defendant Wellpath LLC is one of the U.S.'s largest for-profit health care providers for prisoners. Wellpath LLC has many professional corporations, subsidiaries, and other related corporations, including New York Correct Care Solutions Medical Services, P.C. and Wellpath

NY LLC (collectively, the "Wellpath Defendants"). Orange County contracted with Wellpath LLC and its subsidiaries to provide medical services at Orange County Correctional Facility. Wellpath LLC is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omissions of Defendants' agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility.

14. Defendant New York Correct Care Solutions Medical Services, P.C. ("NY Correct Care") was the specific Wellpath subsidiary operating at Orange County Correctional Facility. Defendant NY Correct Care contracted with Orange County for the purpose of providing medical care and treatment for OCCF inmates and detainees until December 31, 2024. NY Correct Care is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omissions of its agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility.[2]

15. Defendant Wellpath NY LLC was a limited liability company and private business doing business in the state of New York as Wellpath NY. Upon information and belief, Wellpath LLC and its related corporations (including NY Correct Care) operated under the same policies and procedures for medical treatment of people in prison.

16. Defendant MATTHEW J. DUNDON is the Trustee of Wellpath Holdings, Inc.'s Liquidating Trust and is responsible for liquidating claims for which Wellpath LLC is found liable.[3]

---

[2] For convenience, the term "Wellpath Defendants" as identified throughout the Second Amended Complaint shall expressly include NY Correct Care Solutions, its agents, and employees.
[3] On June 6, 2025, the United States Bankruptcy Court for the Southern District of Texas entered an order instructing individuals with personal injury and wrongful death claims against Wellpath to include the Liquidating Trust as a nominal party when seeking determinations of Wellpath's liability in civil court. *See In re: WELLPATH HOLDINGS, INC., et al.*, No. 24-90533 (Bankr. S.D. Tex.), Docket No. 2907 at 2.

17. Defendant YesCare Corp. ("YesCare"), formally Corizon Health, is another for-profit provider of medical services to jails and prisons across the United States. Orange County began contracting with YesCare to provide medical services at Orange County Correctional Facility on January 1, 2025. YesCare presently contracts with Orange County for the purpose of providing medical care and treatment for OCCF inmates and detainees. YesCare is sued for personal injuries to Plaintiffs caused by the wrongful or negligent acts or omissions of Defendants' agents or employees, who were acting within the scope of their office or employment as medical providers at Orange County Correctional Facility.

18. At all times hereinafter mentioned, Individual Defendants Joseph Patrick Harkins; Teneshia Washington, RN; Jillian M Barone, RN; Mandi Lee Zaccagnino, NP; and Dominick Piacente were employees of the Wellpath Defendants and worked at OCCF. They were working within their scope and course of their employment. Upon information and belief, all of the Individual Defendants still working at OCCF after January 1, 2025, were hired and became employees of YesCare.[4]

19. At all times hereinafter mentioned, Individual Doe Corrections Defendants 1-3 were people employed by Orange County as members of the County's Corrections Division.[5] At all times hereinafter mentioned, Individual Doe Medical Defendant 4 worked at OCCF. Each Individual Defendant is sued in her or his individual capacity.

---

[4] For convenience, the term "YesCare Defendants" as identified throughout the Second Amended Complaint shall expressly include its agents and employees, including any of the Individual Defendants ultimately hired by YesCare.
[5] For convenience, the term "Orange County Defendants" as identified throughout the Second Amended Complaint shall expressly include both Orange County, the Individual Doe Defendants 1-3, and any other agents of employees of Orange County and its Division of Corrections.

20. For-profit medical care providers, and their employees and agents, contracted by a governmental entity are state actors for 42 U.S.C. § 1983 purposes when treating inmates and/or implementing policies and practices regarding provision of medical care. *West v. Atkins*, 487 U.S. 42, 54 (1988).

21. Private managers, executives, owners, directors, board members, and supervisors employed to direct the delivery of medical care to inmates are also state actors acting under color of law for purposes of § 1983. *Id.*

22. A municipality cannot delegate its constitutional duties to provide adequate medical care to third party providers. *See Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("a municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care"); *Bryant v. Maffucci*, 729 F. Supp. 319, 324 (S.D.N.Y. 1990) (county "may not avoid liability by delegating the duty to provide medical care").

## FACTUAL ALLEGATIONS

### Facts Specific to Plaintiff Stefany Cruz's Treatment.

23. In October 2014, Plaintiff Stefany Cruz was diagnosed with borderline lupus, which is an early stage of systemic lupus, a chronic autoimmune disease.[6] Systemic lupus is particularly dangerous because it can cause serious kidney damage—and kidney failure is one of the leading causes of death among people with lupus.[7] As such, even borderline lupus requires careful monitoring. Primary care doctors are to monitor early-stage lupus closely and must refer

---

[6] National Institute of Arthritis and Muscoskeletal and Skin Diseases, *Systemic Lupus Erythematosus (Lupus),* https://www.niams.nih.gov/health-topics/lupus.
[7] Mayo Clinic, *Lupus* (Oct. 21, 2022), https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789

patients to a rheumatologist for comprehensive treatment if symptoms worsen significantly.[8] Ms. Cruz carefully monitored her symptom progression for the decade leading up to her incarceration to prevent the disease from worsening.

24.  In October 2014, Ms. Cruz was also diagnosed with deep vein thrombosis—a blood clotting disorder that is common among lupus patients and can lead to life-threatening complications including pulmonary embolism.[9] A pulmonary embolism is an arterial blockage that can result in heart failure, respiratory failure, and even death. Because of these serious risks associated with her deep vein thrombosis, Ms. Cruz was prescribed a daily blood thinner to prevent coagulation, blood clots, and strokes.

25.  Ms. Cruz had continued to take her prescription blood thinners (Warfarin) daily for ten years until she was detained at Orange County Correctional Facility. However, because her lupus was in an early stage in the years leading up to her incarceration, Ms. Cruz did not yet require a rheumatologist's expertise. In the months leading up to her detention, Ms. Cruz began looking for a rheumatologist to treat her borderline lupus. However, Ms. Cruz was detained at OCCF on October 10, 2024, before she could find a provider.

26.  Upon her arrival at the facility, Ms. Cruz underwent a medical intake screening with the Wellpath Defendants. At this screening, Ms. Cruz informed intake staff of her serious medical conditions—including borderline lupus and deep vein thrombosis—and made clear that she was actively seeking treatment with a rheumatologist to control the progression of her

---

[8] *Id.* ("Patients with increased disease activity, complications, or adverse effects from treatment should be referred to a rheumatologist").

[9] W.S. Chung, C.L. Lin, S.N. Chang, C.C. Liu, C.H. Kao, Systemic Lupus Erythematosus Increases the Risks of Deep Vein Thrombosis and Pulmonary Embolism: A Nationwide Cohort Study, 12 J. of Thrombosis and Haemostasias 452 (April 2014) (results of study support that lupus patients are at significantly higher risk for deep vein thrombosis and pulmonary embolism)

condition. During this conversation, she specifically informed medical staff that she urgently required her prescription blood thinners to prevent blood clotting and potential heart failure or stroke.

27.  Despite this urgency, the Wellpath Defendants did not provide her with any blood thinning medication for her first five days at OCCF.

28.  If a lupus patient stops taking a drug like Warfarin, their blood will start clotting at the same rate as before they began taking the medication within one or two days of cessation.[10] In turn, the patient may face immediate risk of stroke, heart attack, deep vein thrombosis, or pulmonary embolism.[11]

29.  During those critical five days, Plaintiff made daily requests to Wellpath Defendants and Orange County Defendants for her prescription blood thinner.

30.  Those officials did not give any explanation as to why she was not getting her necessary medication.

31.  Instead, Wellpath Defendants informed Plaintiff that there were "no medication orders for her in the system," and took no corrective or follow-up action to ensure Ms. Cruz received this necessary care. Instead of providing her with the necessary blood thinners, OCCF officials gave her an anti-cortisone and steroid cream to treat inflammation.

---

[10]National Health Service UK, *Common Questions About Warfarin*, , https://www.nhs.uk/medicines/warfarin/common-questions-about-warfarin/#:~:text=If%20you%20stop%20taking%20warfarin,(DVT)%20or%20pulmonary%20embolism. ("if you stop taking Warfarin, your blood will start clotting at the same rate as before you started taking it, usually within a day or two of stopping").

[11] *Id* ("If you stop taking Warfarin [...] you may be at increased risk of serious problems like strokes, heart attacks, deep vein thrombosis (dvt), or pulmonary embolism").

32.  These over-the-counter medications provided Ms. Cruz with minimal and temporary relief, and overall failed to address the underlying cause of the inflammation–her worsening lupus.[12]

33.  Eventually on October 15, 2024, Defendant Dominick Piacente—at the time an employee of the Wellpath Defendants—entered an order prescribing Ms. Cruz blood thinners. Upon information and belief, there was no explanation for the delay in prescribing and ordering Plaintiff's critical medication. Plaintiff finally received her blood thinner medication six days after informing medical staff that her need for the medication was urgent and fortunately did not experience any immediate consequences from the serious interruption in her long-term course of treatment.

34.  Defendant Dominick Piacente knew or should have known that a delay in prescribing and ordering Plaintiff's critical medication would have worsened Plaintiff's lupus and any reasonable medical provider would have promptly prescribed and ordered the medication.

35.  But that was just the beginning of Ms. Cruz's ordeal at OCCF. Just days after her arrival and before the end of October 2024, Ms. Cruz began to experience the most severe lupus flare-up she has endured since her lupus diagnosis a decade prior. Flare-ups for lupus result in skin lesions, hair loss, shortness of breath, nosebleeds, mouth sores, chest pain—and myriad other serious medical problems.[13] Any of these flare-up symptoms can also indicate that there is

---

[12] Theodore T. Fields, *Steroid Side Effects: How to Reduce Drug Side Effects of Corticosteroids*, (Dec. 17, 2023), https://www.hss.edu/health-library/conditions-and-treatments/steroid-side-effects-how-to-reduce-corticosteroid-side-effects ("beacause cortisone is involved in regulating the body's balance of water, sodium, and other electrolytes, using [corticosteroids] can promote fluid retention and sometimes cause or worsen high blood pressure").

[13] Cleveland Clinic, *Lupus: Symptoms and Treatmen*ts, https://my.clevelandclinic.org/health/diseases/4875-lupus. ("the most common symptoms [of Lupus] include joint pain, muscle pain, chest pain, headaches, rashes, fever, hair loss, mouth sores, fatigue, shortness of breath, swollen glands, confusion, blood clots").

a more imminent risk of ongoing kidney damage. Ms. Cruz began breaking out in skin rashes

and hives, which was the sign of a lupus flare-up that demanded medical attention. The

Cleveland Clinic advises that a healthcare provider should be consulted any time a lupus patient

experiences new or changing symptoms[14].

36.  As early as November 6, 2024, Ms. Cruz informed both the Wellpath and Orange

County Defendants that she was still having "serious issues" related to her lupus flare up. She

filed a formal grievance at OCCF identifying that her repeated "sick calls" for medical attention

were not being responded to for days. That was particularly concerning because she is required

to closely monitor her condition and because she could suffer life-altering consequences if

further degeneration is not addressed promptly.

37.  Wellpath and Orange County Defendants allowed this severe flare-up to persist for

approximately two months without providing meaningful treatment. Ms. Cruz saw Defendant

Dominick Piacente at some intervals from November to December 2024 for lab testing—but that

doctor was not qualified to address Ms. Cruz' flare-ups, which continued to worsen according to

the results of those tests. During this period, Defendant Piacente reviewed the results of several

weekly lab-tests with Ms. Cruz, and nearly every test indicated that the Ms. Cruz's results were

abnormal, which should have alerted Defendant Piacente to the fact that her condition was

worsening. But Defendant Piacente did not refer Ms. Cruz to a specialist after reviewing these

results, despite Plaintiff's repeated requests to be referred to an offsite specialis.

