UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEFANY CRUZ AND MARISOL ORDONEZ VARGAS,<br><br>        Plaintiffs,<br><br>  -against-<br><br>ORANGE COUNTY (New York); WELLPATH, LLC; NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, PC; MATTHEW J. DUNDON, Trustee of Wellpath Holdings, Inc. Liquidating Trust; WELLPATH NY LLC; YESCARE CORP; JOSEPH PATRICK HARKINS; TENESHIA WASHINGTON, RN; JILLIAN M. BARONE, RN; MANDI LEE ZACCAGNINO, NP; DOMINICK PIACENTE; AND DOE DEFENDANTS 1-4,<br><br>        Defendants. | Case No.: 25-cv-00064 (PMH) |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**

COHEN&GREEN P.L.L.C.
Elena L. Cohen
J. Remy Green
Regina Yu
Sarah Kunstler
1639 Centre Street
Suite 216
Ridgewood, NY 11385
t: (929) 888-9480
f: (929) 888-9457

GIDEON ORION OLIVER
277 Broadway
Suite 1501
New York, NY 10007
1825 Foster Avenue
Suite 1K
Brooklyn, NY 11230
718-783-3682 (o) 646-263-3495 (c)

National Police Accountability
Project
Lauren Bonds*
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584

Eliana Machefsky*
2111 San Pablo Avenue
PO Box 2981
Berkeley, CA 94702
(314) 440-3505




*pro hac vice applications
forthcoming

ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

    A. Plaintiff Cruz's Treatment ...................................................................................... 1

    B. Plaintiff Ordonez Vargas' Treatment .................................................................... 2

    C. Defendants' Pattern and Practice of Inadequate Medical Treatment ..................... 3

STANDARD OF REVIEW ................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

    I.    THE SAC PLAUSIBLY ALLEGES DELIBERATE INDIFFERENCE TO
SERIOUS MEDICAL NEEDS ...................................................................................... 4

    A. Legal Standard ........................................................................................................ 4

    B. Plaintiff Cruz States A Plausible Deliberate Indifference Claim ........................... 5

    C. Plaintiff Ordonez Vargas States A Plausible Deliberate Indifference Claim ................... 11

    D. Dismissal of Plaintiffs' Deliberate Indifference Claims Is Premature ............................ 15

    II.    PLAINTIFFS PLAUSIBLY PLEAD *MONELL* LIABILITY AGAINST ORANGE
COUNTY AND THE CORPORATE MEDICAL PROVIDERS ...................................... 16

    A.    Legal Standard ..................................................................................................... 16

    B.    The SAC Plausibly Alleges a Systemic Policy of Delaying and Denying Necessary
Medical Care ........................................................................................................... 17

    C.    The SAC Plausibly Alleges County Knowledge of, and Responsibility for, the OCCF
Medical System ...................................................................................................... 19

    D.    The SAC Plausibly Alleges A Monell Claim Against the Corporate Defendants ........ 24

    III.    PLAINTIFFS PROPERLY PLEADED THEIR STATE LAW CLAIMS ............ 26

    A.    Legal Standard ..................................................................................................... 26

    B.    Plaintiffs Have Plausibly Alleged Negligence, Gross Negligence, and Medical
Malpractice Under New York Law ........................................................................... 27

    C.    County and Corporate Medical Providers May Be Held Liable Under New York Law
for the Negligent Acts of Their Employees and Agents ............................................ 29

    D.    Defendants' Procedural Challenges to the State-Law Claims Do Not Warrant
Dismissal ................................................................................................................ 30

CONCLUSION ................................................................................................................. 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. County of Rensselaer*, 66 N.Y.2d 725 (1985) .................................................... 31

*Alexander v. City of New York*,
No. 24-CV-8084 (AS), 2025 WL 3640231 (S.D.N.Y. Dec. 16, 2025) ..................................... 24

*Alvarado v. Westchester County*,
22 F. Supp. 3d (S.D.N.Y. April 24, 2014).................................................................... 20

*Ancata v. Prison Health Servs. Inc.*,
769 F.2d 700 (11th Cir. 1984) .............................................................................. 20

*Arias v. East Hartford*,
2021 WL 3268846 (D. Conn. July 30, 2021) ...................................................... 8, 9, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 3

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ................................................................................. 8

*Batista v. Rodriguez*,
702 F.2d 393 (2d Cir. 1983) ................................................................................ 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 3

*Black v. Allegheny Cty.*,
2014 WL 5493811 (W.D. Pa. Oct. 30, 2014) .......................................................... 20

*Bleiler v. Bodnar*,
65 N.Y.2d 65 (1985)........................................................................................... 27

*Burns v. Cnty. of Rensselaer,* No. 02-CV-165,
2005 U.S. Dist. LEXIS 41743, at *34 (N.D.N.Y. Dec. 12, 2005)........................................... 12

*Carter v. Broome Cnty.*,
394 F. Supp. 3d 228 (N.D.N.Y. 2019)................................................................ 20, 22

*Cash v. County of Erie*,
654 F.3d 324 (2d Cir. 2011) ............................................................................... 16

*Charles v. Orange County*,
925 F.3d 73 (2d Cir. 2019) ....................................................................... 4, 7, 26

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........................................................................................ 16

*Chance v. Armstrong*,
143 F.3d 698 (2d Cir. 1998) ............................................................................... 15

*Crippen v. Town of Hempstead*,
2009 WL 803117 (E.D.N.Y. Mar. 25, 2009)........................................................... 30

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017) ................................................................................... 4

*Douglas v. County of Oswego*,
151 Misc. 2d 239 (Sup. Ct. Oswego Cnty. 1991)..................................................... 32

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ................................................................................................ 4
*Farrow v. Dalman*,
  No. 97-3598, 1998 WL 879553 (7th Cir. Dec. 7, 1998) ...................................... 12
*Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.*,
  721 F. Supp. 2d 293 (S.D.N.Y. 2010) ................................................................. 26
*Ferro v. Railway Express Agency, Inc.*,
  296 F.2d 847 (2d Cir. 1961) ................................................................................ 8
*Fleming v. City of New York*,
   No. 18 Civ. 4866, 2019 WL 4392522 (S.D.N.Y. Aug. 27, 2019) .......................... 30
*Food Pageant, Inc. v. Consol. Edison Co.*,
  54 N.Y.2d 167 (1981) .......................................................................................... 27
*Gale v. Smith & Nephew, Inc.*,
  989 F. Supp. 2d 243 (S.D.N.Y. 2013) ................................................................. 28
*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985) ............................................................................... 3
*Gomez-Kadawid v. Lee*,
  2022 WL 676096 (S.D.N.Y. Feb. 3, 2022) .......................................................... 8
*Harrell v. New York State Department of Corrections and Community Supervision*,
  No. 15-CV-7065, 2019 WL 3821229 (S.D.N.Y. Aug. 14, 2019) ......................... 27
*Hathaway v. Coughlin*,
  37 F.3d 63 (2d Cir. 1994) ............................................................................... 4, 12
*In the Matter of Renato A. Ticzon, M.D.*,
  No. BPMC 01-306, 2001 WL 35733087 (Dec. 13, 2001) .................................... 7
*Johnson v. City of New York*,
  2011 WL 1044852 (S.D.N.Y. Mar. 22, 2011) ..................................................... 17
*Jones v. Town of East Haven*,
  691 F.3d 72 (2d Cir. 2012) ............................................................................ 16, 21
*Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*,
  557 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................................... 18, 25
*Judith M. v. Sisters Charity Hosp.*,
   92 N.Y.2d 923, 933 (N.Y. 1999) ......................................................................... 29
*Kagan v. State of New York*,
  221 A.D.2d 7 (2d Dep't 1996) ............................................................................. 26
*King v. Kramer*,
  680 F.3d 1013 (7th Cir. 2012) ............................................................................ 20
*Krulik v. Bd. of Educ. of the City of N.Y.*,
  781 F.2d 15 (2d Cir. 1986) .................................................................................. 16
*Kunwar v. Northwell Health*,
  229 A.D.3d 528 (2d Dep't 2024) ........................................................................... 6
*Lasher v. City of Schenectady*,
  No. 02–CV–1395, 2004 WL 1732006 (N.D.N.Y. Aug. 3, 2004) ......................... 12
*Lehal v. Central Falls Detention Facility Corp.*,
  No. 13-cv-3923, 2016 WL 7377238 (S.D.N.Y. Nov. 21, 2016) ...................... 18, 25
*Lowe v. State of New York*,
   35 A.D.3d 1281, 1282 (4th Dep't 2006) .............................................................. 26