38.  Advanced or aggravated lupus requires referral to a rheumatologist for treatment

and should not be handled by primary care physicians.[15] Specifically, primary care doctors are

---

[14] *Id.* ("Visit a healthcare provider as soon as you notice any new or changing symptoms. Even small shifts in how you're feeling can be important").

[15] *See* American Family Physician, *supra* note 9 ("Patients with increased disease activity, complications, or adverse effects from treatment should be referred to a rheumatologist").

not qualified to treat lupus that impacts a major organ system like the kidneys.[16] Upon

information and belief, Defendant Piacente is not a rheumatologist and has no qualifications

similar to those of a rheumatologist.

39.  Having this understanding, Ms. Cruz asked Defendant Piacente when her

rheumatologist appointment would be scheduled at each and every blood draw. However,

Defendant Piacente merely responded that he could not give Ms. Cruz that information. In the

meantime, Defendant Piacente did not prescribe any additional treatment to alleviate or

otherwise address Ms. Cruz's lupus flare-up despite weekly blood draws that indicated her

worsening condition.

40.  Serious lupus flare ups must be treated with high-dose corticosteroids to rapidly

suppress inflammation.[17] Accordingly, it is necessary that a patient experiencing a flare-up visit

with a rheumatologist for immediate medical attention.[18] Wellpath Defendants' decision to take

no action in light of Ms. Cruz' flare-up—and to prescribe no additional medication or refer Ms.

Cruz to a rheumatologist—was an obvious failure to follow the medical standards for providing

the necessary care to Ms. Cruz. In addition to Wellpath Defendants' failure to prescribe

additional medication, Wellpath Defendants adjusted Ms. Cruz's long-term prescription blood

thinner dosage at almost every encounter without logical explanation. This continued for almost

two months as Ms. Cruz continued to report pain, discomfort, and fear regarding her worsening

lupus symptoms.

---

[16] *Compare id.*, *with id.* ("Those with mild SLE that *does not involve major organ systems* can be monitored by primary care physicians").
[17] Johns Hopkins Lupus Center, *Treating Lupus with Steroids*, https://www.hopkinslupus.org/lupus-treatment/lupus-medications/steroids/.("as with Lupus, your body's immune system does not function properly, and the inflammatory response works to damage your tissues [...] Corticosteroids help to slow and stop the processes in your body that make the molecules involved in your inflammatory response").
[18] Lupus Foundation of America, *When to Call the Doctor,* https://www.lupus.org/resources/when-to-call-the-doctor ("Call your doctor *right away* if you experience a lupus flare") (emphasis in original).

41.   Defendant Dominick Piacente knew or should have known that it was necessary for Plaintiff to see a rheumatologist to address her lupus flare, as well as provide corticosteroids to suppress inflammation. A reasonable medical provider would not have delayed scheduling an appointment with a rheumatologist and would have provided corticosteroids.

42.   Wellpath and Orange County Defendants eventually scheduled an intake meeting with an outpatient rheumatologist on December 18, 2024, as Ms. Cruz had been asking Defendant Piacente to arrange since her arrival at OCCF. At this appointment, the rheumatologist attempted to do lab work on Ms. Cruz. Because Ms. Cruz was never told when her appointment was scheduled for or what testing would be done, however, she was unable to adequately prepare for this long-awaited appointment. When she arrived at the provider, Ms. Cruz was experiencing such significant dehydration as a result of her worsening lupus that the rheumatologist could not take a urine sample. Because the transporting officers could not wait for the provider to conduct the required testing, the outpatient provider offered Ms. Cruz a new prescription immunosuppressant to manage her worsening lupus and requested that OCCF conduct lab testing and bring the Plaintiff back for a follow-up appointment in four weeks to monitor her progress.

43.   Wellpath and Orange County Defendants were handed the prescription and paperwork outlining the outpatient doctor's treatment plan. However, the Wellpath Defendants neglected to follow those recommendations made by Ms. Cruz's provider.

44.   While the Wellpath Defendants did conduct lab work upon Ms. Cruz's return to the facility, those results were never shared with the outpatient provider. Sharing the results was necessary to ensure continuity of care and to allow Ms. Cruz's treating providers to confirm that her borderline lupus had become systemic lupus due to the absence of meaningful care and

12

monitoring. Upon information and belief, the Wellpath Defendants "lost" these lab results. Ms. Cruz had no idea that her outpatient provider never received the results from the lab tests she sat for during the height of her lupus flare-up. Instead—perhaps upon learning of this profound oversight—the YesCare Defendants (who as discussed below took over medical care at OCCF in January of 2025) conducted the same lab tests again over a month later on January 27, 2025, and shared those belated results with the outpatient provider.

45.   But in the meantime, Ms. Cruz did not receive the critical immunosuppressant the outpatient provider had prescribed her more than five weeks prior to manage her worsening condition. Throughout this lapse in care, Ms. Cruz had repeatedly advised both the Wellpath Defendants and the Orange County Defendants that she was not receiving her medication. But Ms. Cruz's pleas were unsuccessful. She did not receive the medication that was prescribed to her at the December 18, 2024, appointment until forty-two days later, on January 29, 2025. By that time, Ms. Cruz had continued to experience further pain and discomfort because of her untreated lupus flare-up that had begun 4 months prior.

46.   Wellpath Defendants never scheduled Ms. Cruz's 4-week follow-up appointment as requested by the outpatient provider. In the meantime, the Orange County Defendants had replaced Wellpath with another private medical provider—YesCare—in part due to significant and repeated complaints regarding Wellpath's deficient medical care and its commencement of bankruptcy proceedings. But this change in provider was a distinction without a difference. Upon information and belief, a substantial number of former Wellpath employees were hired by YesCare and continued to provide the same medical "care" at OCCF notwithstanding the change in the contract.

47.   Neither Wellpath Defendants nor YesCare Defendants scheduled Ms. Cruz's follow-up appointment until *ten weeks* after Ms. Cruz's intake appointment, on March 3, 2025. In the meantime, Plaintiff's offsite provider made several attempts to contact the YesCare and Orange County Defendants to move this appointment up given the severity of Ms. Cruz's condition. Upon information and belief, however, the YesCare and Orange County Defendants ignored the provider's repeated voicemails. Instead, the Orange County Defendants informed the outpatient provider that the YesCare Defendants had the final say as to how quickly Plaintiff may be seen by an offsite provider.

48.   At the March 3, 2025, appointment, the outpatient provider was finally able to examine Ms. Cruz. He also determined that Ms. Cruz's lab work showed abnormally high protein creatinine levels in Ms. Cruz's urine, which alerted the outpatient provider to the fact that Ms. Cruz's kidneys were not functioning properly because of her lupus that was now systemic. In other words, the Wellpath and YesCare Defendants' delay in sharing lab work with the outpatient provider, failure to provide critical medication for weeks, and refusal to promptly schedule a follow-up visit as requested by the outpatient provider—had brought Ms. Cruz' lupus to a crisis-level condition. This should have been obvious to both Wellpath and YesCare Defendants, especially given Ms. Cruz's own repeated assertions that her health was deteriorating in the absence of the prescribed care and the Defendants' own review of Ms. Cruz's consistently abnormal lab results.

47. Immediately following her March 3, 2025, appointment, the outpatient rheumatologist sent Ms. Cruz to the emergency room and recommended her for an intravenous steroid treatment and kidney biopsy. Early testing and treatment are crucial when lupus patients

have kidney issues, and undergoing a biopsy is an important component of the early testing process.[19]

49.   The emergency room stabilized Ms. Cruz but  did not conduct the necessary kidney biopsy or kidney function tests. Upon her return to OCCF, Plaintiff Cruz informed the YesCare Defendants of the details from her rheumatologist and emergency room visits, including her abnormal lab results and the need for a kidney biopsy. In response, YesCare Defendants assured Ms. Cruz that they would arrange for her to see a nephrologist for the recommended kidney biopsy.

50.   But YesCare Defendants never scheduled the necessary biopsy appointment. Instead, for more than five weeks, Ms. Cruz waited in fear as she realized she was facing the prospect of permanent kidney damage because the YesCare Defendants would not allow her to get the kidney biopsy she desperately needed. Upon information and belief, the YesCare Defendants and the Orange County Defendants were made aware of Ms. Cruz's likely release from detention and determined not to provide care to avoid the costs associated with that care.

51.   On April 11, 2025, Plaintiff Cruz was released from OCCF. YesCare Defendants never scheduled her kidney biopsy and left Ms. Cruz with an insufficient supply of her prescription blood thinner medication. Upon release, Plaintiff Cruz was taking approximately 5 or 6mg per tablet of blood thinners daily, but OCCF only gave her 30 tablets at 1mg each. Assuming Ms. Cruz took her typical daily dose of 5 or 6 mg of blood thinners, the supply of blood thinners that YesCare Defendants provided Ms. Cruz upon her release would only have lasted for five or six days post-release—an insufficient amount of medication to manage her

---

[19] Lupus Foundation of America, *What is Lupus Nephritis,* N.D., https://www.lupus.org/resources/what-is-lupus-nephritis. ("Getting tested and treated as soon as possible is extremely important. Testing used in evaluating and diagnosing kidney issues include urine test or urinalysis, blood test, and kidney biopsy").

condition. Per Ms. Cruz's recollection of Defendant Orange County's policy on the minimum required supply of medication upon release, YesCare Defendants were responsible for providing Ms. Cruz with a week's worth of all prescription medications. In Ms. Cruz's case, it was especially important that this discharge policy be followed considering YesCare Defendants and Orange County Defendants knew that she would be relying on health insurance provided by OCCF upon release but that such insurance coverage would not take effect until May 2025.

52.  Because Ms. Cruz was detained, she was deprived of the ability to seek and schedule her own doctors' appointments, and because the YesCare Defendants never scheduled her kidney biopsy or follow-up rheumatology appointment, she was left to wait until her health insurance took effect to conduct the necessary tests as quickly as possible upon her release. All this while she was still suffering from severe lupus conditions. Ms. Cruz returned to her rheumatologist the same day her health insurance took effect, nearly a month after her release.

53.  When she was able to return to the rheumatologist who diagnosed her with systemic lupus while she was at OCCF, the results of her lab tests were horrifying. On May 5, 2025—just four months after her urine test from January 27, 2025, confirmed that her borderline lupus had progressed to systemic lupus— Ms. Cruz's creatinine level in her urine was approximately five times higher than before. This indicated that Ms. Cruz had a severely high level of protein in the urine, suggesting kidney failure or damage. [20] In urgent response, Ms. Cruz underwent the kidney biopsy recommended to her months earlier while she was still in OCCF custody. Those results terrified Ms. Cruz because they confirmed that the lupus she had when she arrived at OCCF had advanced into severe conditions— lupus nephritis Class III and Class V. Lupus nephritis is "one of the most serious complications" of lupus and occurs when the immune

---

[20] Cleveland Clinic, *Proteinuria: Causes, Sypmtoms*, Tests, and Treatment, https://my.clevelandclinic.org/health/diseases/16428-proteinuria

system mistakenly attacks the kidneys, leading to organ damage.[21] Lupus Nephritis Class III is present when a patient experiences less than 50% damage to the important kidney vessels, while Class V is a thickening of the important structures of the kidney.[22] Ms. Cruz also developed scarring on her arms due to the severe flare-up she experienced while detained at OCCF.