*Lubell v. Samson Moving & Storage, Inc.*,
    307 A.D.2d 215 (1st Dep't 2003) ........................................................................ 27

*McCants v. City of Newburgh*,
    No. 14 Civ. 556(VB), 2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014) ..................... 23

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ................................................................................. 3

*McConville v. Montrym*,
    No. 3:15-cv-00967, 2016 WL 3212093 (N.D.N.Y. June 9, 2016) .......................... 13

*McNeil v. Corr. Med. Care, Inc.*,
    2019 WL 4415528 (N.D.N.Y. Sept. 16, 2019) ...................................................... 20

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ...................................................................................... 16, 19

*Osterhoudt v. City of New York*,
    No. 10 CV 3173(RJD)(RML), 2012 WL 4481927 (E.D.N.Y. Sept. 27, 2012) ......... 23

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ............................................................................................ 24

*Rennalis v. Alfredo*,
    2015 WL 5730332 (S.D.N.Y. Sept. 30, 2015) ...................................................... 28

*Revels v. Corr. Med. Care, Inc.*,
    2018 U.S. Dist. LEXIS 51118, at *11–12 (N.D.N.Y. Mar. 28, 2018) ...................... 5

*Rivello v. Waldron*,
    47 N.Y.2d 297 (N.Y. 1979) .................................................................................. 29

*S.E.C. v. Lyon*,
    529 F. Supp. 2d 444 (S.D.N.Y. 2008) ................................................................... 3

*Saccone v. DuBois*, 18 CV 1312 (VB),
    2018 WL 4356735 (S.D.N.Y. Sept. 12, 2018) ...................................................... 32

*Sanchez v. NY Correct Care Solutions Med. Servs.*,
    2018 US Dist LEXIS 208864, at *30-31 (W.D.N.Y. Dec. 11, 2018) ................. 18, 25

*Santiamagro v. County of Orange*,
    226 A.D.2d 359 (2d Dep't 1996) .......................................................................... 32

*Shepherd v. Powers*,
    No. 11 Civ. 6860(LTS), 2012 WL 4477241 (S.D.N.Y. Sept. 27, 2012) ................. 23

*Sorlucco v. N.Y.C. Police Dep't*,
    971 F.2d 864 (2d Cir. 1992) .......................................................................... 16, 21

*Sykes v. McPhillips*,
    412 F. Supp. 3d 197 (N.D.N.Y. 2019) .................................................................. 24

*Tandel v. Cty. of Sacramento*,
    No. 2:11cv353 (MCE) (GGH), 2012 WL 602981 (E.D. Cal. Feb. 23, 2012) .......... 18

*Tieman v. City of Newburgh*,
    No. 13-CV-4178 KMK, 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015) ................... 11

*Tutora v. Aramark Corr. Servs.*,
    2022 WL 2237567 (S.D.N.Y. June 22, 2022) ....................................................... 24

*Wesley v. O'Connor-Ryerson*,
    No. 9:08-CV-0953 NAM/DEP, 2011 WL 6103031 (N.D.N.Y. Oct. 27, 2011) ......... 5

*West v. Atkins*,
    487 U.S. 42  (1988) ...................................................................................... 19, 20

iv

*White v. City of New York*,
    2015 WL 4601121 (S.D.N.Y. July 31, 2015)...................................................................... 17, 23
*Williams v. Fisher*,
    No. 02 Civ. 4558 (LMM), 2003 WL 22170610 (S.D.N.Y. Sept. 18, 2003) .............................. 6
*Winkler v. Madison Cnty.*,
    893 F.3d 877 (6th Cir. 2018) ............................................................................................... 24

**Rules**

CPLR § 214-a ........................................................................................................................ 31
CPLR § 215(1).................................................................................................................. 31, 32
Fed. R. Civ. P. 8 ................................................................................................................ 8, 9
Fed. R. Civ. P. 12(b)(6)......................................................................................................... 3

## PRELIMINARY STATEMENT

Plaintiffs submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("MTD") the  Second Amended Complaint ("SAC"). (Dkt. No. 78.) Plaintiffs allege they were subjected to constitutionally inadequate medical care while incarcerated at the Orange County Correctional Facility ("OCCF"), and that these constitutional deprivations resulted from longstanding and well-documented policies and customs of delayed and deficient jail medical care implemented by Orange County and its contracted medical providers. In seeking dismissal of the SAC under Rule 12(b)(6), Defendants ask this Court to do what the rule forbids: resolve factual disputes and  credit Defendants' preferred interpretation of events and medical records.

The SAC plausibly alleges (1) Plaintiffs' objectively serious medical needs and Defendants' unreasonable responses, amounting to deliberate indifference under the Fourteenth Amendment standard applicable to pretrial detainees; (2) Defendants' municipal and contractor liability under *Monell* based on policies, customs, and deliberate indifference to known deficiencies in the OCCF medical system; and (3) Plaintiffs' viable state-law claims. Defendants' motion to dismiss should therefore be denied in its entirety.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the factual allegations set forth in the SAC. For purposes of this opposition, certain relevant facts are summarized below.

### A. Plaintiff Cruz's Treatment

Plaintiff Stefany Cruz entered OCCF on October 10, 2024 with a longstanding diagnosis of borderline lupus and a history of deep vein thrombosis ("DVT") requiring anticoagulation therapy. She had been on prescribed Warfarin for approximately a decade. SAC ¶¶ 23–25. At the

1

time of her incarceration, Ms. Cruz was attempting to obtain rheumatology care for her lupus but had not yet secured a provider. *Id.*

During her incarceration at OCCF, Ms. Cruz experienced interruptions and delays in necessary medications, delays in specialist referrals and diagnostic interventions, and failures in coordination of care and discharge planning. SAC ¶¶ 26–55. These delays and failures contributed to the progression of her lupus and resulted in significant organ damage requiring ongoing treatment and multiple weekly medical appointments. *Id.*

**B. Plaintiff Ordonez Vargas' Treatment**

Plaintiff Marisol Ordonez Vargas, a monolingual Spanish speaker, entered OCCF following a September 17, 2023 motor vehicle accident that resulted in multiple facial fractures, including bilateral nasal fractures requiring surgical correction. SAC ¶¶ 57–60. After her discharge from the hospital, Ms. Ordonez Vargas continued to experience pain, discomfort, and difficulty breathing. Corrective surgery was scheduled for the morning of October 5, 2023. *Id.* ¶ 60. On October 4, 2023, after receiving notice from Immigration and Customs Enforcement ("ICE") requiring her to appear for a check-in on October 5 that conflicted with the scheduled surgery, she moved the procedure to later that day. *Id.* ¶¶ 61–62. Despite carrying documentation of the surgery and informing ICE of her condition and appointment, following the check-in, she was taken into ICE custody, cleared for transfer to detention, and transferred to OCCF. *Id.* ¶¶ 63–65.

While at OCCF, Ms. Ordonez Vargas continued to experience significant pain and breathing difficulties. Instead of receiving treatment for her facial fractures, she was placed in solitary confinement under suicide watch and did not receive surgical treatment for her facial fractures, an unnecessary measure, given the fact that she was not suicidal. SAC ¶¶ 66–72.

2

During her 35-day incarceration, she experienced delayed and inadequate medical assessment and treatment despite repeated requests for care. *Id.* ¶¶ 73–97. The delay in treatment caused unnecessary pain and increased the risk of permanent injury. *Id.* ¶¶ 98–99.

**C. Defendants' Pattern and Practice of Inadequate Medical Treatment**

Orange County and its contracted medical providers, including NYCCS,[1] Wellpath, and later YesCare, maintained policies, customs, and practices that resulted in delayed medication administration, inadequate intake screening, insufficient chronic care management, failures in specialist referral coordination, and deficient staffing and supervision within the OCCF medical system, thereby systematically depriving detained persons, including Plaintiffs, of adequate and timely medical treatment.  SAC ¶¶ 100–152.