54.  Because Defendants inefficiently and inadequately treated Ms. Cruz's serious medical condition during her detention, she now suffers long-lasting damage to her organs and possible permanent damage, the treatment of which requires several weekly appointments with various providers and involvement in a clinical trial. Because of her demanding treatment plan, Ms. Cruz has been unable to maintain employment since her release.

55.  Ms. Cruz entered OCCF custody as a person with employment and with her health conditions well-managed. She left with permanent organ damage—despite repeatedly pleading with Wellpath and YesCare Defendants to provide the baseline care any proper medical staff should have provided.

**Facts Specific to Plaintiff Ordonez Vargas's Treatment.**

56. Plaintiff Ordonez Vargas is a monolingual Spanish speaker who immigrated to the United States—first to Houston, TX. She then moved to New York. In both Houston and New York, Ms. Ordonez Vargas would regularly check in and attend her ICE appointments as requested.

---

[21] Lupus Foundation of America, *What is Lupus Nephritis,* N.D., https://www.lupus.org/resources/what-is-lupus-nephritis. ("lupus nephritis is one of the most serious complications of systemic lupus erythematosus. It occurs when the immune system mainly attacks the kidneys, leading to inflammation and possibly organ damage").
[22] National Kidney Foundation, *Lupus Neephritis* and Your Kidneys, https://www.kidney.org/lupus-nephritis-your-kidneys

57. On September 17, 2023, Ms. Ordonez Vargas was a passenger involved in a serious motor vehicle accident where she lost consciousness. Ms. Ordonez Vargas did not regain consciousness until hours after she arrived at a hospital.

58. When she awoke, Ms. Ordonez Vargas was bleeding from her face. She could not remember what had happened. Doctors then informed her that she was involved in a car crash and that she had several fractures in her face including a fracture of her nasal septum with hemorrhage within the anterior nasal cavity (septal hematoma),[23] comminuted bilateral nose fractures, and a fracture of bilateral anterior processes of the maxilla. These are not simple fractures. The maxilla fracture is an upper jawbone fracture that seriously affects the structure and stability of the midface and impacts the nose, eyes, and chewing function.[24] The comminuted bilateral nasal fractures mean that Ms. Ordonez Vargas' nose was broken into multiple pieces on both sides of the nose, which requires complex surgical treatment.[25] Finally, the nasal septum fracture runs the risk of persistent bleeding and blood pooling.[26]

---

[23] American Family Physician. *Management of Acute Nasal Fractures*. https://www.aafp.org/pubs/afp/issues/2004/1001/p1315.html. ("A septal hematoma is a blood-filled cavity between the cartilage and the supporting perichondrium. If left untreated, these pockets of blood easily become infected. The resulting necrosis of the underlying cartilaginous support may result in permanent saddle nose deformity. When a septal hematoma is identified, it should be aspirated immediately or incised with the aid of local anesthesia…If improperly managed, a septal hematoma may have a disastrous outcome…").

[24] World Journal of Biology Pharmacy and Health Sciences, Maxilla fracture: Medical therapy and surgical therapy by case report, https://wjbphs.com/sites/default/files/WJBPHS-2024-0354.pdf ("Maxillary fracture may include pain and tenderness in the affected area, difficulty breathing through the nose, swelling, and even numbness in the upper lip or palate. It's essential to seek immediate medical attention if a maxillary fracture is suspected, as delay in treatment can result in complications such as breathing problems, infection, or improper healing leading to long-term issues with facial function.")

[25] Clinical Advisor, Diagnosis and Management of Nasal Bone Fractures, https://www.clinicaladvisor.com/features/diagnosis-management-nasal-bone-fractures/ ("Incidence of complications is highest in bilateral fractures, comminuted fractures, and fractures with severe nasal septum deviation. When NBFs are not treated, patients are at risk of cosmetic deformity, epistaxis, CSF leak, septal hematoma, saddle-nose deformity, and airway obstruction.")

[26] Journal for Cosmetic Medicine, A case of nasal bone fracture with septal fracture reduction via closed reduction of nasal bone fracture and endoscopic septoplasty, https://www.jcosmetmed.org/journal/view.html?pn=current_issue&uid=144&vmd=Full (" Fractures of the nasal bone and septum are affect one's cosmetic appearance and nasal airway function. As an untreated septal fracture can cause deviation of the nasal alignment and narrowing of the nasal passages, it is important to also correct an accompanying septal fracture")

59. As a result of these serious fractures, Ms. Ordonez Vargas was experiencing significant difficulty breathing. She was also continuing to bleed profusely from her nose. The hospital promptly referred Ms. Ordonez Vargas for a surgery consultation because it was determined that the fractures were complex and that her breathing problems necessitated prompt surgical intervention.

60.  When Ms. Ordonez Vargas was discharged from the hospital, she consulted with a surgical specialist, who further confirmed that Ms. Ordonez Vargas was suffering from a complete occlusion of the right nasal airway because of her face fractures. The surgeon scheduled a corrective procedure to occur 15 days later, on October 5, 2023. In the meantime, Ms. Ordonez Vargas had been experiencing extreme pain, discomfort, and persistent bleeding from the nose. She was patiently awaiting her surgery to finally achieve relief after this traumatic accident.

61.  On the evening before her scheduled surgery—which was to occur first thing in the morning on October 5, 2023—Plaintiff Ordonez Vargas received an email notification from ICE instructing her to appear for an in-person check-in. Upon receiving this notification, Ms. Ordonez Vargas immediately contacted Dr. Gilbert Fernandez at Long Island Community Hospital to inform him about her ICE check-in.  The surgeon told Ms. Ordonez Vargas that—instead of the morning—her surgery could proceed in the afternoon immediately after her ICE check-in. The doctor also informed her not to eat in preparation for the surgery.

62. On October 5, 2023, Ms. Ordonez Vargas reported to Federal Plaza for her check-in with ICE. Ms. Ordonez Vargas had on her person all of her relevant documents for her check-in. She was also carrying all of the documents related to her surgery scheduled for that day. When Ms. Ordonez Vargas arrived at Federal Plaza, she was in a lot of pain, and her nose was leaking

fluids. She was taken to the fifth floor where she was made to wait for hours. Per the doctor's instructions, Ms. Ordonez Vargas had not eaten any food all day because she was awaiting her surgery.

63.    When she was finally called up for her interview with ICE, Ms. Ordonez Vargas asked for a translator so that she could inform the ICE officials about her surgery scheduled for that day. Ms. Ordonez Vargas was anxious not to miss her surgical appointment. Throughout her interview, she mentioned her nose was hurting and she was visibly in pain. Instead of permitting Ms. Ordonez Vargas to leave for her surgery following this routine check-in, ICE officials detained her immediately after her interview and took her into ICE custody. Once in ICE custody, ICE officials failed to provide Ms. Ordonez Vargas any medication to alleviate her pain and did not provide any medical attention for her bleeding and leaking nose.

64.    Lakeena T. Lloyd, RN cleared Ms. Ordonez Vargas for transfer into ICE detention on October 5, 2023, despite noting that Ms. Ordonez Vargas had a fractured nose and acknowledging that she "was scheduled to have surgery on her nose that day." Meanwhile, Ms. Ordonez Vargas received no medication and no treatment. ICE officials called Dr. Gilbert Fernandez to confirm whether Ms. Ordonez Vargas's surgery was later that day to which the Doctor confirmed.

65.    After being detained for hours, with no medical attention—and having not eaten anything for almost 24 hours in preparation for surgery—Ms. Ordonez-Vargas was transferred to OCCF in Goshen, New York. Ms. Ordonez Vargas still had the written documentation containing her surgeon's information and the details related to her surgery when she was detained by ICE. That physical paperwork was confiscated prior to her transfer to OCCF.

66. Upon arrival at OCCF, Ms. Ordonez Vargas again requested pain medication for her obvious face fractures to no avail.[27] She was sobbing uncontrollably from the pain she was experiencing, the discomfort during her transfer, and her exhaustion after a day without food while being deprived of the surgery she had scheduled.

67. Orange County Defendants claimed they were unable to provide Ms. Ordonez Vargas with medication because medical staff with the authority to write prescriptions were not at OCCF at the time. Ironically, however, the Wellpath and Orange County Defendants did have time to conduct a "wellness" screening during which the Wellpath Defendants questioned Ms. Ordonez Vargas about whether she had ever attempted suicide or had suicidal ideations. There was an interpreter available over the phone. She did her best to respond to the questions, but she was crying because of the excruciating pain from her face fractures and bloody broken nose. Upon information and belief there was a mistranslation done by the translator which resulted in Ms. Ordonez Vargas' placement into solitary confinement.

68. Ms. Ordonez Vargas responded to a question about depression and mentioned that she had once taken sleeping pills to fall asleep following an argument with her partner. Defendant Harkins noted in the Suicide Watch Initial Assessment for Mental Health that he could not understand her answers and noted the language barrier.

69. Despite this, Defendant Harkins e-signed a form that placed Ms. Ordonez Vargas in solitary confinement and put her on suicide watch.

---

[27] Bhama PK, Cheney ML (2017). Surgical management of facial fractures. In The Open Access Atlas of Otolaryngology, Head & Neck Operative Surgery. Retrieved from https://vula.uct.ac.za/access/content/group/ba5fb1bd-be95-48e5-81be586fbaeba29d/Surgical%20management%20of%20facial%20fractures.pdf (" Fracture reduction and fixation are best performed in the first wo weeks following injury").

70. Ms. Ordonez Vargas has never attempted to commit suicide in the past and did not state that she had attempted suicide when being assessed. A different Commission of Correction Suicide Prevention Screening stated that Ms. Ordonez Vargas did not have a prior suicide attempt.

71. Defendant Harkins knew or should have known that it was unnecessary to place Ms. Ordonez Vargas in solitary confinement and put her on suicide watch. Any reasonable provider would have taken steps to ensure that Ms. Ordonez Vargas received treatment for the fractures in her face made obvious by her bleeding, swelling, and crying.

72. Ms. Ordonez Vargas was not suicidal. But she did need urgent medical care for her face fractures—which Wellpath Defendants continued to ignore. Instead, she got no care and was locked in a solitary confinement cell to bleed from her bloody and swollen face, in pain and alone, for days while the Wellpath Defendants continued to ask if she wanted to kill herself.

73. It took an entire week for the Wellpath Defendants to examine Ms. Ordonez Vargas and to determine the extent of her facial fractures—which did not occur until October 12, 2023. Before that, Ms. Ordonez Vargas was given effectively no care for her bleeding nose or breathing difficulties. Ms. Ordonez Vargas' nose was allowed to bleed to the point that her nostrils were filled with coagulated blood while the Orange County Defendants assigned to watch over her well-being offered no relief.

74. In the meantime, Wellpath Defendants saw Ms. Ordonez Vargas for two meaningless appointments on October 6 and October 7, 2023. On October 6, Defendant Teneshia Washington appears not to have even examined Ms. Ordonez Vargas. Instead, Defendant Washington prescribed Ms. Ordonez Vargas a single dose of Tylenol and stated that she complained of "pain to nasal bones" and "recent fracture with surgery." But, of course, there had been no surgery.

Ms. Ordonez Vargas had been detained before her surgery could take place. Ms. Ordonez Vargas begged Defendant Washington to examine her nose and noted that she had an important surgery scheduled. Ms. Ordonez Vargas' nose was still noticeably bleeding at this point.

75.   Upon information and belief, Defendant Washington did not speak Spanish, did not seek to bring in a translator, and did not conduct any physical examination of Ms. Ordonez Vargas. No reasonable medical professional would have failed to examine their patient in this context.