**STANDARD OF REVIEW**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *S.E.C. v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008). To survive a motion to dismiss, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court's role at this stage is not to weigh evidence but to determine

---

[1] NYCCS (New York Correct Care Solutions Medical Services, P.C.) is the subsidiary through which Wellpath provided medical services at OCCF during the relevant period. The Second Amended Complaint alleges the conduct of Wellpath and its employees providing medical care at the facility. To the extent Defendants distinguish between Wellpath and NYCCS, those entities operated together as the contracted medical provider at OCCF.

whether the complaint is legally sufficient. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## ARGUMENT

### I.   THE SAC PLAUSIBLY ALLEGES DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

**A. Legal Standard**

As Defendants acknowledge, a pretrial detainee's inadequate medical care claim under the Fourteenth Amendment is evaluated under a two-prong framework. *See Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017). First, the plaintiff must plead an objectively serious medical need and an unreasonable response by the defendants that deprived the plaintiff of adequate care. *Id.* at 29. Second, the plaintiff must plausibly allege that defendants acted with the requisite *mens rea*, namely, that they "knew, or should have known," that their acts or omissions posed an excessive risk to health or safety and failed to act with reasonable care. *Id.*

Deliberate indifference under the Fourteenth Amendment is not limited to outright refusals of care. Delays in treatment, interruptions in necessary medication, failures to implement prescribed care, and breakdowns in coordination and follow-up may constitute deliberate indifference where they create a substantial risk of serious harm and reflect more than mere inadvertence. *See Charles v. Orange County*, 925 F.3d 73, 86–88 (2d Cir. 2019)(reversing dismissal; failures in discharge planning and coordination can satisfy deliberate indifference); *see also Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (per curiam) (unreasonable delay can constitute deliberate indifference); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (reversing summary judgment; allegation of a two-year delay in arranging hip surgery could constitute the required deliberate indifference)

**B. Plaintiff Cruz States A Plausible Deliberate Indifference Claim**

        **1. Ms. Cruz pleads serious medical needs and constitutionally significant deprivations**

Ms. Cruz entered OCCF with a documented history of lupus and DVT requiring long-term anticoagulation therapy. SAC ¶¶ 23–36. While incarcerated, she received test results reflecting impaired kidney function. *Id.* ¶ 37. These conditions are sufficiently serious under the Fourteenth Amendment. Kidney dysfunction alone constitutes a serious medical need. *See Revels v. Corr. Med. Care, Inc.*, 2018 U.S. Dist. LEXIS 51118, at *11–12 (N.D.N.Y. Mar. 28, 2018) (collecting cases finding kidney failure sufficiently serious). Lupus is a chronic autoimmune disease that "is generally regarded as a serious medical condition," *Wesley v. O'Connor-Ryerson*, No. 9:08-CV-0953 NAM/DEP, 2011 WL 6103031, at *7 (N.D.N.Y. Oct. 27, 2011), report and recommendation adopted, 2011 WL 6112131 (N.D.N.Y. Dec. 7, 2011) (also collecting cases).

Ms. Cruz's kidney complications were evidenced by repeated abnormal laboratory results during an active lupus flare. SAC ¶¶ 38–39. Despite these findings, Defendants delayed Ms. Cruz's access to specialty rheumatology care for approximately two months. *Id.* ¶¶ 40–41. When Defendants eventually transported her to an outpatient rheumatology appointment, they failed to wait for appropriate onsite laboratory testing, failed to provide the medication prescribed by the specialist for forty-two days, and failed to deliver follow-up lab results requested by the outpatient provider. *Id.* ¶¶ 42–45.

As a result, Ms. Cruz's condition worsened dramatically. Although she entered OCCF with "borderline" lupus, by the time she returned to a rheumatologist, her condition had progressed to "systemic" and "crisis-level," requiring emergency stabilization with intravenous steroid treatment. *Id.* ¶¶ 45–48. The outpatient rheumatologist recommended a kidney biopsy, yet none occurred despite repeated assurances that one would be scheduled. *Id.* ¶¶ 49–50.

Defendants failed to ensure continuity of care upon discharge, resulting in a 20-day gap before Ms. Cruz could return to a rheumatologist. *Id*. ¶¶ 51–52. Subsequent testing confirmed systemic lupus, and biopsy results showed progression to lupus nephritis Class III and Class V. *Id.* ¶ 53. These allegations easily satisfy the objective prong.

### 2. Ms. Cruz plausibly pleads that defendants knew or should have known of the substantial risk to her health and failed to act with reasonable care

Defendants were on notice of Ms. Cruz's diagnoses and medication needs but nonetheless allowed critical delays and interruptions to persist, failed to timely implement prescribed treatment, and failed to ensure follow-up and diagnostic steps. SAC ¶¶ 26-55. "Allegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard." *Williams v. Fisher*, No. 02 Civ. 4558 (LMM), 2003 WL 22170610, at *6-7 (S.D.N.Y. Sept. 18, 2003) (collecting cases).

First, Defendants were on notice from intake that Ms. Cruz had lupus and DVT requiring long-term anticoagulation therapy. SAC ¶¶ 26–31. Interruption or delay in anticoagulation therapy for a patient with a history of DVT carries a well-recognized risk of clot formation, pulmonary embolism, and stroke, risks that medical providers necessarily understand. *See Kunwar v. Northwell Health*, 229 A.D.3d 528, 529 (2d Dep't 2024) (recognizing that even a five-day delay in anticoagulation therapy may constitute a departure from accepted medical practice).

Second, Defendants received repeated laboratory results demonstrating kidney dysfunction during Ms. Cruz's incarceration. SAC ¶¶ 37–39. Disciplinary authorities have recognized that a physician's failure to follow up on abnormal laboratory results may constitute

6

gross negligence where those results signal serious medical deterioration. *See In the Matter of Renato A. Ticzon, M.D.,* No. BPMC 01-306, 2001 WL 35733087 (Dec. 13, 2001).

Third, despite these worsening indicators during an active lupus flare, Defendants delayed specialty rheumatology care for approximately two months and did not initiate additional treatment. SAC ¶¶ 40–41.

Fourth, when Ms. Cruz was finally transported to rheumatology, Defendants: failed to wait for appropriate onsite lab testing, failed to provide the medication prescribed by the specialist for forty-two days, and failed to deliver follow-up lab results requested by the outside provider. SAC ¶¶ 42–45.

Fifth, Ms. Cruz's condition escalated to emergency hospitalization requiring intravenous steroid stabilization. SAC ¶¶ 45–48.

Sixth, despite recommendation for a kidney biopsy, Defendants failed to schedule or complete that diagnostic step for more than five weeks until Ms. Cruz's release. SAC ¶¶ 49–50.

Finally, Defendants failed to ensure continuity of care upon discharge, resulting in a 20-day gap before Ms. Cruz could return to a rheumatologist. SAC ¶¶ 51–52. Failures in discharge planning and coordination of medical care may constitute deliberate indifference where they expose detainees to serious health risks. *See Charles*, 925 F.3d at 86–88.

Taken together, these allegations plausibly show that Defendants knew or should have known that their delays and omissions posed an excessive risk to Ms. Cruz's health and failed to act with reasonable care. At the pleading stage, no more is required.

### 3. The SAC does not engage in impermissible group pleading with respect to Ms. Cruz

Defendants argue that Plaintiff Cruz's claims must be dismissed because the SAC constitutes impermissible "group pleading." MTD, at 4 and 8. But Rule 8 requires only "a short

and plain statement" and "simple, concise, and direct" allegations sufficient to give each defendant fair notice of the claim and its grounds. Fed. R. Civ. P. 8(a)(2), 8(d)(1); *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (*quoting Ferro v. Railway Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)).

Courts applying Rule 8 recognize that "context matters in notice pleading," and the application of group-pleading principles is "fact-dependent and far from absolute." *See Arias v. East Hartford*, 2021 WL 3268846, at *4 (D. Conn. July 30, 2021). In *Arias*, the court denied dismissal even though the complaint did not identify which officer performed each act during a rapidly unfolding encounter, recognizing that such precision may be unrealistic at the pleading stage and that the relevant inquiry is whether the complaint provides "adequate notice for initial pleading purposes" in the particular factual context. *Id.* at *4–6; *see also Gomez-Kadawid v. Lee*, 2022 WL 676096, at *7 (S.D.N.Y. Feb. 3, 2022) (finding a pretrial detainee's allegations sufficient under Rule 8(a), despite collective references to defendants).