76.   Upon information and belief, Wellpath subsidiaries have a specific policy that they must "include the use of a translation service [to] ensure that patients who have difficulty communicating understand how to access health services."[28]

77.   On October 7, 2023, Ms. Ordonez Vargas was seen again—this time by Defendant Mandi Zaccagnino, NP. But the result was the same as her October 6 appointment with Defendant Washington. Defendant Zaccagnino did not conduct any physical examination of Ms. Ordonez Vargas. Instead, she ordered two more doses of Ibuprofen for Ms. Ordonez Vargas to receive on days three and four of her solitary confinement. There was still no examination of Ms. Ordonez Vargas' facial fractures. No reasonable medical professional would have failed to examine their patient in this context.

78.   Defendant Mandi Zaccagnino N.P. knew or should have known of the extent of Marisol's injuries and a reasonable person would have known to provide more adequate medical care.

---

[28] Wellpath Clark County Detention Center Policies and Procedures, Nonemergency Health Care Requests, Page 1 ("Special procedures, including the use of a translation service, ensure that patients who have difficulty communicating understand how to access health care services. Any special procedure used shall be documented in the health record to demonstrate effective communication").

79.  While Ms. Ordonez Vargas remained in solitary confinement, she repeatedly informed the guards outside of her cell, Individual Defendants 1-3, that her nose was bleeding and in extreme pain, but Defendants provided no medical treatment for her.Ms. Ordonez Vargas was in solitary confinement for a week, during which the Individual Defendants failed to take any steps for Ms. Ordonez Vargas to receive proper treatment.

80.  While in solitary confinement, Individual Defendants 1-3 and other Orange County Defendants threw trays of food on the ground in her cell. She had to sleep on the floor in isolation, with no sheets. She was not given any privacy when using the bathroom, despite asking. In the cell, there was no toilet paper. She was not permitted to shower until she was removed from solitary confinement, and she was prohibited from making calls for several days during her detainment. Individual Defendants 1-3 and other Orange County Defendants told Plaintiff that there was no doctor available.

81.  Defendant Corrections Doe 1-3 and other OCCF staff told Plaintiff that they did not speak Spanish and could not understand her pleas for medical treatment. Upon information and belief, they did not attempt to find a staff member who spoke Spanish or a translator. But a language barrier is no excuse for failing to treat Ms. Ordonez Vargas, who was visibly in pain and clearly bleeding from her nose while trying to get the attention of Individual Defendants 1-3 and other Orange County Defendants. But the Defendants took no action.

82.  It took another five days for Ms. Ordonez Vargas to see any of the Wellpath Defendants for any kind of medical attention. In the meantime, Ms. Ordonez Vargas was transferred from solitary confinement to the general population. The air conditioning was set so high that it burned her nose, causing the pain from the fractures in her face to become progressively worse. Ms. Ordonez Vargas' nose also required cleaning by a medical professional

24

because the coagulated blood was preventing any drainage and further exacerbated her breathing issues.

83.  Plaintiff Ordonez Vargas submitted three to four formal written grievances to the Wellpath and Orange County Defendants explaining that she had several nasal fractures and needed medication. Each time, Ms. Ordonez Vargas was told that she was on a list of people who were supposed to receive medical attention. But there was no medical professional who examined Ms. Ordonez Vargas during this critical time.

84.  Finally, on October 12, 2023—a full week into her detention at OCCF—Ms. Ordonez Vargas saw Defendant Zaccagnino again for an actual physical examination of her condition. Defendant Zaccagnino determined what was already obvious—that Ms. Ordonez Vargas did indeed have a "fracture of nasal bones sequela." Rather than providing care directly, Defendant Zaccagnino informed Ms. Ordonez Vargas that they should wait for a recommendation from her treating physician in the community. Ms. Ordonez Vargas tried to inform Defendant Zaccagnino that the paperwork with her doctor's information was available because it had been taken and reviewed by ICE upon her detention. Ms. Ordonez Vargas informed Defendant Zaccagnino that this paperwork had all the information Defendant Zaccagnino needed to confirm her surgery.

85.  Upon information and belief, Defendant Zaccagnino took no steps to obtain the relevant medical information from ICE, or to locate Ms. Ordonez Vargas' medical papers that were taken from her during her detention. Instead, Defendant Zaccagnino decided to "send release of information to various hospitals in an effort to locate plaintiff's records." This was a patently unreasonable delay tactic. Ms. Ordonez Vargas had already informed Defendant Zaccagnino where to look for her provider's information.

86. Upon information and belief, Defendant Jillian Barone also interacted with Ms. Ordonez Vargas on October 12, 2023, and did not provide any relevant medical care despite confirmation of her condition. Upon information and belief, Defendant Barone knew or should have known to provide relevant medical care to alleviate the fracture confirmed by Defendant Zaccagnino, and any reasonable provider would have promptly provided the needed medical care.

87. Ms. Ordonez Vargas repeatedly asked Defendant Zaccagnino and other Wellpath Defendants to examine her previously-taken medical papers and emphasized the importance of the documentation multiple times because it had the information about her surgery.

88. On October 16, 2023, Ms. Ordonez Vargas once again formally requested medical attention—noting that she needed her nose surgery because she was unable to breathe well for days and could not breathe through her right nostril.

89. On October 17, 2023, Defendant Zaccagnino saw Ms. Ordonez Vargas only to note that an X-ray clearly proved her fractures—which was already abundantly clear based on Defendant Zaccagnino's own examination days prior. But instead of taking any immediate steps to schedule surgery or otherwise offer treatment, Defendant Zaccagnino decided to take no action and "review records when obtained." But Ms. Ordonez Vargas had already made clear that she had her surgery scheduled and where that paperwork identifying her surgeon was. Nor was there any reason to delay further, as any forwarded records would simply have confirmed what Defendant Zaccagnino already knew or should have known from Ms. Ordonez Vargas' first appointment—that she had a broken and continuously bloody nose that needed prompt treatment.

90. Belying any sense of urgency, Defendant Zaccagnino and the Wellpath Defendants did not even attempt to send around requests for medical records as to Ms. Ordonez Vargas until

October 25-27, 2023—at least 13 days after Defendant Zaccagnino's physical examination of Ms. Ordonez Vargas and 18 days since their first appointment. No reasonable provider would wait 18 days before even attempting to seek medical records for a patient with persistent bleeding and fractures in the face—let alone wait for medical records at all under these circumstances. These circumstances are even more unacceptable because, upon information and belief, Defendant Zaccagnino had access to medical records from ICE indicating their awareness of Ms. Ordonez Vargas' surgery and the details regarding that surgery.

91.  Finally on October 30, 2023, Ms. Ordonez Vargas was seen by Defendant Dominick Piacente, MD. Defendant Piacente—the first doctor Ms. Ordonez Vargas ever had the opportunity to see almost a month after her detention—noted that her nasal septum was deviated to the right, which observation is consistent with the specialist's diagnosis of there being a complete occlusion of the right nasal airway and Ms. Ordonez Vargas' complaints of difficulty breathing on the right side. But again, Defendant Piacente declined to provide Ms. Ordonez Vargas with any care and, upon information and belief, insinuated that Ms. Ordonez Vargas' surgery was unnecessary because he too had a nasal fracture without surgery.

92.  This was a deeply disappointing encounter. When Defendant Piacente arrived, he asked the Ms. Ordonez Vargas what the issue was, and she explained that she had a nasal fracture and ongoing bleeding. Defendant Piacente responded by telling her that he himself had once had a nasal fracture, but that no one had paid for him to have a nose surgery. The clear implication was that Defendant Piacente was not interested in providing the medical care that Wellpath and Orange County Defendants are constitutionally compelled to provide, depriving Ms. Ordonez Vargas the opportunity to attend the necessary surgery she herself had scheduled and arranged payment for through insurance.

93.  Defendant Piacente then briefly touched Ms. Ordonez Vargas' nose and provided no further medical attention or treatment. In the process, Defendant Piacente belittled Ms. Ordonez Vargas' injury and her pain. The entire encounter lasted approximately five minutes.

94.  Ultimately, Long Island Community Hospital did fax records to the Wellpath and Orange County Defendants confirming that Ms. Ordonez Vargas was in pain and had been scheduled for surgery on October 5, 2023. But Ms. Ordonez Vargas was released from custody on November 9, 2023, without ever receiving any meaningful medical attention for her facial fractures.

95.  Ms. Ordonez Vargas saw Defendants Teneshia Washington, RN; Jillian M Barone, RN; Mandi Lee Zaccagnino, NP; and Dominick Piacente, MD—all of whom were employees of the Wellpath Defendants. These individual defendants all independently confirmed that Ms. Ordonez Vargas had a fractured nose, but all either provided no medical care or only administered ibuprofen. Defendants Washington, Barone, Zaccagnino, and Piacente all knew or should have known the extent of Ms. Ordonez Vargas' injuries and any reasonable medical provider would have responded with prompt treatment. They failed to do so.

96.  Despite Ms. Ordonez Vargas' confirmed nasal fracture; confirmed appointment for surgery; and that she repeatedly requested medical help because she could not breathe, her nose was bleeding, and she was in immense pain that the ibuprofen was not helping, the Wellpath Defendants did not provide any medical treatment besides ibuprofen.

97.  Defendants released Plaintiff from custody on November 9, 2023.

98.  Because the Wellpath Defendants failed to treat Plaintiff's fractured nose while she was in OCCF, her nose healed before it could be realigned or otherwise treated, leading to ongoing (and likely permanent) difficulty breathing and pain.[29]

99.  After Ms. Ordonez Vargas was discharged, she was unable to undergo the surgery that had been recommended and previously approved by her insurance. That is because the insurance company determined that the time delay in rescheduling her surgery meant that the surgery would no longer be covered by insurance. Additionally, Ms. Ordonez Vargas' nose will likely need to be re-broken before she can receive appropriate treatment for her complex fractures.

### A Custom and Practice of Inadequate Medical Care by Wellpath and its Affiliate NY Correct Care—Orange County's Previous Medical Provider.

100. Unfortunately, the unacceptable medical "treatment" that Plaintiff Cruz and Plaintiff Ordonez Vargas received while in custody at OCCF is part and parcel of the Wellpath Defendants model of doing business—including Defendant NY Correct Care.

101. Wellpath Defendants engage in a well-documented policy and practice of cost-cutting for the benefit of the counties it serves. Upon information and belief, Defendant Orange County had engaged Wellpath precisely for its "affordability" as a jail healthcare provider. Defendant Orange County had engaged Defendant NY Correct Care to provide care at OCCF until it became politically untenable to do so given Wellpath's bankruptcy and the litany of lawsuits filed against the company for its unscrupulous practices.[30]

---

[29] Children's Hospital of Philadelphia. *Nasal Fracture*. https://www.chop.edu/conditions-diseases/nasal-fracture#:~:text=A%20broken%20nose%20can%20also%20cause%20more,that%20can%20cause%20the%20bridge%20to%20collapse. (" If a broken nose is left untreated, [it] can have permanent changes in breathing, a susceptibility to sinus infections, and a nose that looks misshapen or different from [the] original nose.")
[30] Dietrich Knauth, *Wellpath signs off on behavioral health unit in bankruptcy sale,* (Jan. 8, 2025), https://www.reuters.com/legal/government/wellpath-spins-off-behavioral-health-unit-bankruptcy-sale-2025-01-08/ ("Wellpath filed for bankruptcy in November 2024 with $644 million in debt. The company was facing over 1,500

102. Upon information and belief, many of Wellpath's healthcare contracts provide that Wellpath shall establish a scheduling system designed to consolidate offsite appointments and services to minimize the impact upon corrections staff and transportation vehicles.[31]

103. Upon further information and belief, many of Wellpath's contracts provide that Wellpath is contractually responsible for attempting all clinically appropriate interventions before sending a detainee for offsite treatment, to save the counties Wellpath serves money on offsite treatment.[32]

104. These policies contribute to Wellpath routinely failing to provide time-sensitive medical care in pursuit of cost-cutting. Upon information and belief, Defendant NY Correct Care has adopted policies that are co-extensive with these cost-cutting policies of its previous parent company, Wellpath.