Here, the SAC provides sufficient under Rule 8(a), as it differentiates among (1) individual medical providers, including Defendant Dominick Piacente; (2) the corporate medical contractors by time period (NYCCS prior to January 1, 2025 and YesCare thereafter); and (3) Orange County's policymaker role in overseeing and contracting for jail medical services. It alleges concrete failures tied to specific dates, laboratory findings, referrals, prescriptions, and follow-up care. To the extent certain operational details, such as who transmitted laboratory results, processed prescriptions, or scheduled outside appointments, are not attributed to a particular employee, those mechanics are internal to the jail medical system and are peculiarly within Defendants' control. *See Arias* 2021 WL 3268846, at *4. Under Rule 8, the SAC provides

8

more than sufficient notice of what went wrong, when it occurred, and which Defendants are responsible.

### a.    The SAC pleads specific conduct by Defendant Piacente

The SAC pleads detailed allegations concerning Defendant Dominick Piacente, M.D., and does not rely on generalized references to "Defendants."

First, the SAC alleges that despite being informed at intake that Ms. Cruz required daily Warfarin to prevent clotting complications associated with deep vein thrombosis, she did not receive anticoagulation medication for the first five days of her detention. SAC ¶¶ 26–33. Defendant Piacente entered the prescription order only on October 15, 2024—six days after Ms. Cruz's arrival. *Id.* ¶ 33. The SAC further alleges that Defendant Piacente knew or should have known that delaying anticoagulation posed serious and potentially life-threatening risks. *Id.* ¶ 34.

Second, during Ms. Cruz's severe lupus flare, Defendant Piacente personally reviewed multiple weekly laboratory results showing abnormal findings indicating worsening kidney involvement. *Id.* ¶ 37. Despite these objective indicators, and despite Ms. Cruz's repeated requests for referral, Defendant Piacente failed to refer her to a rheumatologist and failed to prescribe corticosteroids or other appropriate treatment. *Id.* ¶¶ 37–41.  These allegations identify a specific defendant, specific medical encounters, specific laboratory findings, and specific failures to act. They therefore satisfy the personal involvement requirement for a § 1983 claim.

### b.    The SAC separately pleads Wellpath's conduct

The SAC also distinguishes the conduct of Wellpath and NYCCS, the medical contractor responsible for OCCF's medical services prior to January 1, 2025, and alleges that Wellpath's systemic deficiencies, including delays in medication administration, failures in specialist

9

referral coordination, and deficient chronic-care management, led Wellpath and NYCCS employees to delay and deny Ms. Cruz necessary treatment.

The SAC alleges that Wellpath and NYCCS employees failed to provide Ms. Cruz with prescribed anticoagulation medication for five days after intake despite being informed of her DVT and medication requirements. SAC ¶¶ 26–32. It further alleges that despite repeated sick-call requests and notice of Ms. Cruz's lupus flare as early as November 6, 2024, Wellpath and NYCCS employees allowed the condition to persist without referral to a specialist. *Id*. ¶¶ 36–40.

After Ms. Cruz was finally transported to a rheumatologist on December 18, 2024, Wellpath and NYCCS allegedly failed to implement the specialist's treatment plan. *Id*. ¶¶ 42–45. Specifically, they failed to provide the immunosuppressant medication prescribed by the rheumatologist for forty-two days, failed to transmit laboratory results to the outside provider, and failed to schedule the recommended four-week follow-up appointment. *Id*. ¶¶ 42–46.

These allegations are tied to specific events, dates, and omissions occurring during Wellpath's contractual control of medical services at OCCF. Corporate liability under § 1983 does not require identification of each individual employee responsible for executing institutional policies; it requires plausible allegations that the entity's practices caused the deprivation. The SAC satisfies that standard.

### c.    The SAC separately pleads YesCare's post-January 1, 2025 conduct

The SAC likewise distinguishes the conduct of YesCare after it assumed responsibility for OCCF's medical services on January 1, 2025 and alleges that YesCare failed to ensure timely specialist follow-up, failed to implement recommended diagnostic testing, and failed to provide adequate discharge planning for Ms. Cruz despite knowledge of her worsening condition.

According to the SAC, YesCare employees failed to promptly schedule Ms. Cruz's

10

follow-up rheumatology appointment, resulting in a ten-week delay, ignored repeated attempts by her outpatient provider to expedite care, and failed to schedule the kidney biopsy recommended by the emergency room and rheumatologist. *Id.* ¶¶ 47–50. The SAC further alleges that YesCare provided Ms. Cruz with an insufficient supply of anticoagulation medication upon discharge despite knowledge of her dosing requirements and failed to ensure adequate discharge planning or continuity of care following her release. *Id.* ¶¶ 51–52.

Again, these allegations identify a specific corporate entity, a defined time period, specific treatment failures, and resulting harm.

### d. The claims against Orange County are properly pleaded under *Monell*

Finally, Plaintiff's claims against Orange County are properly pleaded under *Monell*. The SAC alleges that Orange County maintained and ratified a longstanding custom and practice of cost-driven delays, denial of specialist referrals, and systemic failures in medical care at OCCF. SAC ¶¶ 186–192. It further alleges that the County had repeated notice of medical deficiencies through investigative findings, grievances, public reporting, and prior litigation, yet continued to contract with providers whose policies resulted in constitutional violations. SAC ¶¶ 136–151.

These allegations describe the County's role as policymaker and contracting authority and plead that its customs were the moving force behind Plaintiff Cruz's injuries. That is precisely what *Monell* requires. *See Tieman v. City of Newburgh*, No. 13-CV-4178 KMK, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) (collecting cases).

## C. Plaintiff Ordonez Vargas States A Plausible Deliberate Indifference Claim

### 1. Ms. Ordonez Vargas pleads serious medical needs and actionable deprivations

11

Ms. Ordonez Vargas entered custody with multiple confirmed facial fractures, including a fractured nasal septum and bilateral comminuted nasal fractures. SAC ¶¶ 58–60. Her treating surgeon had already determined that corrective surgery was necessary and scheduled the procedure for October 5, 2023. *Id.* ¶ 60. Ms. Ordonez Vargas experienced persistent bleeding, severe pain, and airway obstruction, including complete occlusion of her right nasal passage. *Id.* ¶¶ 58–63. The existence of a pre-scheduled surgical procedure further underscores that medical providers were on clear notice that timely surgical intervention was medically necessary.

Courts have consistently held that bleeding facial fractures and breathing impairments present serious medical needs under the Fourteenth Amendment. *See Burns v. Cnty. of Rensselaer,* No. 02-CV-165, 2005 U.S. Dist. LEXIS 41743, at *34 (N.D.N.Y. Dec. 12, 2005); *Lasher v. City of Schenectady*, No. 02–CV–1395, 2004 WL 1732006, at *15–17 (N.D.N.Y. Aug. 3, 2004); *Farrow v. Dalman*, No. 97-3598, 1998 WL 879553, at *1 (7th Cir. Dec. 7, 1998).

Here, for approximately one week after entering OCCF, Ms. Ordonez Vargas received no meaningful examination or intervention for her visibly bleeding and fractured nose. SAC ¶¶ 72–74. Instead of arranging medical treatment, Defendants placed her in solitary confinement. *Id.* ¶¶ 68–77.

Even after medical staff confirmed the fracture, they failed to arrange timely surgical intervention or specialist referral. *Id.* ¶¶ 84–90. Delays in providing necessary surgical treatment may constitute deliberate indifference where the delay causes prolonged pain or permanent injury. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Despite Ms. Vargas Ordonez's repeated requests and identification of her surgeon, Defendants delayed treatment while claiming they were awaiting records. *Id.* ¶¶ 84–85. By the time she was released, no corrective surgery

12

had occurred, and her fractures had healed improperly, leaving her with persistent breathing impairment and likely permanent damage. *Id.* ¶¶ 98–99.

These allegations readily  satisfy the objective prong.

**2. Ms. Ordonez Vargas plausibly pleads that Defendants knew or should have known of substantial risk and failed to act with reasonable care**

First, Defendants were aware at intake that Ms. Ordonez Vargas had multiple facial fractures and was scheduled for surgery that same day. SAC ¶¶ 63–65. She informed ICE officials of her scheduled surgery and arrived carrying related medical documentation. These facts alone put Defendants on notice of the seriousness of her condition.

Second, her injuries were apparent. Ms. Ordonez Vargas was bleeding and in visible pain. *Id.* ¶¶ 63, 66–73. These were observable symptoms requiring prompt evaluation. *See McConville v. Montrym*, No. 3:15-cv-00967, 2016 WL 3212093, at *6–7 (N.D.N.Y. June 9, 2016) (finding plausible deliberate indifference where detainee displayed "telltale signs" of medical distress including vomiting, confusion, dizziness, impaired coordination, and trouble breathing).