105. A report issued by the Project on Government Oversight indicated Wellpath's predecessor Correct Care Solutions had been sued 1,395 times in federal court as of September 12, 2019.[33] Leading these suits are claims of wrongful death, malpractice, and inadequate medical care.[34] Investigative reports published by CNN[35] and The Atlantic[36] in 2019 further

---

lawsuits alleging that Wellpath provided deficient medical care to prisoners, and it underperformed financial expectations due to rising costs for labor and professional liability coverage").

[31] Coleman Dep., 165:18 - 165:24, Oct. 2, 2024 (taken in *O'Neill v. Las Vegas Metropolitan Police Dep't*, No. 2:22-cv-00474-ART-BNW, D. NV.) ("we want to have as few transports out of the facility as possible so that we are [...] not impacting security staff [...] So if I have five people that need to see the neurologist, I'm going to try and schedule them all at the same time, so they make one visit to the neurology office instead of five").

[32] *Id.* ("Payment for pre-existing illness or injuries contracted or incurred by a prisoner prior to being in custody and previously treated prior to being in CDDC or NVC will not be the responsibility of [...] Wellpath; however, all clinically appropriate interventions should be made to treat the prisoner before seeking offsite treatment").

[33] Ken Silverstein, Leading For-Profit Prison and Immigration Detention Medical Company Sued at Least 1,395 Times, (Oct. 29, 2018), https://www.pogo.org/investigations/leading-for-profit-prison-and-immigration-detention-medical-company-sued-at-least-1-395-times.

[34] *Id.*

[35] Blake Ellis & Melanie Hicken, *CNN investigation exposes preventable deaths and dangerous care that government agencies have failed to stop*, CNN (June 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

[36] Marsha McLeod, *THE PRIVATE OPTION*, The Atlantic (Sept. 12, 2019), https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/.

detail the denial of adequate medical care, lack of medical care options, and other life-threatening inadequacies in the medical care provided by Wellpath and its predecessor entity in jails throughout the United States.

106. The CNN report cited "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [Wellpath][37] has provided substandard care that has led to deaths and other serious outcomes that could have been avoided."[38]

107. The CNN report went on to state:[39]

    i.    "Across the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. [Wellpath] employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."

    ii.    "A review of lawsuits filed over the last five years found the company has been sued for more than 70 deaths. In other lawsuits over that time period, inmates have alleged prolonged suffering, ongoing complications, shortened life expectancy and debt."

    iii.    Among the instances of inmates being denied adequate medical care are Henry Clay Stewart and Jeff Lillis who both died after not receiving

---

[37] The report details care provided by Wellpath's predecessor entity, Correct Care Solutions (CCS), and notes that CCS was renamed Wellpath after it was acquired by a private equity firm. In this section and for the sake of consistency, Wellpath is named instead of CCS.

[38] Ellis & Hicken, *supra* note 6.

[39] *Id.*

adequate medical care from the company while incarcerated. "Doctors who examined records from around a dozen deaths and other incidents for CNN said they believed that in the majority of the cases they reviewed, serious outcomes could have been avoided and inmates including Stewart and Lillis could have lived had [Wellpath] provided proper care."

    iv.    "In December [2018], the US Department of Justice took the rare step of declaring the medical program at a Virginia jail unconstitutional. It found that inmate requests at the Hampton Roads Regional Jail were ignored or otherwise not taken seriously, resulting in serious harm and death."

108. Directly referencing and implicating the pattern, practice, policy and/or custom of Wellpath, the CNN report stated, "In a deposition in a South Carolina lawsuit, a medical director [for the company] . . . said in 2014 that the company made it clear that employees who 'run up the tab' wouldn't be around very long. He said there was pressure on him from both the county and [Wellpath] to limit emergency room transfers because of the 'severe expense' involved -- regardless of who had to foot the bill."

109. Further evidence of this pattern, practice, policy and/or custom of prioritizing profit by denying medical care was another employee interviewed by CNN, "[W]ho said she started working for [a county jail] facility more than a decade ago when the county ran the medical unit, said that after [the company] took over she repeatedly made it clear to her supervisors and a county official that she believed inmates were at risk. Medical decisions and staffing were being driven by an 'obsession with profit,' she said."

110. The sheer number of reports of Wellpath's pattern or practice of cost-cutting has raised significant concerns for legislators. In a December 18, 2023, letter signed by twelve

United States Senators, it is stated that Wellpath "routinely fails to provide time-sensitive care."[40]

111. The severity of the allegations included in the complaints against Wellpath have also resulted in investigations by the United States Department of Justice Civil Rights Division. In San Luis Obispo County, the D.O.J. found that there was "reasonable cause to believe that the Jail violates the constitutional and statutory rights of its prisoners by its [...] failure to provide constitutionally adequate medical care."[41]

112. Defendant NY Correct Care, as a subsidiary of Wellpath and an adopter of its policies and methods—has the same custom or practice of providing deficient medical care.

113. Specifically, Defendant NY Correct Care has a pattern of failing to develop and implement appropriate medical screening instruments that identify observable and non-observable medical needs, including chronic diseases.

114. Defendant NY Correct Care has a pattern of failing to ensure timely access to a physician when patients present symptoms requiring such care.

115. Defendant NY Correct Care has a pattern of failing to ensure inmates have access to adequate health care, including by failing to ensure that the medical request process for inmates adequately meets inmates' needs. The medical request process should include adequate logging, tracking, and timely responses by medical staff.

---

[40] Letter from U.S. Senator Elizabeth Warren, et al., to Ben Slocum, Wellpath C.E.O., Tony Tamer, Founder and C.E.O, H.I.G. Capital, and Sami Mnaymneh, Founder and C.E.O., H.I.G. Capital (Dec. 18, 2024), (https://www.warren.senate.gov/imo/media/doc/2023.12.18%20Wellpath%20letter1.pdf).

[41] Letter from Kristen Clarke, Ass't Attorney General, U.S. Dep't of Justice Civil Rights Division to Wade Horton, San Luis Obispo County Administrative Officer and Sheriff Ian Parkinson, San Luis Obispo County Sheriff's Office (Aug. 31, 2021) (Re: Investigation of San Luis Obispo County Jail) (https://www.justice.gov/crt/case-document/file/1429036/dl?inline).

116. Defendant NY Correct Care did not understand the New York health services market well enough to provide quality care to OCCF inmates and detainees.

117. Upon information and belief, Defendant Orange County knew or should have known about Wellpath and NY Correct Care long pattern and practice of failures to provide medical care—and chose to take no action despite horrifying accounts of medical neglect until Wellpath declared bankruptcy and it was no longer palatable to work with Defendant NY Correct Care.[42]

**A Custom and Practice of Inadequate Medical Care by YesCare—Orange County's Current Medical Provider.**

118. Rather than find a provider to offer appropriate medical care to incarcerated individuals, Defendant Orange County instead opted for YesCare—a for-profit prison healthcare provider that has its own track record of cost-cutting and egregious medical outcomes for people in the care of state and local authorities.

119. On January 1, 2025, YesCare "began offering comprehensive medical services [] at the Orange County Correctional Facility in Goshen, New York." Prior to its contract with Orange County, YesCare had an extensive history of providing inadequate medical care to incarcerated patients.

120. Defendant YesCare has a custom and practice of cost-cutting and substandard care that directly impacted Plaintiff Cruz—who was denied the emergency lupus treatment she needed because of YesCare Defendants' decisions after January 1, 2025.

---

[42] Lana Bellamy, *Orange County Continues to Use Controversial Medical Provider at Jail as it Prepares New Requests for Proposals,* April 16, 2024, https://www.timesunion.com/hudsonvalley/news/article/orange-county-jail-wellpath-correct-care-19403303.php ("The state Commission on Correction investigated two recent prior deaths at Orange County Jail, concluding that the lack of adequate medical care by New York Correct Care Solutions may have contributed to them. The commission also directed Orange County to reconsider its contract with New York Correct Care Solutions. [Orange County Attorney Rick] Golden said the county sheriff's office conducted internal investigations and met with the company, and was satisfied that it had taken steps to prevent similar incidents in the future."

121. Defendant YesCare[43] has a pattern of failing to ensure that adequate intake screening and health assessments are provided.

122. Defendant YesCare has a pattern of failing to develop and implement appropriate medical screening instruments that identify observable and non-observable medical needs including chronic diseases.

123. Defendant YesCare has a pattern of failing to ensure timely access to a physician when patients present symptoms requiring such care.

---

[43] YesCare was formerly known as Corizon Health. Starting in May 2022, Corizon Health began to restructure and divide itself into two entities, Tehum Care Partners, a company that assumed Corizon's debts and liabilities, and YesCare, the company that assumed all of Corizon's active corrections contracts. Similar to Wellpath, Tehum declared bankruptcy in February 2023 which stayed claims against the company. Now, YesCare continues to provide health care in prisons and jails across the country, including OCCF. *See* Beth Schwartzapfel, *A Prison Medical Company Faced Lawsuits From Incarcerated People. Then It Went 'Bankrupt.'*, The Marshall Project (Sept. 19, 2023), https://www.themarshallproject.org/2023/09/19/corizon-yescare-private-prison-healthcare-bankruptcy; Hannah Harris Green, *When US prison healthcare companies went bust, victims' families kept fighting*, The Guardian (Aug. 19, 2025), https://www.theguardian.com/us-news/2025/aug/19/us-private-prison-healthcare-companies; Private Equity Stakeholder Project, High stakes in Corizon/YesCare bankruptcy decision (Mar. 22, 2024), https://pestakeholder.org/news/high-stakes-in-corizon-yescare-bankruptcy-decision/.

Despite the legal maneuvers in which Corizon and YesCare  engaged to evade liability, Corizon's history of providing inadequate medical care and the attendant allegations against it should be imputed to YesCare because of the lack of distinction between the two entities. For one, YesCare–a company that was created in 2022–references Corizon's history of providing medical care to inmates in describing itself "[a]s the correctional healthcare pioneer and leader for 40 years." *See* YesCare Corp., "About YesCare," https://www.yescarecorp.com/about; U.S. Senator Elizabeth Warren, et al.,. "Letter Re Corizon Texas Two-Step" (Oct. 24, 2023), https://www.warren.senate.gov/imo/media/doc/2023.10.24%20Letter%20re%20Corizon%20Texas%20Two-Step.pdf. Further, when announcing "the company's next chapter" during the reorganization process, YesCare stated that "**the dedicated employees of Corizon Health are now YesCare,**" thus making clear that **YesCare is "composed of the former Corizon Health team."** *See* Business Wire, Leading Healthcare Group Forms YesCare, Debuting New Vision and Leadership (May 16, 2022), https://www.businesswire.com/news/home/20220516005378/en/Leading-Healthcare-Group-Forms-YesCare-Debuting-New-Vision-and-Leadership.