Third, rather than secure medical intervention, Defendants placed her on suicide watch and in solitary confinement despite no history of suicide attempts. *Id.* ¶¶ 68–72. While she was in solitary confinement, language barriers were noted but not addressed in any meaningful way. *Id.* ¶¶ 67–69.

Fourth, over the course of multiple encounters, individual medical providers confirmed fracture and septal deviation but provided only minimal over-the-counter pain medication and did not arrange surgical correction. *Id.* ¶¶ 74–78, 91–93. Even after physical confirmation of structural damage, Defendants delayed action while purportedly awaiting outside records. *Id.* ¶¶

13

84–90.

The foreseeable consequence of delaying treatment for complex nasal fractures is improper healing and permanent impairment, precisely what occurred here. *Id.* ¶¶ 98–99.

These allegations plausibly show that Defendants knew or should have known that delaying treatment for confirmed facial fractures posed a substantial risk of serious harm. That is sufficient under *Darnell.*

**3. The SAC does not engage in impermissible group pleading with respect to Ms. Ordonez Vargas**

As with Plaintiff Cruz, Defendants' "group pleading" argument fails. The SAC identifies specific providers and describes their discrete conduct.

Defendant Washington prescribed only a single dose of Tylenol without conducting a meaningful examination. SAC ¶¶ 74–75. Defendant Zaccagnino confirmed the fracture on October 12, 2023, yet declined to look for the medical records that Ms. Ordonez Vargas had provided to ICE upon her surrender to custody. Instead, he sent medical release forms to various hospitals and awaited their response, delaying surgical care. *Id.* ¶¶ 84–89. Defendant Barone also interacted with Ms. Ordonez Vargas on October 12, 2023 and failed to provide medical care despite confirmation of her condition. *Id.* ¶ 86. Defendant Harkins signed documentation placing Ms. Ordonez Vargas on suicide watch despite noting language barriers. *Id.* ¶¶ 68–69. Defendant Piacente personally observed septal deviation and declined intervention. *Id.* ¶¶ 91–93.

These are date-specific encounters tied to named individuals. They are not undifferentiated allegations that fail to allege personal involvement. MTD at 10.

The SAC also pleads institutional failures during the period Wellpath and NYCCS provided medical services and separately alleges municipal liability against Orange County

14

under *Monell*. SAC ¶¶ 186–192. Corporate and municipal liability theories do not require identification of every administrative actor involved in scheduling appointments, retrieving records, or transmitting information between providers. *See, e.g., Arias v. East Hartford*, 2021 WL 3268846, at *4–6 (D. Conn. July 30, 2021) (recognizing that, in contexts where internal actions are controlled by defendants, precise attribution of each step is not required at the pleading stage).

Rule 8 requires fair notice, not discovery-level detail. Because the SAC pleads individualized conduct, defined timeframes, and distinct liability theories, dismissal on group pleading grounds is unwarranted.

**D. Dismissal of Plaintiffs' Deliberate Indifference Claims Is Premature**

As the Second Circuit has explained, the deliberate indifference inquiry is inherently fact-specific and rarely appropriate for resolution at the pleading stage. In *Chance v. Armstrong*, the Second Circuit illustrated the point succinctly: while a prisoner who "nicks himself shaving" does not have a constitutional right to medical treatment, officials who deliberately ignore "a five-inch gash on his cheek that is becoming infected" may violate the Constitution. 143 F.3d 698, 702 (2d Cir. 1998).

That principle governs here. Whether Defendants exercised reasonable medical judgment or acted with deliberate indifference depends on the facts and cannot be resolved on a Rule 12(b)(6) motion. *See id.* at 703.

15

II.    **PLAINTIFFS PLAUSIBLY PLEAD *MONELL* LIABILITY AGAINST ORANGE COUNTY AND THE CORPORATE MEDICAL PROVIDERS**

The SAC alleges that Plaintiffs' injuries were caused by systemic failures in the delivery of medical care at OCCF. Plaintiffs allege that Orange County and its contracted medical providers (Wellpath/NYCCS and later YesCare) implemented and tolerated practices that delayed necessary medical treatment, restricted specialist referrals, and disregarded outside medical directives. SAC ¶¶ 101–124, 186–192. At the pleading stage, these allegations are sufficient to state municipal and corporate liability under *Monell*.

A.  **Legal Standard**

To state a claim for municipal or corporate liability under *Monell*, a plaintiff must plausibly allege that a policy or custom attributable to the municipality or corporate contractor caused the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978). Such a policy may be shown through formal directives, persistent and widespread practices, or a policymaker's failure to remedy known constitutional violations. *See Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). ("A municipal policy may be pronounced or tacit and reflected in either action or inaction.")

In order to establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870-71 (2d Cir. 1992) (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *Krulik v. Bd. of Educ. of the City of N.Y.*, 781 F.2d 15, 23 (2d Cir. 1986)). In other words, there must be "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Jones v. Town of East Haven*,

16

691 F.3d 72, 82 (2d Cir. 2012); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (acknowledging that inaction may lead to municipal liability for the "persistent failure to discipline subordinates who violate civil rights" as it can "give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*").

At the pleading stage, a plaintiff need only allege facts that make the existence of such a policy or custom plausible. *See White v. City of New York*, 2015 WL 4601121, at *6 (S.D.N.Y. July 31, 2015). Detailed proof of the policy itself is not required before discovery; plaintiffs need only allege facts permitting a reasonable inference that the challenged conduct resulted from systemic practices rather than isolated acts. *See Johnson v. City of New York*, 2011 WL 1044852, at *11 (S.D.N.Y. Mar. 22, 2011).

B. **The SAC Plausibly Alleges a Systemic Policy of Delaying and Denying Necessary Medical Care**

Defendants argue that the SAC alleges nothing more than "a series of discrete incidents taking place over a long period of time insufficient to state a policy or custom of cost-cutting deficient medical care." MTD, at 24. That characterization misreads the complaint. The SAC pleads, in extensive detail, a pattern of prolonged delays (SAC ¶¶ 33–34, 48, 85, 89, 99), ignored specialist instructions (*id*. ¶¶ 42–43, 45–47, 90), worsening symptoms (*id*. ¶¶ 32, 34, 37, 39–40, 42, 45, 82), and diagnostic neglect. *Id*. ¶¶ 43, 90, 94. Plaintiff Cruz's initial outpatient rheumatology appointment was delayed for over a month, her four-week follow-up appointment took 10 weeks to schedule, and her nephrology referral was never scheduled despite clear evidence of kidney dysfunction—in addition to being deprived of critical lupus medication for forty-two days. *Id*. ¶¶ 26–27, 49–51. Plaintiff Ordonez Vargas likewise presented with a

17

confirmed fractured nose, persistent bleeding, difficulty breathing, and a physician's directive that surgery was required, yet Orange County provided nothing more than over-the-counter painkillers. *Id.* ¶¶ 64, 66–67, 77, 95–96). Both Plaintiffs' conditions deteriorated as a direct result of these delays.

These allegations are not limited to Plaintiffs' experiences. The SAC identifies numerous detainees who allegedly suffered severe medical neglect under the same system of care at OCCF. *Id.* ¶¶ 133-150. Taken together, these allegations plausibly describe a systemic custom or practice rather than isolated acts of negligence.

Courts routinely permit *Monell* claims against correctional healthcare providers based on allegations that cost-driven policies resulted in delayed or denied medical treatment. *See, e.g., Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) (denying a motion to dismiss a *Monell* claim, and noting, "if the evidence shows that the denial of Jones' surgery was part of a custom of denying medical procedures to pre-trial detainees who are soon to be transferred, the County might well be liable under *Monell*"); *Lehal v. Central Falls Detention Facility Corp.*, No. 13-cv-3923, 2016 WL 7377238, at *14 (S.D.N.Y. Nov. 21, 2016) (denying motion to dismiss where plaintiff alleged a policy of denying medical care in order to reduce costs); *Sanchez v. NY Correct Care Solutions Med. Servs.,* 2018 US Dist LEXIS 208864, at *30-31 (W.D.N.Y. Dec. 11, 2018) (denying dismissal of *Monell* claim against NYCC based on cost-cutting theory); *Tandel v. Cty. of Sacramento*, No. 2:11cv353 (MCE) (GGH), 2012 WL 602981, at *18-19 (E.D. Cal. Feb. 23, 2012) (denying a motion to dismiss a *Monell claim*, where the plaintiff alleged that "numerous Jail employees repeatedly denied or delayed his medical treatment" despite knowledge of his serious medical conditions, "weeks of complaints," and repeated requests for treatment).