As U.S. Senator Elizabeth Warren noted in her letter to the U.S. Trustee for the Southern and Western District of Texas, "the assurances of 'corporate separateness' between YesCare and Tehum are a plainly unconvincing attempt to shelter assets and avoid adequately compensating victims. Even a federal judge in the Eastern District of Michigan has found that YesCare's subsidiary 'CHS TX is a mere continuation of pre-division Corizon . . . . Evidently, CHS TX picked up right where Corizon left off. Indeed, CHS TX holds itself out to clients as Corizon's successor.'" *See* U.S. Senator Elizabeth Warren, Letter to U.S. Trustee re Corizon Bankrutpcy (Jan. 31, 2024), https://www.warren.senate.gov/imo/media/doc/2024.01.31%20Letter%20to%20U.S.%20Trustee%20re%20Corizon%20Bankrupcy.pdf; *Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022), at *13.

124. Defendant YesCare has a pattern of failing to ensure inmates have access to adequate health care, including by failing to ensure that the medical request process for inmates adequately meets inmates' needs. The medical request process should include adequate logging, tracking, and timely responses by medical staff.

125. Defendant YesCare did not understand the New York health services market well enough to provide quality care to OCCF inmates and detainees.

126. In 2013, the American Civil Liberties Union observed that Corizon (now YesCare) was sued 660 times in the preceding five years for malpractice. One nurse, Diane Jackson, stated that Corizon saves "money by skipping the ambulance and taking prisoners directly to the morgue."

127. As of late 2021, Corizon (now YesCare) was sued over 1,000 times by plaintiffs alleging substandard care. By one estimate, Corizon was named as a defendant in wrongful death and sexual abuse lawsuits more than 1,300 times.

128. A 2023 investigative report published by The Marshall Project details Corizon's history of providing substandard medical care to incarcerated patients throughout the United States, leading to serious injuries and even death.

129. That same investigative report, for instance, detailed a case in which multiple Corizon nurses at a jail in Kent County, Michigan, were found to be deliberately indifferent to a 40-year-old inmate's pain and suffering, thus awarding the plaintiff and his family more than $6 million.

130. A 2023 *amicus* brief submitted on behalf of nonprofit legal advocacy organizations to the U.S. Bankruptcy Court for the Southern Division of Texas, in support of *pro se* litigants'

requests for notice and opportunity to participate in Chapter 11 proceedings, further detailed

Corizon's history of providing inadequate medical care:

> For over a decade, Corizon maximized profits by systematically providing substandard care—and sometimes no care at all—subjecting incarcerated people to a substantial risk of serious harm and death. Indeed, a federal district court found that the State of Arizona's prison health care system, which Corizon was responsible for administering between 2013 and 2019, "is plainly grossly inadequate." *Jensen v. Shinn*, 609 F. Supp. 3d 789, 796 (D. Ariz. 2022). As the Court detailed in its 200-page opinion, multiple incarcerated people died or were seriously harmed as a direct result of Corizon's failure to provide timely and adequate health care. See *id*. at 815- 16, 818-22, 827-30, 903 n.70. Many more suffered prolonged and preventable pain and suffering. *Id*.

131. The court in *Jensen v. Shinn* further observed that the Corizon defendants (no

YesCare) were "aware of their failures for years and [] refused to take necessary actions to

remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of

monetary sanctions, establish Defendants are acting with deliberate indifference to the

substantial risk of serious harm posed by the lack of adequate medical and mental health care

affecting all prisoners." 609 F. Supp. 3d 789, 796 (D. Ariz. June 30, 2022).

132. Upon information and belief, Defendant Orange County knew or should have known

about YesCare's long pattern and practice of failures to provide medical care.

### Orange County's Pattern and Practice of Inadequate Medical Treatment

133. Defendant Orange County has an extensive, well-documented history of failing to

provide adequate medical care to individuals in its custody while those individuals are

incarcerated at OCCF. Upon information and belief, Defendant Orange County carries out that

custom and practice by engaging private prison medical providers like Defendant NY Correct

Care and YesCare to provide medically deficient treatment for a fraction of the cost.

134. In particular, Defendant Orange County maintains a practice of: (1) refusing to assess and evaluate individuals to determine if they need medical care; (2) delaying the provision of medical care; and (3) ignoring complaints and requests for treatment and care—especially when the contemplated treatment would require expensive care or outside referral. Repeated investigations into misconduct at OCCF make these practices abundantly clear.

135. In 2025, New York Lawyers for the Public Interest detailed in a report the "severe and systemic deficiencies in medical care" that detainees at OCCF experience. The report specifically documents Orange County's failure to provide follow-up care, lack of care for chronic conditions, improper prescriptions and denials of medication, and lack of competent language assistance at OCCF.[44]

136. In 2024, the New York State Commission on Correction investigated at least three deaths at OCCF and identified "a lack of adequate medical care" at the jail as a contributing factor. The incidents included the deaths of Michael Stevenson, who died from acute cardiac arrest resulting from coronary artery disease that was inadequately treated while he was detained at Orange County Jail, Troy Conklin, who died by suicide and whose "risk for suicide was not fully recognized" by the jail and Ricky Mack, who died from a combination of health-related issues and suffered from "gross failures in the medical assessments and treatment of Mack

---

[44] New York Lawyers for Public Interest, Denied Care, Denied Dignity: Systemic Medical Failures in Immigration Detention at Orange County Jail, https://www.nylpi.org/wp-content/uploads/2025/09/English-OCJ-Health-in-Detention-Report_FINAL.pdf (" We documented numerous instances of ICE failing to provide daily and routine monitoring such as eye exams for someone with glaucoma, blood pressure tests for people with hypertension and diabetes, and psychiatric care for people with serious mental health conditions. These failures cause prolonged suffering and place people at risk of worsening complications, including irreversible organ damage and suicidality")

during his incarceration that were contributory to his death."[45] Regarding the inadequate medical treatment, Orange County Attorney Rick Golden conceded that the "failures noted by the commission were significant[.]"[46] The report issued by the Commission in response to the death of Michael Stevenson directed "the County Legislature shall review the above findings and conduct an inquiry into the fitness of the currently designated provider."[47] Upon information and belief, Wellpath declared bankruptcy before the legislature conducted its inquiry.

137. In 2023, the New York Civil Liberties Union observed that the "regular abuse, exploitation, and inadequate medical care that immigrants face while trapped in jail are particularly abhorrent at Orange County Jail[,]" including ICE and local law enforcement denying basic medical care to the people incarcerated there."[48]

138. In 2022, after a tour of OCCF, New York City Council members and advocates raised concerns about "inadequate medical care and insufficient language services at" OCCF. One Council member described the conditions at the facility—such as OCCF making individuals wait seven days to get tested for Covid—as "medical negligence [that] is egregious, [] profoundly unacceptable, [and] disrespectful."[49]

---

[45] Lana Bellamy, *Orange County continues to use controversial medical provider at jail as it prepares new request for proposals*, Times Union (Apr. 16, 2024), https://www.timesunion.com/hudsonvalley/news/article/orange-county-jail-wellpath-correct-care-19403303.php.; New York State Commission on Correction, *Final Report of the New York State Commission on Correction in the Matter of the Death of Michael Stevenson, an incarcerated individual of the Orange County Jail* (Dec. 18, 2024), https://scoc.ny.gov/system/files/documents/2025/02/stevenson-michael-orange-cj.pdf.

[46] New York State Commission on Correction, *Final Report of the New York State Commission on Correction in the Matter of the Death of Michael Stevenson, an incarcerated individual of the Orange County Jail* (Dec. 18, 2024), https://scoc.ny.gov/system/files/documents/2025/02/stevenson-michael-orange-cj.pdf.

[47] New York State Commission on Correction, *Final Report of the New York State Commission on Correction in the Matter of the Death of Michael Stevenson, an incarcerated individual of the Orange County Jail* (Dec. 18, 2024), https://scoc.ny.gov/system/files/documents/2025/02/stevenson-michael-orange-cj.pdf.

[48] New York Civil Lib. Union, *New York Jails are Conspiring with ICE to Abuse Immigrants* (May 2, 2023), https://www.nyclu.org/commentary/new-york-jails-are-conspiring-ice-abuse-immigrants.

[49] Giulia McDonnell Nieto del Rio & Fisayo Okare, *Advocates Raise Concerns About Orange County Jail After Rare Tour*, Documented (May 17, 2022), https://documentedny.com/2022/05/17/orange-county-jail-covid-ny/.

139. In 2022, a coalition of organizations—Catholic Charities Community Services –
Archdiocese of New York, Envision Freedom Fund, For the Many, Freedom for Immigrants,
New York Lawyers for the Public Interest, and New York University Law Immigrant Rights
Clinic—submitted a civil rights complaint to the U.S. Department of Homeland Security
alleging, among other issues, medical neglect, abuse, and retaliatory withholding of care at
OCCF. The complaint alleges the following:

> Detained people are regularly "ignored." Medical staff often take days, at times
> weeks, to respond to requests for medical attention. People have to submit "four or
> five sick calls" to get the attention of staff, and "go without medication for two or
> three weeks" due to gaps in prescription refills. Not only do sick calls and medication
> requests generally go unanswered, but OCCF also fails to give detained people copies
> of their requests, making it harder for them to keep a record of the number of times
> they have asked for help.

> Evidence shows that even when provided, medical treatment at OCCF is negligent
> and dehumanizing. Critical medical information is not communicated in the
> individual's preferred language, and interpreters are reportedly not used during
> appointments. Painkillers regularly substitute for actual care, even when medically
> inappropriate or inadequate. One person's medical records revealed that despite
> measurements of elevated liver enzymes indicative of liver disease, OCCF failed to
> conduct any additional testing, leaving the individual at risk of chronic liver
> damage.[50]

140. In 2022, The Legal Aid Society, Brooklyn Defender Services, and The Bronx
Defenders condemned OCCF's failure to protect individuals who were detained during a
widespread Covid-19 outbreak. The organizations specified "that people at Orange County

---

[50] Complaint submitted to the U.S. Department of Homeland Security, *Racist and Retaliatory Abuse, Violence, and Medical Neglect Endured by Individuals Detained at Orange County Correctional Facility*, (Feb. 17, 2022), available at https://www.law.nyu.edu/sites/default/files/OCCF%20Multi-Organization%20DHS%20CRCL%20Complaint%20and%20Index_2%2017%202022.pdf; Chris McKenna, *A moneymaker for years, Orange County jail ICE detention faces glare after complaints*, Times Herald-Record (Mar. 22, 2022), https://www.recordonline.com/story/news/local/2022/03/22/immigrants-held-orange-county-ny-jail-ice-blast-their-conditions/9430863002/ ("[The complaints] claimed the jail food is inedible, the medical care slow and indifferent."); Chris McKenna, *ICE moved 65 detained immigrants from Orange County jail to Mississippi and Buffalo*, Times Herald-Record (Aug. 3, 2022), https://www.recordonline.com/story/news/local/2022/08/03/ice-moves-detained-immigrants-orange-county-correctional-facility-to-mississippi-buffalo/65389710007/ ("The complaints about jail conditions earlier this year included allegations of barely edible food, indifferent medical care and frequent use of solitary confinement as punishment for trivial offenses.").