18

The SAC also plausibly alleges that these systemic practices were the moving force behind Plaintiffs' constitutional injuries. *See Monell*, 436 U.S. at 694. Plaintiffs allege that the same practices described above–delayed access to specialists, failures to implement prescribed treatment, and disregard of outside medical directives–directly caused the deterioration of Ms. Cruz's lupus condition and damage to her kidneys, and, separately,  prolonged the denial of necessary surgical treatment for Ms. Ordonez Vargas's fractured nose, causing ongoing—and likely permanent—breathing difficulties and pain. SAC ¶¶ 45–52, 77, 90, 95–99, 186–192. These allegations permit the reasonable inference that the harms suffered by Plaintiffs were not the result of isolated clinical judgment but rather the predictable consequence of a medical system that routinely delayed and denied necessary care. At the pleading stage, that is more than sufficient to plausibly allege *Monell* liability.

C. **The SAC Plausibly Alleges County Knowledge of, and Responsibility for, the OCCF Medical System**

Defendant Orange County argues that Plaintiffs fail to plausibly allege municipal liability because medical care at OCCF was delivered by private contractors and the SAC does not adequately allege that a County policymaker was responsible for the challenged practices. MTD at 22–23. That argument misstates both the allegations in the complaint and the governing law.

1. **Orange County cannot avoid *Monell* liability by delegating medical care to contractors**

A municipality may not avoid its constitutional obligations to detainees by outsourcing medical services to private providers. As the Supreme Court recognized in *West v. Atkins*, 487 U.S. 42  (1988), the provision of medical care to incarcerated individuals is a traditional state function, and private physicians who contract with correctional facilities to provide such care act

19

under color of state law when performing those duties. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id.* at 56.

The same principle applies to municipal liability under § 1983: a county remains responsible for constitutional violations caused by the medical system it establishes for detainees, even when that system is operated by a contractor. Courts within this and other Circuits have repeatedly rejected the argument that a county escapes *Monell* liability simply because medical services are delivered by a private company. *See, e.g., Carter v. Broome Cnty.*, 394 F. Supp. 3d 228, 242 (N.D.N.Y. 2019) (finding that the county remained liable for any constitutional deprivations caused by the policies or customs of its private medical contractor); *McNeil v. Corr. Med. Care, Inc.*, 2019 WL 4415528, at *10 (N.D.N.Y. Sept. 16, 2019) (same); *Alvarado v. Westchester County*, 22 F. Supp. 3d, 218 (S.D.N.Y. April 24, 2014) ("Here, plaintiffs plausibly allege the County's deliberate indifference to the risk the Correct Care Defendants were providing constitutionally inadequate medical care at [Westchester County Jail], or its acquiescence in the provision of such treatment."); *see also Ancata v. Prison Health Servs. In*c., 769 F.2d 700 (11th Cir. 1984) (holding that Broward County could not relieve itself of liability for constitutional violations by contracting away, with private entities, the duty to provide medical care to inmates); *King v. Kramer,* 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services ... [t]he underlying rationale is not based on respondeat superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Black v. Allegheny Cty.*, 2014 WL 5493811, at *10 (W.D. Pa.

20

Oct. 30, 2014) (denying summary judgment to Allegheny County on a Monell claim where issues of fact remained to be tried on private medical contractor's policy or practice).

Here, the SAC plausibly alleges County responsibility for the medical system operating at OCCF. Plaintiffs allege that Orange County maintained and oversaw a jail medical system in which detainees routinely experienced prolonged delays in specialist referrals, failures to implement outside medical directives, and interruptions in necessary medication. SAC ¶¶ 33–52, 64–96, 101–124. The complaint further alleges that County officials were repeatedly placed on notice of deficiencies in detainee medical care through grievances, complaints, investigative reporting, and prior litigation concerning medical treatment at the facility. *Id.* ¶¶ 133–150.

Defendants' argument that the SAC fails to plausibly allege that the Sheriff is a final policymaker for the County with respect to medical care at OCCF misses the point. MTD at 22–23. Plaintiffs' claim here is that *the County* is liable for its contracting with YesCare, Wellpath and NYCC. And caselaw is clear that a county remains responsible for constitutional violations caused by the medical system it establishes for detainees, even when that system is operated by a contractor.

Further, while municipal liability may be established either through the acts of a final policymaker, it may also be established through a persistent and widespread practice that implies the constructive acquiescence of senior officials. *See Sorlucco v. New York City Police Department*, 971 F.2d 864, 870–71 (2d Cir. 1992); *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012). Here, the SAC alleges precisely such a pattern. Plaintiffs describe repeated delays in specialist referrals, failures to implement outside medical directives, interruptions in prescribed medication, and other deficiencies in medical care affecting detainees at OCCF. SAC ¶¶ 33–52, 64–96, 101–124. The complaint further alleges that officials responsible for operating

21

OCCF, were repeatedly placed on notice of these deficiencies through grievances, complaints, investigative reporting, and prior litigation concerning medical care at the facility. *Id.* ¶¶ 133–150. At the pleading stage, those allegations plausibly support the inference that the challenged practices persisted despite notice to County officials. That is sufficient to plausibly allege municipal liability under *Monell*.

> **2.  Orange County was aware of repeated instances of medical neglect by its medical providers and failed to take any steps to address those violations**

The SAC further alleges that Orange County was aware of the obviously deficient medical care provided by its corporate contractors. (SAC ¶¶ 188-190.) That is all that is necessary to establish the County's liability. *See, e.g., Carter v. Broome Cnty.*, 394 F.Supp.3d 228, 242 (N.D.N.Y., 2019) ("plaintiff's evidence also establishes that Sheriff Harder and/or Administrator Smolinsky, in their roles as policymakers for the Jail, possessed abundant knowledge about CMC's egregious misconduct").

The substandard medical care at OCCF has been documented in numerous reports and investigations, including a 2025 report by New York Lawyers for the Public Interest (SAC ¶ 135); at least three separate investigations by the New York State Commission on Correction in 2024 into deaths at the facility (SAC ¶ 136); a 2022 human rights complaint to the U.S. Department of Homeland Security (SAC ¶ 139); a 2017 Human Rights Watch Report  (SAC ¶ 141), and in numerous lawsuits by OCCF detainees (SAC ¶ 142–148).

Defendants argue that "unsubstantiated media reports and unrelated lawsuits" fail to support the existence of a policy or practice. MTD at 18, 23. Yet the fact that the deficiencies at OCCF are so widespread and pervasive that they were routinely documented and reported through grievances, investigative reporting, public findings, and prior civil rights litigation concerning medical treatment  (SAC ¶¶ 133–150) supports the Plaintiffs' allegation that

22

municipal officials were aware of ongoing constitutional violations yet failed to take corrective action.

Courts in the Second Circuit consider allegations from other lawsuits sufficient to allege a custom or practice under *Monell*. *See, e.g., Osterhoudt v. City of New York*, No. 10 CV 3173(RJD)(RML), 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012) ("While plaintiff's citations to pending lawsuits and settlement agreements will not suffice to overcome summary judgment ... they do permit a plausible inference of deliberate indifference") (internal quotations omitted); *White v. City of New York*, No. 13-CV-7421 (KPF), 2015 WL 4601121, at *6–9 (S.D.N.Y. July 31, 2015) (refusing to dismiss *Monell* claim because plaintiff sufficiently pled policy or custom by citing to DOJ Findings Letter and identifying past lawsuits with similar allegations); *Shepherd v. Powers*, No. 11 Civ. 6860(LTS), 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012) ("the steady stream of suits against the County alleging excessive use of force in the [Westchester County Jail]" added further credibility to the claims alleged in the complaint); *McCants v. City of Newburgh*, No. 14 Civ. 556(VB), 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (finding that the plaintiff's reference to other lawsuits demonstrated that the municipality "was on notice to the possible use of excessive force by its police officers on seventeen different occasions"). Here, there are ample additional allegations of a pattern of misconduct beyond the mere invocation of past lawsuits. *See*, *e.g.*, SAC ¶¶ 133-141 (listing investigations, news reports, legislator statements, and individual accounts of medical mistreatment).

Taken together, these allegations plausibly support the inference that the delays and denials of medical care experienced by Plaintiffs were not isolated incidents but manifestations of a systemic problem within a system overseen by the County and maintained with the

23

knowledge of County officials. At the pleading stage, that is more than sufficient to state a *Monell* claim.