Correctional Facility are denied adequate medical care while the coronavirus is surging within the walls of the detention facility." Jose Luis, who was incarcerated at OCCF at the time, stated that he and others at the facility were "waiting so long for medical care" leading him to "becoming weaker by the day." Members of the New York State Assembly described "alarming" conditions at OCCF including OCCF's "failure to properly implement health and safety protocols [which] puts incarcerated individuals and staff at risk."[51]

141. Between 2015 and 2016, an individual identified as Luke R. was incarcerated by ICE at OCCF, at which time the facility knew about his schizophrenia and the medications he had been taking. OCCF, however, failed to treat Luke's condition during his detention, according to a report released by Human Rights Watch and Community Initiatives for Visiting Immigrants in Confinement. The report—which includes analyses by doctors who reviewed relevant medical records—described the care Luke received at OCCF as "abysmal." It indicates that OCCF medical officials gave Luke the wrong medication and did not provide him with necessary therapy. In addition, OCCF officials placed Luke in solitary confinement where he banged his head against a glass window, breaking it and causing a "large laceration" on his forehead. When OCCF officials first responded to the incident, they did not stop the bleeding or assess Luke. Instead, they placed him in restraints and recorded the incident while Luke waited an additional six minutes to be assessed by medical professionals. The report describes this delay in care as "a red flag" that "could be life or death."[52]

---

[51] Press Release, The Legal Aid Soc'y, Brooklyn Def. Servs., The Bronx Defs., *NYIFUP Statement on Client Reports of a Widespread COVID-19 Outbreak in New York Jail Impacting Immigrants in ICE Detention* (Jan. 27, 2022), https://legalaidnyc.org/wp-content/uploads/2022/01/NYIFUP-Statement-on-COVID-19-Outbreak-at-Orange_ICE-Detention.pdf.

[52] Human Rights Watch & Community Initiatives for Visiting Immigrants in Confinement, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention* (May 2017), https://www.endisolation.org/wp-content/uploads/2017/05/CIVIC_HRW_Report.pdf, at 73-75; *Id.* at 58 ("Records from people held in Orange County Jail in New York . . . also reveal instances in which requests for care were

142. In 2019, Luis Medina was incarcerated at OCCF when, during his first day in custody, he complained of severe pain and swelling in his fourth and fifth fingers in his right hand and was subsequently examined by medical personnel employed by Wellpath. After being examined by a doctor for the pain, Mr. Medina was only given painkillers and ointment before the doctor directed that he be sent to an outside hospital for treatment. At that hospital, Mr. Medina was diagnosed with an abscess in his right hand that needed to be drained and was then discharged with specific instructions to return in two days for additional orthopedic treatment. Once Mr. Medina returned to OCCF, however, he was never sent back to the outside hospital despite his frequent complaints of severe pain and swelling. Instead, medical personnel at OCCF only treated Mr. Medina with Motrin, naproxen, oral antibiotics, and antibiotic ointment. Mr. Medina did not receive adequate treatment until after he was transferred to another facility. Due to the inadequate treatment at OCCF, Mr. Medina suffered severe pain and infection that required surgery and lengthy treatment with antibiotics.[53]

143. In 2020, Paul Smith was incarcerated at OCCF when he notified Orange County officials of his need for medical treatment after being attacked. The Orange County defendants failed to provide adequate medical treatment to Mr. Smith and, as a result, Mr. Smith suffered severe injuries.[54]

144. In 2023, Niki Capaci was incarcerated at OCCF when, three days after her incarceration, she was found dead in her cell. At the time of her incarceration, Ms. Capaci was

---

ignored or were addressed only after unreasonable delay."); *Id.* at 75 ("Reena Aurora, an attorney with New York Lawyers for Public Interest, told Human Rights Watch one of her clients had attempted suicide at Orange County Jail (the same facility in which Luke R. was held), and he was placed in isolation and never had a psychiatrist do an evaluation or assessment."); *see also* Annamarya Scaccia, *When Suicide Happens at Immigration Detention Centers, Who Is to Blame?*, VICE (May 26, 2017), https://www.vice.com/en/article/when-suicide-happens-at-immigration-detention-centers-who-is-to-blame/.

[53] *Medina v. DuBois*, Case No. 7:22-cv-08051-NSR, ECF No. 31 (S.D.N.Y. Apr. 17, 2024).
[54] *Smith v. DuBois*, Case No. 7:23-cv-08211-CS, ECF No. 10 (S.D.N.Y. Dec. 18, 2023).

experiencing symptoms of severe opioid withdrawal. She was intolerant to buprenorphine, a common medication given to treat opioid withdrawal. Nonetheless, Ms. Capaci was given the medication which resulted in her becoming "extremely ill with uncontrollable vomiting and diarrhea." At this time, Ms. Capaci was under special protocol requiring OCCF personnel to perform periodic checks, but she was largely left alone in her cell while she was ill, without any medical intervention by OCCF personnel including medical staff.[55]

145. Between 2021 and 2023, six individuals who were incarcerated at OCCF in ICE detention were subjected to "degrading conditions and continual mistreatment while incarcerated," including inadequate medical care at the facility. For instance, Lucas Palacios Alvarado requested to be screened for cholesterol and blood sugar levels but was denied treatment by OCCF officials. Nahum Gilberto Ortiz was incarcerated with a chronic back injury and, despite repeated requests for medication and a backstrap, it took the jail more than 10 months to provide them. And, when Jeremias Lopez was ill from food poisoning, OCCF officials refused to provide adequate medical treatment, instead providing over-the-counter medications to treat his symptoms with minimal effect, and failing to conduct follow-up testing.[56]

146. From 2010 to 2012, Gregory Harvey was incarcerated at OCCF. In January 2011, Mr. Harvey complained to OCCF medical staff about multiple gastrointestinal issues. Between January 2011 and February 2012, Mr. Harvey made six complaints to OCCF medical staff about those gastrointestinal issues and had multiple additional meetings with OCCF staff where he raised those issues repeatedly. After the multiple complaints and requests for medical care Mr. Harvey made to various OCCF staff, OCCF eventually arranged for Mr. Harvey to be seen by an

---

[55] Jaclyn Diaz, *She died in a New York jail. Her family still has questions, alleges medical neglect,* NPR (June 18, 2024), https://www.npr.org/2024/05/23/nx-s1-4937273/new-york-jail-death-addiction-opioids-withdrawal-wellpath
[56] *Ortiz et al. v. Orange County, NY et al.*, No. 7:23-cv-02802-VB-VR, ECF No. 81 at 10-12 (S.D.N.Y. June 11, 2024).

outpatient medical provider. That appointment occurred a year and a half after Mr. Harvey began alerting the facility of his medical issues. Shortly after seeing the outside provider, Mr. Harvey was admitted to the hospital and diagnosed with cancer.[57]

147. In 2020, Anthony Stevenson was incarcerated at OCCF. While at OCCF, Mr. Stevenson complained of chest pain more than 20 times and was diagnosed with a sinus condition after he was seen by a doctor at an outpatient facility. Mr. Stevenson received instructions from that doctor stating that he should return to the emergency room if his symptoms continued or worsened and that he should return for a follow-up appointment. Although OCCF nurses were aware of Mr. Stevenson's complaints of continued chest pains, OCCF officials did not return him to the emergency room or to be seen for the follow-up appointment. Mr. Stevenson continued to complain of chest pain throughout his incarceration but was never seen by a doctor or taken to a hospital. In 2021, Mr. Stevenson was found dead in his cell because of his heart condition.[58]

148. In 2016, Fortunato Febus was incarcerated at OCCF, and at the time he arrived at the jail, he told the intake nurse about various serious injuries to his ribs, neck, head, shoulders, and knee. Despite his injuries, Mr. Febus did not see a doctor until about one month later, at which time the doctor ordered he receive a second mattress and breathing device. Mr. Febus did not receive the second mattress that the doctor ordered because an OCCF official refused to provide it and the breathing device Mr. Febus had was taken away from him without explanation. Mr. Febus also experienced a hernia and requested surgery to address it, but the

---

[57] *Harvey v. United States*, No. 14 Civ. 1787 (PAC), 2017 U.S. Dist. LEXIS 106128 (S.D.N.Y. July 10, 2018).
[58] Stevenson v. Cnty. of Orange, No. 23-CV-6959 (NSR), 2024 U.S. Dist. LEXIS 189581 (S.D.N.Y. Oct. 18, 2024).

OCCF doctor who saw Mr. Febus refused to approve the surgery request because Mr. Febus was going to leave OCCF "any day."[59]

149. Upon information and belief, the Orange County Sheriff was made aware of these repeated instances of profound medical neglect at OCCF and the regular investigative reports reporting on these abuses in recent years. In response to public outrage in relation to these allegations, Orange County Attorney Rick Golden said the County Sheriff's Office conducted internal investigations and met with Defendant NY Correct Care—meaning the Sheriff was perfectly aware of the ongoing medical neglect at OCCF.[60] Upon information and belief, the Orange County Sheriff was also made personally aware of the findings of the New York State Commission on Corrections and the New York City Council when those public agencies specifically called out the repeated instances of medical neglect at OCCF. *See supra* ¶¶ 130.

150. These repeated instances of profound medical neglect at OCCF from 2020 through 2024 and the regular investigative reports reporting on these abuses in recent years directly implicate the Wellpath Defendants and Defendant NY Correct Care—which at all relevant times had been the private jail medical provider for OCCF until January 1, 2025. Upon information and belief, the Orange County Sheriff took no real action to address these ongoing harms.

151. Upon information and belief, Defendant YesCare has employed some of the very same medical providers at OCCF employed by Defendant NY Correct Care. Upon information and belief, the Orange County Sheriff has neither made nor required any changes to the provision of medical care at OCCF but for the nominal change in provider as of January 1, 2025.

---

[59] Febus v. CCS Correct Care Sols., No. 17 CV 3408 (VB), 2018 U.S. Dist. LEXIS 147024 (S.D.N.Y. ug. 29, 2018).
[60] Lana Bellamy, *Orange County Continues to Use Controversial Medical Provider at Jail as it Prepares New Requests for Proposals,* April 16, 2024, https://www.timesunion.com/hudsonvalley/news/article/orange-county-jail-wellpath-correct-care-19403303.php.

152. Upon information and belief, Defendant Orange County directly contracted with both Defendant NY Correct Care and with Defendant YesCare to provide medical services at Orange County Jail.[61]

## FIRST CLAIM FOR RELIEF:
42 USC § 1983: Deliberate Indifference to Medical Needs
(All Plaintiffs v. All Defendants)

153. Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

154. Defendants failed to provide Plaintiffs with timely medical attention despite Defendants' actual or constructive knowledge that Plaintiffs were suffering from serious medical conditions.

155. Defendants' actions constituted an unnecessary and wanton infliction of pain.

156. By their conduct and actions in failing to provide medical treatment to Plaintiffs, who were suffering from serious medical conditions, and by failing to intercede to prevent the complained of conduct, the Defendants, acting under color of law and without justification, intentionally, and/or with deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiffs' constitutional rights as guaranteed under 42 U.S.C. Section 1983 and the United States Constitution, including the Due Process Clause of the Fourteenth Amendment.

157. As a result of the foregoing, Plaintiffs suffered physical injuries, conscious pain and suffering, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of their constitutional rights as guaranteed under 42 U.S.C. § 1983.

---

[61] *Id.* ("[T]he commission directed the Orange County Legislature to assess Wellpath's fitness as a provider, Golden explained that it [is] the responsibility of the county sheriff's office, which works with the county's executive branch to handle health care contracts at the jail").

158. Defendants' conduct was such that punitive damages should be imposed against the non-municipal Defendants.

**SECOND CLAIM FOR RELIEF:**
Negligence under State Law and related *Respondeat Superior* Claims
(All Plaintiffs v. Defendants Wellpath, Matthew J. Dundon, NY Correct Care, YesCare, Joseph Patrick Harkins, Teneshia Washington, Jillian Barone, Mandi Lee Zaccagnino, Dominic Piacente, and Individual Doe Defendants 1-4)

159. Plaintiffs repeat and restate each and every statement made hereinabove as if set forth fully at length once again.

160. Defendants, including by the agents and servants thereof, at all times relevant hereto, had a duty to use ordinary care to provide for the health and care of people incarcerated at OCCF.