D.  **The SAC Plausibly Alleges A *Monell* Claim Against the Corporate Defendants**

The same allegations independently support *Monell* liability against the corporate medical providers that operated the OCCF medical system.

Though government contractors "are not municipalities, conduct that is formally private may be so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action." *Alexander v. City of New York*, No. 24-CV-8084 (AS), 2025 WL 3640231, at *5 (S.D.N.Y. Dec. 16, 2025) (internal quotation marks omitted) (*quoting Rendell-Baker v. Kohn*, 457 U.S. 830, 847 (1982)). S*ee also Winkler v. Madison Cnty.*, 893 F.3d 877, 904 (6th Cir. 2018) ("A private entity ... that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function."); *Tutora v. Aramark Corr. Servs.*, 2022 WL 2237567, at *7 (S.D.N.Y. June 22, 2022) (holding that a prison food service provider "stepped into the shoes" of the county government and could be liable under *Monell*). Courts in this Circuit therefore routinely apply *Monell* principles to private companies that provide correctional medical services. *See, e.g., Sykes v. McPhillips*, 412 F. Supp. 3d 197, 207 (N.D.N.Y. 2019).

The SAC plausibly alleges that the deficiencies in medical care at OCCF were the product of systemic customs or practices implemented or tolerated by the corporate medical providers themselves. The customs and practices of Wellpath and YesCare resulted in prolonged untreated symptoms, worsening medical conditions, and the denial of necessary care to detainees including Plaintiffs Cruz and Ordonez Vargas. *Id*. ¶¶ 33–52, 64–96.

The NYCCS/Wellpath Defendants implemented a well-documented cost-containment

24

system directing staff to "consolidate offsite appointments" and attempt all "clinically appropriate interventions" before approving outside treatment. SAC ¶¶ 102–117. These directives functioned as a corporate custom that predictably delayed necessary care.

Defendant YesCare, which assumed responsibility for OCCF medical services on January 1, 2025, continued these practices. The deficiencies in medical care at OCCF under YesCare reflect a longstanding pattern of constitutionally inadequate care associated with YesCare and its predecessor, Corizon Health. SAC ¶¶ 118–131, 186, 188–89. Corizon has been sued hundreds of times for substandard correctional medical care—including more than 1,000 lawsuits by 2021 and over 1,300 wrongful-death and abuse claims. SAC ¶¶ 126–127. Investigative reporting and judicial findings likewise document systemic failures in facilities where Corizon provided care. SAC ¶¶ 128–131. These allegations support the inference that the denial of adequate medical care at OCCF resulted from systemic practices attributable to YesCare rather than isolated incidents.

The SAC describes recurring failures affecting multiple detainees across the OCCF medical system, including delayed access to specialists, failures to implement prescribed treatment, interruptions in medication, and diagnostic neglect. *Id.* ¶¶ 33–52, 64–96, 101–124, 126–131, 133–150. Taken together, these allegations plausibly describe systemic practices within the OCCF medical system rather than isolated incidents of negligence.

Courts routinely permit *Monell* claims against correctional medical contractors to proceed where plaintiffs allege patterns of delayed or denied care attributable to systemic practices within the facility's medical system. *See, e.g., Jones v. Westchester Cnty. Dep't of Corr.*, 557 F. Supp. 2d 408, 417 (S.D.N.Y. 2008); *Lehal v. Cent. Falls Det. Facility Corp.*, 2016 WL 7377238, at *14 (S.D.N.Y. Dec. 20, 2016); *Sanchez v. NY Correct Care Solutions Med. Servs.,* 2018 US Dist

LEXIS 208864, at *30-31 (W.D.N.Y. Dec. 11, 2018).

At the pleading stage, Plaintiffs are not required to prove the precise internal policy that produced these outcomes. It is sufficient to allege facts permitting the reasonable inference that detainees were subjected to recurring deficiencies in medical care arising from systemic practices within the OCCF medical system. *See Charles* 925 F.3d at 81–82 (holding that plaintiffs plausibly stated a Fourteenth Amendment claim where the complaint alleged systemic failures in medical care and the court must draw reasonable inferences in plaintiffs' favor). The SAC plausibly alleges exactly that.

### III.    PLAINTIFFS PROPERLY PLEADED THEIR STATE LAW CLAIMS

The SAC plausibly alleges state-law claims for negligence and gross negligence against Defendants Wellpath and YesCare, and claims for medical malpractice against the corporate defendants and Orange County.

#### A.  Legal Standard

To state a claim for negligence under New York law, a plaintiff must plausibly allege the existence of a duty, a breach of that duty, and injury resulting from the breach. *Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.*, 721 F. Supp. 2d 293, 299 (S.D.N.Y. 2010). It is well established that the State owes a duty to provide adequate medical care to individuals in its custody. *See Kagan v. State of New York*, 221 A.D.2d 7, 16 (2d Dep't 1996); *Lowe v. State of New York*, 35 A.D.3d 1281, 1282 (4th Dep't 2006).

New York law distinguishes between ordinary negligence and medical malpractice depending on the nature of the duty allegedly breached. Where the challenged conduct involves the exercise of medical judgment or is substantially related to the diagnosis, treatment, or care of

26

a patient, the claim is properly analyzed as medical malpractice. *See Bleiler v. Bodnar*, 65

N.Y.2d 65, 72–73 (1985). Courts applying this principle routinely treat claims concerning

diagnosis, medication management, and treatment decisions by medical professionals as

malpractice claims. S*ee Harrell v. New York State Department of Corrections and Community

Supervision*, No. 15-CV-7065, 2019 WL 3821229, at *18–19 (S.D.N.Y. Aug. 14, 2019).

Gross negligence requires conduct demonstrating a reckless disregard for the rights of

others or a failure to exercise even slight care. *See Food Pageant, Inc. v. Consol. Edison Co.*, 54

N.Y.2d 167, 172 (1981). Whether conduct rises to that level is ordinarily a question for the trier

of fact. *See Lubell v. Samson Moving & Storage, Inc.*, 307 A.D.2d 215, 216 (1st Dep't 2003).

**B. Plaintiffs Have Plausibly Alleged Negligence, Gross Negligence, and Medical Malpractice Under New York Law**

**1. Plaintiffs have plausibly alleged negligence and gross negligence against Wellpath and YesCare**

The SAC alleges that the corporate defendants and individual medical providers failed to

exercise reasonable care in the provision of medical services at OCCF. Plaintiffs allege that

Defendants ignored obvious medical conditions, delayed or refused necessary treatment, failed to

provide prescribed medication, failed to arrange outside medical care when clearly required, and

failed to prepare for continuity of care at discharge. SAC ¶¶ 178–181. For example, Wellpath

medical providers knew that Ms. Ordonez Vargas had suffered multiple facial fractures and had

been scheduled for corrective surgery, yet failed to ensure that she received appropriate

treatment. *Id.* ¶ 179. Likewise, Wellpath, and later, YesCare, knew that Ms. Cruz was

experiencing a lupus flare and deteriorating kidney function, yet delayed medication and delayed

or denied specialist care despite worsening symptoms. *Id.* ¶ 180.

These allegations go well beyond a mere disagreement with medical judgment. Plaintiffs

27

allege that Defendants failed to respond to known and serious medical conditions, failed to implement prescribed treatment, and permitted serious conditions to worsen despite obvious symptoms and documented medical need. Accepting those allegations as true, the SAC plausibly alleges that Defendants breached their duty to exercise reasonable care in providing medical services to detainees.

Moreover, Plaintiffs plausibly allege conduct that could rise to the level of gross negligence. The SAC describes repeated failures to respond to serious and worsening medical conditions, including ignoring obvious symptoms, delaying necessary treatment, and failing to provide prescribed medication. If proven, such conduct could demonstrate reckless disregard for Plaintiffs' health and safety. Whether Defendants' conduct ultimately rises to the level of gross negligence is a factual question that cannot be resolved on a motion to dismiss.