161. Defendants failed to use this ordinary care.

162. The foregoing acts constitute negligence on the part of the Defendants hereto.

163. As a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily pain and mental anguish for some time to come; have been and will be required to seek and obtain medical care and treatment; and sustained other damages.

**THIRD CLAIM FOR RELIEF:**
Gross Negligence under State Law and related *Respondeat Superior*
(All Plaintiffs v. Defendants Wellpath, Matthew J. Dundon, NY Correct Care, YesCare, Joseph Patrick Harkins, Teneshia Washington, Jillian Barone, Mandi Lee Zaccagnino, Dominic Piacente, and Individual Doe Defendants 1-4)

164. Plaintiffs repeat and restate each and every statement made hereinabove as if set forth fully at length once again.

165. The above constitutes a gross deviation from the normal standard and caused direct injury to Plaintiffs.

166. That as a result of the foregoing, Plaintiffs sustained conscious pain and suffering, physical injury, great mental distress, mental anguish, shock, fright and humiliation; were rendered sick, sore and disabled; suffered and still suffer and will continue to suffer bodily pain and mental anguish for some time to come; have been and will be required to seek and obtain medical care and treatment; and sustained other damages.

### FOURTH CLAIM FOR RELIEF:
Medical Malpractice under State Law
(All Plaintiffs v. Defendants Orange County, Wellpath, Matthew J. Dundon, NY Correct Care, YesCare, Joseph Patrick Harkins, Teneshia Washington, Jillian Barone, Mandi Lee Zaccagnino, Dominic Piacente, and Individual Doe Defendant 4)

167. Plaintiffs repeat, reiterate, and re-allege each and every statement and allegation as set forth above.

168. Defendant New York Correct Care failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

169. Defendant YesCare failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

48

170. Defendants Wellpath LLC and Wellpath NY LLC failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

171. Defendant Orange County, by the agents and servants thereof at all times relevant hereto, failed to properly provide medical care to Plaintiffs. Upon information and belief, Defendant Orange County directly contracted with both Defendant NY Correct Care and with Defendant YesCare to provide medical services at Orange County Jail. [62]

172. Defendant Orange County failed to promulgate, enforce, abide by, or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

173. The Individual Defendants failed to abide by or follow appropriate rules, regulations, guidelines, procedures, policies, or protocols with respect to the performing, rendering or providing of medical, surgical, orthopedic, medical imaging, or nursing examinations, evaluations, care, treatments, procedures, services, prescribing medication, or advice of, for, and to medical, surgical, orthopedic, or nursing patients.

---

[62] Lana Bellamy, *Orange County Continues to Use Controversial Medical Provider at Jail as it Prepares New Requests for Proposals,* April 16, 2024, https://www.timesunion.com/hudsonvalley/news/article/orange-county-jail-wellpath-correct-care-19403303.php ("[Orange County Attorney Rick] Golden explained that it [is...] the responsibility of the County sheriff's office, which works with the County's executive branch to handle health care contracts at the jail").

174.  Commencing on or about October 5, 2023, and at all times hereafter complained of, Defendants undertook and endeavored to and did advise and treat plaintiffs professionally as a hospital or physician including providing diagnosis, care, and treatment for medical conditions.

175.  At all times complained of herein Defendants represented themselves to be skilled, competent and careful physicians, registered nurses, nurse practitioners and social workers, with the knowledge and capacity to practice medicine in accordance with the standards common and acceptable in the community.

176.  As set forth herein Defendants' treatment of Plaintiffs fell below acceptable standards and skills and Defendants breached the duty they owed to Plaintiffs.

177.  In fact, Defendants did not possess the necessary skill to treat Plaintiffs and neglected to apply the skill they did have. They did not use reasonable care in applying their skill, mistreated Plaintiffs, and engaged in poor medical practice and practice which fell below the customary standard.

178.  Defendants were negligent and departed from the standard of care in ignoring Plaintiffs' symptoms and delaying treatment for obvious medical issues.

179.  Beginning on October 5, 2023—the day of Ms. Ordonez Vargas' initial medical screen—medical personnel at OCCF, including Defendant Harkins and other defendants, knew of Ms. Ordonez Vargas' broken nose, and that she was scheduled for surgery that day. Defendants Washington, Barone, Zaccagnino, and Piacente also had access to Ms. Ordonez's medical record, which showed that she had a broken nose and was scheduled for surgery.

180.  Beginning on October 10, 2024—the day of Ms. Cruz's initial medical screen—medical personnel at OCCF knew she has lupus and needs to take Warfarin to manage such

disease. Defendants, including Defendant Piacente, did not provide Ms. Cruz with necessary care or medications. They also failed to properly refer Ms. Cruz to a specialist during a critical lupus flare up and allowed her urgent condition to deteriorate further by failing to provide appropriate care or outside treatment when it was clearly called for.

181.  Defendants were negligent and departed from the standard of care in not treating Plaintiffs' medical conditions, or sending Plaintiffs for outside treatment, including emergency treatment and treatment by specialists and surgeons.

182.  Defendants were negligent and departed from the standard of care in other ways that are documented in Plaintiffs' medical records and in ways of which Plaintiffs are not yet aware.

183. As a result of all the foregoing, the Plaintiffs were caused severe and serious personal injuries, severe and serious conscious pain and suffering, severe and serious mental anguish, and will suffer future severe and serious economic losses by reason of the negligence, carelessness, neglect and medical malpractice of the Defendants.

184.  The medical evaluations, consultations, care, treatments, procedures, services, medical imaging, or advice or lack thereof ordered for, requested for, recommended for, advised for, performed upon, rendered to, requested, ordered or provided to Plaintiffs on behalf of, jointly with, or under the supervision of various Defendants named herein, were ordered, neglected, requested, recommended, advised, performed, rendered, or provided in a negligent, careless, or improper manner, or in a manner contrary to good and accepted medical, surgical, radiological, orthopedic, or nursing practices in the community.

**FIFTH CLAIM FOR RELIEF:**
42 U.S.C. § 1983 *Monell* Claims Against Orange County
(All Plaintiffs v. Defendant Orange County, NY Correct Care, and YesCare)

185.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

186.  This action challenges Defendant Orange County's longstanding custom, policy, and practice of deliberate indifference to the serious medical needs of persons detained at the Orange County Correctional Facility ("OCCF"). Through its direct policies and those it has adopted and maintained by contract with private medical providers—including Defendant NY Correct Care and Defendant YesCare—the County has systemically deprived detained persons, including Plaintiffs, of adequate and timely medical treatment in violation of the Fourteenth Amendment to the United States Constitution.

187.  Under color of law, Defendant Orange County and its contracted medical providers have established and maintained a de facto regime in which serious medical needs are routinely disregarded, emergency care is delayed or denied, and essential diagnostic testing, medication, and specialist referrals are withheld. These practices are neither isolated nor inadvertent; they reflect a persistent and widespread course of conduct so entrenched and focused on cost-cutting, that it constitutes the official policy and custom of the County itself.

188.  For years, Defendant Orange County has knowingly contracted with private corporations to execute its non-delegable duty to provide adequate medical care to individuals in its custody. Those private corporations—Defendant NY Correct Care and Defendant YesCare—maintain operational models that prioritize cost containment and profit maximization over medical necessity. Despite repeated warnings—including individual grievances, internal audits, state inspection reports, wrongful death lawsuits, and media coverage—the County has renewed

and expanded these contracts. In doing so, the County has expressly ratified and adopted its contractors' policies and practices of deliberate indifference as its own.

189.  These policies and customs include, but are not limited to: (a) the routine failure to respond to detainees' written and verbal request for medical assistance; (b) the substitution of non-therapeutic painkillers for indicated diagnostic or surgical interventions; (c) the denial or delay of emergency hospital transfers; (d) the refusal to authorize laboratory testing, imaging, and biopsies necessary for diagnosis of serious and life-threatening conditions; (e) the failure to monitor chronic illnesses such as lupus and heart disease; (f) the lack of qualified medical supervision or physician access for detainees housed at OCCF; and (g) the lack of access to necessary language services for detainees who require these services to receive adequate care.

190.  Orange County and its agents were fully aware that these practices resulted in needless suffering, preventable deteriorations of health, and medical emergencies among detained persons. The County received numerous grievances, public complaints, inspection reports, and prior lawsuits documenting these deficiencies, yet took no steps to investigate, train, supervise, or discipline those responsible, nor to ensure adequate oversight of contracted medical providers. Instead, the County continued to prioritize contractual cost savings over detainee safety and well-being, deliberately choosing policies that would predictably result in constitutional violations.

191. The deliberate indifference of Orange County and its contracted entities was not the result of negligence or inadvertence, but rather of conscious policy decisions designed to minimize saving money at the expense of inmate healthcare. The County's policymakers and correctional administrators were repeatedly placed on notice regarding the medical contractors' failure to provide constitutionally adequate care. Their failure to intervene or modify these

practices constitutes ratification of unconstitutional conduct and a policy of deliberate indifference to serious medical needs.

192.  As a direct and proximate result of these policies, practices, and customs, Plaintiffs were denied timely and adequate medical treatment. Plaintiff Ordonez Vargas was left without the surgery prescribed for her several facial fractures and was given only ibuprofen in lieu of necessary care. Plaintiff Cruz endured months-long delays in receiving prescribed lupus medication and treatment, resulting in severe flare-up and kidney damage. These harms were not aberrations. They were the predictable and inevitable results of Orange County's entrenched cost-over-care medical regime.

193.  Through the acts and omissions described herein, Defendants Orange County, NY Correct Care, and YesCare deprived Plaintiffs of rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. §1983. The County's longstanding policies, customs, and failures to train, supervise, and monitor medical contractors were the moving force behind these constitutional deprivations.

## JURY TRIAL DEMAND

194. Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs demand the following relief jointly and severally against all of Defendants:

    a.  Compensatory damages;
    b.  Punitive damages;
    c.  The convening and empaneling of a jury to consider the merits of the claims herein;
    d.  Costs and interest and attorney's fees;
    e.  Such other and further relief as this court may deem appropriate and equitable.

Dated: Ridgewood (Queens), New York
     October 17, 2025

**COHEN&GREEN P.L.L.C.**

By: _____
Elena L. Cohen
J. Remy Green
Regina Yu
Leena M. Widdi
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
   remy@femmelaw.com
   regina@femmelaw.com
   leena@femmelaw.com


**MAIN STREET LEGAL SERVICES, INC.**

By: _____

  Zal K. Shroff, #5560669
  2 Court Square West
  Long Island City, NY 11101
  T: (718) 340-4053
  E: zal.shroff@law.cuny.edu

  Jonathan Alleyne
  Jennifer Cardoza
  Alison Klein
  Jayden Lopez

  *Law Student Interns\**

   * Student Appearances Forthcoming

**GIDEON ORION OLIVER**


By: _Gideon Orion Oliver_
Gideon Oliver, Esq.
718-783-3682 (o) 646-263-3495 (c)

277 Broadway, Suite 1501,
New York, NY  10007

1825 Foster Avenue, Suite 1K,
Brooklyn, NY 11230

**National Police Accountability Project**

Lauren Bonds*
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584
legal.npap@nlg.org
Kansas Bar No. 27807
Texas Bar No. 24090504


Eliana Machefsky*
2111 San Pablo Avenue
PO Box 2981
Berkeley, CA 94702
(314) 440-3505
fellow.npap@nlg.org
California Bar No. 342736


Devontae W. Torriente*
PO Box 15070
Philadelphia, PA 19130
(215) 987-0021
devontae.npap@nlg.org
Pennsylvania Bar No. 335901


*pro hac vice applications forthcoming


**ATTORNEYS FOR PLAINTIFFS**


56