### 2. Plaintiffs have plausibly alleged malpractice against all Defendants

The SAC plausibly alleges that  Defendants failed to provide treatment for known medical conditions, delayed necessary medication, and failed to refer Plaintiffs for specialist care despite clear indications that such treatment was medically necessary. Courts routinely hold that allegations of delayed diagnosis, failure to provide prescribed medication, and failure to refer a patient for necessary treatment are sufficient at the pleading stage to state a claim for medical malpractice. *See Rennalis v. Alfredo*, 2015 WL 5730332, at *13 (S.D.N.Y. Sept. 30, 2015)(holding that plaintiff plausibly alleged medical malpractice at the pleading stage by alleging that correctional medical providers denied specialist care and diagnostic testing, causing continued pain, worsening condition, and hearing loss); *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) (holding that complaint adequately alleged malpractice where it plausibly tied the physician to the surgery and aftercare that allegedly deviated from

28

accepted medical practice and caused plaintiff's injuries.)

Defendants' attempt to characterize Plaintiffs' allegations as mere disagreements with medical judgment, MTD, at 6, 13 and 15, misstates the SAC. Plaintiffs do not allege a good-faith difference of medical opinion. Rather, they allege that Defendants ignored known medical conditions, failed to provide treatment that had already been identified as necessary, and failed to implement prescribed care. Those allegations plausibly state a departure from accepted medical practice.

C. **County and Corporate Medical Providers May Be Held Liable Under New York Law for the Negligent Acts of Their Employees and Agents**

New York law recognizes *respondeat superior* as a valid theory of liability for negligence actions against an employer. *See Judith M. v. Sisters Charity Hosp.*, 92 N.Y.2d 923, 933 (N.Y. 1999) ("The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of their employment. Pursuant to this doctrine, an employer may be liable when the employee acts negligently […] so long as the tortious conduct is generally foreseeable and a natural incident of employment"); *Rivello v. Waldron*, 47 N.Y.2d 297, 203 (N.Y. 1979) (same).

The SAC alleges that the individual medical providers were employees or agents of the corporate medical defendants and were acting within the scope of their duties while providing medical care to Plaintiffs at OCCF. SAC ¶¶ 174–181. The negligence and malpractice claims therefore plausibly state claims against the corporate medical defendants under principles of *respondeat superior*.

The SAC also plausibly alleges a medical malpractice claim against Orange County and the medical defendants based on their roles in providing and overseeing medical care at OCCF.

29

*See Fleming v. City of New York,* No. 18 Civ. 4866, 2019 WL 4392522, at \*19 (S.D.N.Y. Aug. 27, 2019).

Accepting the well-pleaded allegations as true, Plaintiffs have plausibly alleged that Defendants' departures from accepted standards of medical care caused Plaintiffs significant injury. The state-law claims should therefore proceed.

D. **Defendants' Procedural Challenges to the State-Law Claims Do Not Warrant Dismissal**

Defendants seek dismissal of Plaintiffs' state-law claims based on alleged defects relating to the notice-of-claim requirement, the statute of limitations, and the County's asserted lack of vicarious liability for the Sheriff. While the notice-of-claim issue as to Ms. Cruz may require dismissal at this stage, any such dismissal must be without prejudice. Defendants' remaining arguments do not warrant dismissal.

1. **Any dismissal based on the notice-of-claim issue must be without prejudice.**

Defendants argue that Plaintiff Cruz's state-law claims must be dismissed because her petition seeking leave to file a late notice of claim remains pending in state court. MTD at 29.

Dismissal at the pleading stage would serve little practical purpose. The federal claims in this case will proceed regardless of the state court's determination, and the factual development relevant to Ms. Cruz's state-law claims will substantially overlap with discovery on the federal claims. However, under these circumstances, courts routinely dismiss state-law claims without prejudice, permitting refiling if and when the state court grants leave to serve a late notice of claim. *See, e.g., Crippen v. Town of Hempstead,* 2009 WL 803117, at \*18 (E.D.N.Y. Mar. 25, 2009). This approach avoids premature adjudication while preserving the claims.

Accordingly, if the Court determines that dismissal is required pending the state court's decision, the dismissal should be without prejudice.

### 2. CPLR § 215(1) does not bar Plaintiffs' claims

Defendants next contend that Plaintiff Ordonez Vargas's claims are time-barred under CPLR § 215(1), which provides a one-year limitations period for actions against a sheriff or sheriff's deputies for acts performed in their official capacity. MTD at 30. That argument fails.

First, Plaintiffs' claims are directed primarily at the medical providers and corporate contractors responsible for delivering medical care at OCCF, including Wellpath, NY Correct Care, and YesCare. These defendants are medical providers, not sheriffs or deputy sheriffs, and claims against them are governed by the two-and-a-half-year limitations period applicable to medical malpractice under CPLR § 214-a.

Second, even as to the County, the conduct alleged in the SAC does not arise from the Sheriff's statutory custodial duties of keeping and supervising inmates, but from the provision of medical diagnosis and treatment by healthcare providers exercising independent professional judgment. The New York Court of Appeals has made clear that the statute applies only where the alleged liability is "coextensive with the liability against which a Sheriff must be bonded." *See Adams v. County of Rensselaer*, 66 N.Y.2d 725, 727 (1985). Thus, the one-year limitations period governs claims arising from the sheriff's custodial duties, such as safely keeping and supervising inmates, not claims arising from independent professional obligations.

The SAC alleges negligence and malpractice in the provision of medical care, including failures to diagnose, treat, prescribe medication, and arrange specialist referrals. SAC ¶¶ 178–181. Those allegations concern the exercise of professional medical judgment by healthcare providers responsible for treating detainees, not custodial or supervisory acts performed by

correction officers. New York courts have recognized that a jail physician owes an independent duty to exercise reasonable care in treating prisoners and that a county may be held vicariously liable for malpractice committed in the course of that treatment. *Douglas v. County of Oswego*, 151 Misc. 2d 239, 242 (Sup. Ct. Oswego Cnty. 1991).

Defendants reliance on *Saccone v. DuBois*, 18 CV 1312 (VB), 2018 WL 4356735 (S.D.N.Y. Sept. 12, 2018) is misplaced. In *Saccone*, the negligence claim arose from correction officers restraining the plaintiff with ankle shackles and securing him to a hospital bed while he remained in the Sheriff's custody. *Id.* at *5–6. The court applied CPLR § 215(1) because those allegations concerned custodial acts performed by correction officers in carrying out the Sheriff's duty to safely keep detainees. By contrast, Plaintiffs' claims arise from the alleged negligent provision of medical care by healthcare providers responsible for diagnosing and treating detainees. Accordingly, *Saccone* does not support application of § 215(1) to the claims alleged here.

Accordingly, CPLR § 215(1) does not render Plaintiffs' claims untimely.

### 3. The County may be held liable for the provision of medical care at OCCF

Defendants also argue that Orange County cannot be held liable for the acts of the Sheriff or deputies. MTD at 30. That argument misstates the nature of Plaintiffs' claims.

It is true that counties are generally immune from vicarious liability for the acts of sheriffs and deputy sheriffs unless the county has expressly assumed such liability by local law. *See Santiamagro v. County of Orange*, 226 A.D.2d 359, 359–60 (2d Dep't 1996). Relying on that principle, courts have dismissed negligence claims against counties where the claims were based *solely* on the conduct of sheriff's deputies. *See Saccone,* 2018 WL 4378165, at *6.

But Plaintiffs' claims do not seek to hold the County vicariously liable for the acts of

32

deputies. Instead, the SAC alleges that the County undertook responsibility for providing

medical care at OCCF through contracts with private medical providers and failed to ensure that

detainees received adequate medical treatment. SAC ¶ 171. The claims thus arise from the

County's own role in establishing and maintaining the medical system at OCCF. Accordingly,

the rule barring vicarious liability for the acts of sheriffs and deputies does not require dismissal

of Plaintiffs' state-law claims against the County.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

In the alternative, any dismissal should be without prejudice and with leave to amend.

Dated: March 20, 2026

Respectfully submitted,

_____

COHEN&GREEN P.L.L.C.
Elena L. Cohen
J. Remy Green
Regina Yu
Sarah Kunstler
1639 Centre Street
Suite 216
Ridgewood, NY 11385
t: (929) 888-9480
f: (929) 888-9457


GIDEON ORION OLIVER
277 Broadway
Suite 1501
New York, NY 10007
1825 Foster Avenue

33

Suite 1K
Brooklyn, NY 11230
718-783-3682 (o) 646-263-3495 (c)

National Police Accountability Project
Lauren Bonds*
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584

Eliana Machefsky*
2111 San Pablo Avenue
PO Box 2981
Berkeley, CA 94702
(314) 440-3505

*pro hac vice applications forthcoming

ATTORNEYS FOR PLAINTIFFS

34